UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC., AND VERMONT TRUCK & BUS ASSOCIATION, INC., <br><br> Plaintiffs, <br><br> -v- <br><br> G. STEVEN ROWE, in his official capacity as Attorney General of the State of Maine, <br><br> Defendant. | Case No. |

COMPLAINT
(INJUNCTIVE RELIEF SOUGHT)

NOW COME plaintiffs, the New Hampshire Motor Transport Association, the Massachusetts Motor Transportation Association, Inc., and the Vermont Truck & Bus Association, Inc., by and through their attorneys, Morrison & Foerster LLP and Jensen Baird Gardner & Henry, and for its Complaint state as follows:

1. This is an action, pursuant to 28 U.S.C. §§ 2201, 2202 and the Supremacy Clause of the United States Constitution, for declaratory and injunctive relief, seeking compliance by G. Steven Rowe, in his official capacity as Attorney General of the State of Maine, with 49 U.S.C. §§ 14501(c)(1) and 41713(b)(4), also known as the Federal Aviation Administration Authorization Act of 1994 (the "FAAAA").

2. Specifically, plaintiffs seek:

(a) a declaration that 22 M.R.S.A. §§ 1555-C(3)(A) and (C) are preempted by federal law under the FAAAA and the Supremacy Clause — because those provisions purport to regulate which "Delivery Services" can be utilized for shipping a Delivery Sale of Tobacco

sf-1558458

Products to a person in Maine, and what data Delivery Services must collect from shippers of such packages;

       (b)    a declaration that 22 M.R.S.A. § 1555-D is preempted by federal law under the FAAAA and the Supremacy Clause as applied to motor carriers and air/ground intermodal carriers — because that provision purports to regulate from whom and to whom such carriers may make a delivery of Tobacco Products in Maine; and

       (c)    a permanent injunction enjoining defendant from enforcing 22 M.R.S.A. §§ 1555-C(3)(A) and (C) altogether, and from enforcing 22 M.R.S.A. § 1555-D as against motor carriers and air/ground intermodal carriers.[1]

## JURISDICTION AND VENUE

3.    This action arises under the Constitution and laws of the United States, including the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2; and the FAAAA, 49 U.S.C. §§ 14501(c)(1), 41713(b)(4).  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1337(a) (Act of Congress regulating commerce).

4.    This is a proceeding for a declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201, 2202 and the Supremacy Clause.  This action presents an actual controversy within the Court's jurisdiction.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2), because the claims asserted in this Complaint are based on events occurring in this district, and defendant maintains offices and performs official duties within this district.

---

[1] Hereinafter, Me. Rev. Stat. Ann. tit. 22, § 1555-D and Me. Rev. Stat. Ann. tit. 22, §§ 1555-C(3)(A) and (C) are referred to collectively as the "Challenged Provisions."  The text of, and all citations to, the Challenged Provisions can be found in the Act of June 9, 2003, ch. 444, 2003 Me. Laws 444(regulating delivery and sales of tobacco products and preventing sales of tobacco products to minors).

## PARTIES TO THIS ACTION

6. Plaintiffs are the New Hampshire Motor Transport Association, the Massachusetts Motor Transportation Association, and the Vermont Truck & Bus Association, Inc. (collectively the "Carrier Associations").

7. The New Hampshire Motor Transport Association ("NHMTA") is a non-profit trade association that was founded in the 1930s. It has more than 350 members engaged in the commercial delivery of packages containing property. The NHMTA's mission includes to promote a motor transport system that will serve the citizens of New Hampshire reliably, efficiently, safely, and economically; serve as a spokesperson for motor transport before federal, state, and municipal governmental bodies; communicate the mission of motor transport to the general public through media and personal appearances; foster the principles of the Association through promotion of its services that may enhance the operation of its participating members; encourage cooperation, courtesy, and safety among highway users; and encourage construction and maintenance of safe and adequate highways. The Challenged Provisions explicitly affect the services of those of the NHMTA's delivery service members that are, have been, and/or desire to be engaged in the transportation of tobacco products to consignees in Maine, among other states.

8. The Massachusetts Motor Transportation Association, Inc. (the "MMTA"), which was founded in 1919, is a non-profit trade association that has more than 300 members engaged in the commercial delivery of packages containing property. The MMTA's mission includes to foster, develop, encourage, and promote the business of motor carrier transportation through the sound, economical, safe and efficient operations of its members; to encourage, maintain, and promote the inherent advantages of safe, and efficient highway transportation; to foster and maintain just and lawful trade practices in the motor carrier business and related businesses; and to strive for and encourage uniformity in motor carrier business practices and reciprocity among states with respect thereto. The Challenged Provisions explicitly affect the services of those of the MMTA's delivery service members that are, have been, and/or desire to be engaged in the transportation of tobacco products to consignees in Maine, among other states.

9.  Founded in 1928, the Vermont Truck & Bus Association, Inc. ("VTBA") is a non-profit trade association that has more than 250 members. The VTBA's purposes include promoting the business of motor carrier transportation; enhancing the industry's efficiency, productivity, and competitiveness; and promoting highway safety. Its members operate truck fleets ranging from family-owned trucking businesses based in Vermont to large enterprises headquartered elsewhere. Most of its trucking members are engaged in the commercial delivery of packages containing property. These members include interstate package carriers, such as United Parcel Service and Federal Express, as well as truckload carriers, and regional carriers. The Challenged Provisions explicitly affect the services of those of the VTBA's delivery service members that are, have been, and/or desire to be engaged in the transportation of tobacco products to consignees in Maine, among other states.

10. The Carrier Associations have standing to bring suit on behalf of their members because their ground and air/ground intermodal carrier members otherwise would have standing to sue in their own right; the interests that the Carrier Associations seek to protect are germane to the Carrier Associations' purposes; and neither the claims asserted nor the prospective relief requested requires the participation of individual carrier members in the lawsuit. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

11. Defendant G. Steven Rowe is sued in his official capacity as the Attorney General of the State of Maine. Under subsection 8 of 22 M.R.S.A. §1555-C, and subsection 3 of 22 M.R.S.A. § 1555-D, the Attorney General is responsible for enforcement of the Challenged Provisions by seeking injunctive relief, fines, penalties, and equitable relief.

**GENERAL ALLEGATIONS**

12. The trucking industry is an essential component of the American economy. Americans and the American economy benefit from the cargo shipped by truck every day, including electronic equipment, shoes and clothing, agricultural goods, petroleum products, and machine parts. Trucks carry approximately 60% of the nation's domestic freight. In 1997 (the date of the last economic census), for-hire motor and air carriers transported more than 3.5

billion tons of goods, valued in excess of $4 trillion. The trucking industry's annual contribution to the gross domestic product is more than $260 billion.

13. Due to the popularity of the Internet, home shopping networks, mail-order catalogues, and various forms of "e-commerce," a significant portion of the retail transactions across the United States now takes place via direct sales transactions in which businesses and consumers communicate through the Internet, telephone, facsimile, or mail. A corresponding portion of the business of cargo carriers — including the Carrier Associations' members — is devoted to transporting and delivering the goods purchased in such transactions. These direct sales operations depend on interstate cargo carriers to transport and deliver the goods they sell; the carriers, in turn, depend on these operations for a significant portion of their business.

### A. The Challenged Provisions Of The Maine Statute.

14. Although the United States Congress has mandated that carriers be subject exclusively to uniform federal laws in providing transportation and delivery services, Maine has enacted legislation that impermissibly regulates the manner in which carriers provide service. On June 9, 2003, Maine enacted Public Law 444, "An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors," which became effective on September 13, 2003 (the "Statute"). In relevant part, it enacted 22 M.R.S.A. sections 1555-C and 1555-D.

15. In relevant part, 22 M.R.S.A. §1555-C ("Delivery Sales Of Tobacco Products") provides as follows:

> (3) **Requirements For Shipping A Delivery Sale**. The following provisions apply to a tobacco retailer shipping Tobacco Products pursuant to a Delivery Sale.
>
> (A) Prior to shipping, the tobacco retailer shall provide to the Delivery Service the age of the purchaser …
>
> ….
>
> (C) The tobacco retailer shall utilize a Delivery Service that imposes the following requirements:
>
> (1) the purchaser must be the addressee;

5

sf-1558458

> (2) the addressee must be of legal age to purchase tobacco products and must sign for the package; and
>
> (3) if the addressee is under 27 years of age, the addressee must show valid government-issued identification that contains a photograph of the addressee and indicates that the addressee is of legal age to purchase tobacco products.

Elsewhere, the Statute defines the term "Delivery Service" to mean "a person, including the United States Postal Service, who is engaged in the commercial delivery of letters, packages or other containers." 22 M.R.S.A. § 1551(1-C). The Carrier Associations' members qualify as "Delivery Services" under the Statute. The Statute also defines a "Delivery Sale" as "a sale of tobacco products to a consumer in this state when … the tobacco products are delivered by use of a delivery service." 22 M.R.S.A. § 1551(1-B). Under Maine law, the term 'tobacco products' "includes any form of tobacco and any material or device used in the smoking, chewing or other form of tobacco consumption, including cigarette papers and pipes." 22 M.R.S.A. § 1551(3).

16. Thus, to lawfully be utilized to deliver packages containing tobacco products to an address in Maine, a carrier must:

- receive information from the shipper as to the purchaser's age;
- require that Maine-bound packages containing tobacco products be addressed to the purchaser;
- require that such purchasers be of legal age to purchase tobacco products;
- require that addressees of such packages personally sign for the package; and
- where the purchaser is indicated to be age 18 through 26, require that the purchaser show a valid government-issued photo-identification indicating that the purchaser is at least 18 years old.

17. Subsection (8) of 22 M.R.S.A. § 1555-C enables the Attorney General to enforce these provisions against tobacco retailers in district court or superior court, and to seek injunctive relief, fines, penalties and equitable relief for any violation. In addition, a violation of these

provisions is considered a violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A.

18. In relevant part, 22 M.S.R.A §1555-D ("Illegal Delivery of Tobacco Products") provides as follows:

> A person may not knowingly transport or cause to be delivered to a person in this state a Tobacco Product purchased from a person who is not licensed as a tobacco retailer in this state, except that this provision does not apply to the transportation or delivery of Tobacco Products to a licensed tobacco distributor or tobacco retailer. A person is deemed to know that a package contains a tobacco product if the package is marked in accordance with the requirements of Section 1555-C, Subsection 3, Paragraph B or if the person receives the package from a person listed as an unlicensed tobacco retailer by the Attorney General under this Section.

19. Thus, complying with the plain terms of section 1555-D requires a carrier making deliveries in Maine:

- to determine whether the shipper of each package traveling to Maine is on the Attorney General's list of known unlicensed tobacco retailers; and
    - then, for any such package, either to prevent the package from being delivered, or
    - to deliver it only after consulting the Attorney General's list of licensed tobacco retailers and determining that the recipient is either a licensed retailer or a licensed distributor;
- to examine each package traveling to Maine to determine whether it is marked as containing tobacco products; and
    - then, for any such package, to consult the Attorney General's lists of licensed tobacco retailers and distributors to determine whether the shipper or addressee is licensed either as a tobacco retailer or a tobacco distributor in Maine; and
    - if not, then to prevent the package from being delivered;
- to determine whether, even if not marked as containing tobacco products, the carrier knows that the package contains tobacco products; and
    - then, for any such package, to consult the Attorney General's lists of licensed tobacco retailers and distributors to determine whether the shipper or addressee is licensed either as a tobacco retailer or a tobacco distributor in Maine; and
    - if not, then to prevent the package from being delivered.

20. Subsection(2)(A) of 22 M.R.S.A. § 1555-D provides that a person who violates § 1555-D commits a civil violation for which a fine of not less than $50 nor more than $1500 may be adjudged for each violation. Subsection(2)(B) of 22 M.R.S.A. § 1555-D provides that the employer of a person who, while working and within the scope of that person's employment, violates § 1555-D commits a civil violation for which a fine of not less than $50 nor more than $1500 may be adjudged for each violation.

21. Subsection (3) of 22 M.R.S.A. § 1555-D enables the Attorney General to enforce these provisions against carriers in district court or superior court, and to seek injunctive relief, fines, penalties and equitable relief for any violation. In addition, a violation of these provisions is considered a violation of the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A.

22. Except as set forth above, the Carrier Associations expressly do not challenge 2003 Public Law 444, or its enactment and/or amendment of 22 M.R.S.A. §§ 1551, 1555-C, and 1555-D. Those unchallenged provisions regulate purchasers and retailers of tobacco product delivery sales in a manner that does not relate to the carriers' prices, routes, or services.

### B. Maine's Regulation Of, And Prohibition Of Delivery By, Carriers.

23. On August 28, 2003, the Tobacco Enforcement Coordinator of the State of Maine Office of the Attorney General, sent a letter addressed "Dear Delivery Service" to various carriers doing business in Maine, including members of the Carrier Associations. The letter informs carriers that "Maine has enacted a new law that affects delivery of tobacco products" and "regulates delivery sales of tobacco products" to consumers in Maine." The letter explains that: "Delivery services are prohibited from delivering tobacco products to consumers in Maine unless purchased and shipped from a licensed tobacco retailer." It further informs carriers that they "must only accept shipments from retailers licensed by the Maine Department of Human Services," and encloses "a list of known unlicensed and licensed tobacco retailers." The letter notes that "[i]llegal delivery of tobacco products is a civil violation," subject to fines, and that under the Maine Unfair Trade Practice Act, the State may "obtain a court order enjoining a

8

delivery service from delivering tobacco products to Maine consumers." Finally, the letter states: "We expect full compliance with this law."

### C. The Preempting Federal Statute.

24.     The United States Congress enacted the FAAAA effective January 1, 1995.  The FAAAA provides in relevant part that "a State . . . *may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service*" of any motor carrier, or intermodal air/ground carrier with respect to the transportation of property.  49 U.S.C. § 14501(c)(1) (relating to motor carriers) (emphasis added); 49 U.S.C. § 41713(b)(4)(A) (relating to air and intermodal air/ground carriers) (emphasis added).

25.     In enacting the FAAAA, Congress expressly found that the regulation of intrastate transportation of property by the states had "imposed an unreasonable burden on interstate commerce; [and] impeded the free flow of trade, traffic, and transportation of interstate commerce."  FAAAA, Pub. L. No. 103-305, tit. VI, § 601(a)(1), 108 Stat. 1569, 1605 (1994).  Through the FAAAA, Congress sought to ensure that interstate carriers are able to provide service subject exclusively to a uniform body of federal law, and not by a "patchwork" of individual states' laws and regulations.  H.R. Conf. Rep. No. 103-677, § 601, at 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1759.  Congress thereby intended to remove obstacles to "national and regional carriers attempting to conduct a standard way of doing business."  *Id*.  Congress specifically identified restrictions on "types of commodities carried" as one of the forms of state regulation eliminated by the FAAAA.  *Id*. at 86, *reprinted in* 1994 U.S.C.C.A.N. at 1758.

26.     Interpreting the air and intermodal carrier provision of the FAAAA, 49 U.S.C. § 41713, the United States Court of Appeals for the First Circuit has held that the FAAAA has a "broad reach," such that "[s]tate laws and regulations 'having a connection with or reference to' an air carrier's prices, routes or services are preempted." *United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 335 (1st Cir. 2003).  As the court held: "A sufficient nexus exists if the

9

sf-1558458

law expressly references the air carrier's prices, routes or services, or has a 'forbidden significant effect' upon the same." *Id*. (citation omitted).

27. In *Flores-Galarza*, the First Circuit held that the FAAAA preempted a Puerto Rico "statutory regime that prohibits an interstate air carrier from delivering any package unless the carrier first provides proof that the package's addressee has paid the appropriate excise tax, or the carrier prepays the amount of the tax on the addressee's behalf." *Id*. at 325. The court held that "[t]he challenged scheme both refers to and has a forbidden significant effect on [the plaintiff carrier's] prices, routes or services." *Id*. at 335.

28. Like the Challenged Provisions here, one aspect of the statutory scheme held preempted in Puerto Rico made certain deliveries unlawful. The court specifically held that the Puerto Rico statute that "forbids delivery unless and until a recipient produces a certificate from the Secretary . . . significantly affects the timeliness and effectiveness of [the plaintiff carrier's] service" and was preempted. *Id*. at 335-36.

29. Also like the Challenged Provisions here, one aspect of the statutory scheme held preempted in Puerto Rico required carriers to take certain steps before they could make deliveries. The court specifically held that "the prepayment mechanism imposes extensive requirements that must be met before a carrier may make a lawful delivery," which imposed "a substantial burden on [the plaintiff carrier], in the form of additional labor, costs, and delays" and was preempted. *Id*. at 336.

### D. The Challenged Provisions' Relation To Carriers' Services, Routes, And Prices.

30. The broad preemptive scope of the FAAAA precludes the enactment and enforcement of state laws related to carriers' services. Subsections (3)(A) and (3)(C) of section 1555-C violate that mandate because they expressly refer to and, indeed, regulate the manner in which carriers must operate in order to lawfully be utilized to transport Maine-bound packages containing tobacco products. Likewise, section 1555-D violates that mandate because it

expressly refers to and, indeed, regulates the manner in which carriers must operate to avoid civil liability in transporting Maine-bound packages containing tobacco products.

31.   Based on their express terms, the Challenged Provisions also have a significant effect on carriers' services.  In order to comply with the Challenged Provisions, carriers have to devise and implement systems and procedures to:

(a) recognize when a Maine-bound package is indicated to contain tobacco products;

(b) determine whether the shipper of such packages is licensed in Maine as a tobacco retailer, and if the shipper is not so licensed, determine whether the addressee is licensed in Maine as a tobacco distributor or a tobacco retailer;

(c) for such packages, receive information about an addressee's age, and keep that information tied to the package as it moves through the carrier's system;

(d) require such packages to be delivered only to the named addressee (instead of to a mail room attendant, receptionist, or adult in a home);

(e) perform an identification check, when required for such packages;

(f) obtain a signature from the addressee of such packages; and

(g) make provisions for any such packages that the carriers determine cannot lawfully be delivered under the Maine Statute.

In addition, to comply with the Challenged Provisions, carriers have to devise and implement systems and procedures to:

(h) recognize when a Maine-bound shipment is from a shipper on the Attorney General's list of known unlicensed tobacco retailers;

(i) determine whether the addressee of such packages is licensed in Maine as a tobacco distributor or a tobacco retailer; and

(j) make provisions for any such packages that the carriers determine cannot lawfully be delivered under the Maine Statute.

11

sf-1558458

32. As Congress expressly intended, *see* H.R. Conf. Rep. No. 103-677, at 87, *reprinted in* 1994 U.S.C.C.A.N. at 1759, motor and intermodal carriers of property rely on the efficiencies of uniform procedures to provide their transportation and delivery services within and among the 50 states. Carriers' operations are engineered to provide speed, reliability, and efficiency. In large part, they depend on uniformity — that is, repetition of the same processes and procedures for all packages regardless of their destination. Such uniformity allows superior, reliable services to shippers and their consignees, and is essential in a highly competitive industry with numerous competitors, including the United States Postal Service.

33. In order to comply with the Challenged Provisions, and lawfully be utilized by tobacco retailers, carriers are prevented from employing their uniform procedures for Maine-bound packages. This disruption in uniformity does and will have a significant effect on the manner, timeliness, and effectiveness of the carriers' services, and on carriers' routes and prices.

34. For example, 22 M.R.S.A. § 1555-C(3)(C)(2) requires that Maine-bound packages containing tobacco products be delivered personally to the purchaser/addressee. However, carriers typically complete a delivery by transporting a package to the recipient's address, not to a particular person at that address. Even where carriers offer a service to obtain a delivery signature, typically that signature can be obtained from any person (or, where specified, any adult) at the delivery address. Thus, carriers routinely deliver signature-required packages to persons such as business receptionists, mail room attendants, and stay-at-home parents. Requiring delivery of such packages only to the specific addressee would preclude such routine practices, and would force carriers to alter their manner of delivering packages. Delivery drivers will have to spend extra time at each stop while attempting to locate the addressee. The requirement places burdens on carriers comparable to those faced by process servers — burdens that high-volume cargo carriers are ill-equipped to handle. This requirement also has a significant effect on carriers' routes, by forcing them to reroute packages back to the carriers' facilities, make multiple delivery attempts, and, in some cases, reroute a package back to the sender, if the addressee cannot be located.

35. Similarly, carriers have to create procedures to identify, segregate, and separately process Maine-bound packages containing tobacco products. Potentially *every* Maine-bound package has to be inspected for markings indicating a tobacco product. Every package so identified has to be researched to determine the licensing of its shipper, and possibly its addressee. Carriers also have to create procedures to identify and process packages shipped by retailers on the Attorney General's list of known unlicensed tobacco retailers. Finally, carriers have to create procedures for packages that cannot lawfully be delivered to the addressee, or for which the addressees are not available for signature.

36. Implementing these procedures has a significant effect on carriers' costs (including labor), and therefore they are related to carriers' prices.

37. Faced with the burdens and disruptions on their uniform services imposed by the Challenged Provisions, some carriers may terminate all deliveries of tobacco products to Maine. The resulting termination of that service plainly is a significant effect on carriers' services.

38. Since carriers have to undertake special procedures for deliveries to Maine, the Challenged Provisions have the potential of slowing down the delivery of *all* packages destined for Maine — not merely those packages that are marked as or known to contain tobacco products. The myriad efficiencies that come from a uniform system of delivery, and the attendant benefits to consumers, will be lost.

## COUNT ONE – SUPREMACY CLAUSE
## (FAAAA PREEMPTION)

39. Plaintiffs incorporate by reference all of the foregoing paragraphs as though set forth fully herein.

40. The United States Constitution gives Congress the power to enact the "supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, § 3, cl. 2.

13

sf-1558458

41.     An actual controversy exists among the parties in that carriers have to meet the requirements of 22 M.R.S.A. § 1555-C in order to lawfully be utilized to deliver Maine-bound packages containing tobacco products, and have to comply with the requirements of 22 M.R.S.A. § 1555-D, and carriers contend that, pursuant to the Supremacy Clause, the FAAAA preempts enforcement of the Challenged Provisions.

42.     Plaintiffs' members fear the civil penalties and enforcement actions authorized under 22 M.R.S.A. §§ 1555-D(2) and (3), and the loss of business from compliant retailers, if they fail to comply with the obligations directly and indirectly imposed by 22 M.R.S.A. § 1555-C.

43.     The State has notified delivery services of the new law and warned them that "[i]llegal delivery of tobacco products is a civil violation, punishable by a fine of up to $1500," and that the State may obtain a court order "enjoining a delivery service from delivering tobacco products to Maine consumers."  The threat that this preempted law will be enforced against the Carrier Associations' members is an irreparable harm that makes injunctive relief appropriate.  In addition to the imminent enforcement of the Challenged Provisions, their unconstitutionality itself reinforces the irreparable harm carriers face.

44.     The harm is irreparable for the additional reason that the Eleventh Amendment to the United States Constitution bars an award of retrospective monetary damages against the State or the individual defendant acting in his official capacity.

45.     Plaintiffs are entitled to injunctive relief against enforcement of the Challenged Provisions because their members are and will continue to suffer irreparable harm from enforcement of the challenged provision of the Statute.

**COUNT TWO - 28 U.S.C. §§ 2201, 2202**

**(DECLARATORY RELIEF)**

46.     Plaintiffs incorporate by reference all of the foregoing paragraphs as though set forth fully herein.

47.     Plaintiffs bring this cause of action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, to obtain a declaration of their members' rights with respect to the Challenged Provisions of the Maine Statute.

48.     As alleged above, an actual controversy has arisen and now exists within the meaning of 28 U.S.C. § 2201, as to whether the Challenged Provisions are preempted by the FAAAA pursuant to the Supremacy Clause of the United States Constitution.

49.     The Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant declaratory relief under 28 U.S.C. § 2201.

WHEREFORE, plaintiffs respectfully request:

(a)     a declaration that 22 M.R.S.A. §§ 1555-C(3)(A) and (C) are preempted by federal law under the FAAAA and the Supremacy Clause;

(b)     a declaration that 22 M.R.S.A. § 1555-D is preempted by federal law under the FAAAA and the Supremacy Clause;

(c)     a permanent injunction enjoining defendant from enforcing 22 M.R.S.A.§ 1555-C(3)(A) and (C) altogether, and from enforcing 22 M.R.S.A. § 1555-D as against motor carriers and air/ground intermodal carriers;

(d)     an order granting plaintiffs the costs incurred to bring forth this Complaint; and

(e)     such other and further relief as this Court may deem appropriate under law and equity.

Dated: October 10, 2003

        PAUL T. FRIEDMAN
        RUTH N. BORENSTEIN
        LAWRENCE R. KATZIN
        MORRISON & FOERSTER LLP
        425 Market Street
        San Francisco, CA  94105-2482
        Telephone:  (415) 268-7000

        MICHAEL A. NELSON
        JENSEN BAIRD GARDNER & HENRY
        10 Free Street
        P.O. Box 4510
        Portland, ME 04112-4510
        Telephone: (207) 775-7271


        By: /s/
                Michael A. Nelson

        Attorneys for Plaintiffs
        NEW HAMPSHIRE MOTOR TRANSPORT
        ASSOCIATION, MASSACHUSETTS MOTOR
        TRANSPORTATION ASSOCIATION, INC., and
        VERMONT TRUCK & BUS ASSOCIATION, INC.