UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC., AND VERMONT TRUCK & BUS ASSOCIATION, INC.<br><br>                              Plaintiffs,<br><br>                   -v-<br><br>G. STEVEN ROWE, in his official capacity as Attorney General of the State of Maine,<br><br>                              Defendant. | Case No.  1:03-cv-178-DBH |

**APPENDIX OF UNPUBLISHED CASES CITED IN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENTAND PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

sf-1581883

## INDEX OF AUTHORITIES

### CASES

*Minott v. Smith*, 03-10-P-H, 2003 U.S. Dist. LEXIS 15574 (D. Me. Sept. 5, 2003)

*Soly v. United Parcel Serv., Inc.*, No. 02-CV-10499-MEL, 2002 U.S. Dist. LEXIS 24059 (D. Mass. Aug. 22, 2002)

### NEW YORK STATUTES

N.Y. Pub. Health Law § 1399-ll

### LEGISLATIVE MATERIALS

H.R. 2422, 80th Leg., Reg. Sess. (Kan. 2003)

S. 67, 183d Gen. Ct., Reg. Sess. (Mass. 2003)

sf-1581883

LEXSEE 2003 US DIST LEXIS 15574

**KATHY POULIS MINOTT, as personal representative of the estate of CARLYLE POULIS MINOTT, Plaintiff v. DAVID W. SMITH, Defendant**

Civil No. 03-10-P-H

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE

*2003 U.S. Dist. LEXIS 15574*

**September 5, 2003, Decided**

**DISPOSITION:** **[*1]** Motion to construe was granted, motion to strike was granted in part and denied in part, and recommend that defendant's motion for summary judgment be granted and that of estate be denied.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For KATHY POULIS MINOTT: CAROLYN M. LATTI, LATTI & ANDERSON LLP, BOSTON, MA, LEAD ATTORNEY. DAVID J. BERG, LATTI & ANDERSON LLP, BOSTON, MA, LEAD ATTORNEY.

For DAVID W SMITH, Defendant: MARK E. DUNLAP, NORMAN, HANSON & DETROY, PORTLAND, ME, LEAD ATTORNEY.

**JUDGES:** David M. Cohen, United States Magistrate Judge.

**OPINIONBY:** David M. Cohen

**OPINION:**

*RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MEMORANDUM DECISION ON ANCILLARY MOTIONS*

Plaintiff Kathy Poulis Minott, in her capacity as personal representative of the estate of Carlyle Poulis Minott ("Estate"), moves for partial summary judgment, and defendant David W. Smith cross-moves for summary judgment as to all claims against him, in this action arising from the sinking of the F/V KATINA ASHLEY ("Vessel") and the death of its captain, Carlyle Poulis Minott. *See* Plaintiff's Motion for Partial Summary Judgment on the Issues of Liability, Comparative Negligence **[*2]** and the Primary Duty Rule Defense ("Plaintiff's S/J Motion") (Docket No. 5); Defendant's Objection to Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross Motion for Summary Judgment ("Defendant's S/J Motion") (Docket No. 9) at 1, 15.

Ancillary to these motions, the Estate moves to exclude certain testimony of Smith's experts and to strike portions of their affidavits, while Smith requests that the court construe his memorandum filed in opposition to the Estate's motion for summary judgment to include arguments relating to his primary-duty-rule defense. *See* Plaintiff's Motion To Exclude Various Opinions of Defendant's Experts ("Motion To Exclude") (Docket No. 13); Plaintiff's Motion To Strike Portions of Defendant's Affidavits in Support of His Cross Motion for Summary Judgment ("Motion To Strike") (Docket No. 19); Defendant's Motion To Have the Court Consider Its Argument in Opposition to Plaintiff's Motion for Partial Summary Judgment To Include Opposition to the Plaintiff's Primary Duty Rule Argument ("Motion To Construe") (Docket No. 25). The Motion To Construe is granted without objection, the Estate having filed no response. *See* Loc. R. 7(b). For the **[*3]** reasons that follow, I grant in part, deny in part and in part defer decision on the Motion To Exclude, grant in part and deny in part the Motion To Strike, and recommend that the court grant Smith's motion for summary judgment and deny that of the Estate.

**I. Summary Judgment Standards**

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material

Case 1:03-cv-00178-DBH   Document 5-5   Filed 10/15/03   Page 4 of 20

Page 2
2002 U.S. Dist. LEXIS 15574

fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp., 261 F.3d 90, 93-94 (1st Cir. 2001)* (quoting *McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995))*.

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* **[*4]** In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000).* Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)* (citation and internal punctuation omitted); *Fed. R. Civ. P. 56(e).* "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel, 260 F.3d 27, 31 (1st Cir. 2001)* (citation and internal punctuation omitted).

To the extent that parties cross-move for summary judgment, the court must draw all reasonable inferences against granting summary judgment to determine whether there are genuine **[*5]** issues of material fact to be tried. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth., 972 F.2d 426, 429 (1st Cir. 1992).* If there are any genuine issues of material fact, both motions must be denied as to the affected issue or issues of law; if not, one party is entitled to judgment as a matter of law. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2720, at 336-37 (1998).

## II. Factual Context

I address at the outset the Estate's motions to strike and to exclude, which partly define the boundaries of facts cognizable on summary judgment.

### A. Motion To Exclude

I grant in part, deny in part and in part defer decision on the Motion To Exclude, as follows:

**Point A.** Opinion of expert David DuBois that the verbal agreement between Smith and Minott was a "bareboat charter" agreement: **Granted.** "It is black-letter law that it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997)* (citations and internal punctuation omitted). In keeping with this principle, "the question **[*6]** of interpretation of [a] contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." *Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir. 1977)* (citation and internal quotation marks omitted). *See also, e.g., North Am. Specialty Ins. Co. v. Myers, 111 F.3d 1273, 1281 (6th Cir. 1997)* ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible.") (citation and internal quotation marks omitted).

**Point B.** DuBois' opinion that the Vessel was struck by another vessel: **Denied.** This opinion is not so unreliable and speculative as to be excludable pursuant to *Daubert v. Merrell Dow Pharms., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999).* Based on the timing and location of the Vessel's EPIRB n1 distress signals and the retrieval of one of its survival suits in a location where it would not have been taken by the prevailing winds and currents had it been **[*7]** drifting in the apparent vicinity of the Vessel's loss, DuBois drew a reasonable inference that the Vessel was struck and dragged by a larger vessel, the larger vessel made some erratic movements, the EPIRB was ditched approximately fourteen miles from the accident site and the survival suit was towed or inadvertently dragged until it came loose and drifted ashore on Cape Cod. *See* Letter dated May 14, 2003 from David C. DuBois to Mark E. Dunlap, Esq. ("DuBois Report"), attached as Exh. B to Motion To Exclude, at 3-4; *see also generally* Affidavit of David DuBois ("DuBois Aff.") (Docket No. 14).

---

n1 An "EPIRB" is an Emergency Position Indicating Radio Beacon. *See Reber v. United States, 951 F.2d 961, 965 (9th Cir. 1991).*

---

The fact that one can conjur up other plausible explanations for the Vessel's loss, *see* Motion To

Exclude at 4-5, does not undermine the reliability of the DuBois opinion, *see, e.g., Pace v. Insurance Co. of N. Am.,* 838 F.2d 572, 577-78 (1st Cir. 1988) **[*8]** (upholding district court's ruling permitting defense expert to testify as to his theory of cause of vessel's loss over plaintiff's objection that testimony was "speculative"; noting, "Given the absence of determinative evidence concerning the cause of PATRIOT's sinking, we see no error in permitting [the defense expert] to present his explanation, based on evidentiary facts, of why PATRIOT sank.").

**Point C.** Opinion of expert Dennis Custeau or his supervisor, Chris Harrison, regarding the functionality of the life raft and hydrostatic release: **Deferred.** Smith does not rely upon this testimony for purposes of the instant cross-motions for summary judgment. *See generally* Defendant's Response to Plaintiff's Statement of Material Facts ("Defendant's Opposing SMF") (Docket No. 10); Defendant's Statement of Additional Material Facts ("Defendant's SMF") (Docket No. 11); Defendant's Response to Plaintiff's Reply Statement of Genuine Issues of Material Fact ("Defendant's Reply SMF") (Docket No. 26). He represents that if he offers these opinions at trial, he expects to provide sufficient underpinnings for them to be admissible. *See* Defendant's Objection to Plaintiff's **[*9]** Motion To Exclude Various Opinions of Defendant's Experts (Docket No. 21) at 4.

**Point D.** Lack of specification of expert qualifications: **Deferred.** The Estate notes that it raises this point to preserve it for trial. *See* Motion To Exclude at 6.

### B. Motion To Strike

I grant in part and deny in part the Motion To Strike, as follows:

**Paragraph 10 of the Affidavit of Lee Leavitt** ("Leavitt Aff."), attached as Exh. 3 to Defendant's SMF: **Granted** (beyond scope of expert designation). The statement in question, which Smith himself characterizes as an expert opinion for purposes of responding to a separate hearsay objection, *see* Defendant's Objection to Plaintiff's Motion To Strike Portions of Defendant's Affidavits in Support of His Cross Motion for Summary Judgment ("Strike Opposition") (Docket No. 22) at 2, was not adequately disclosed in his expert designation. *See* Defendant's Designation of Experts ("Expert Designation"), attached as Exh. A to Motion To Strike, at 1-2. Accordingly, I exclude it from consideration in connection with the instant cross-motions. *See Macaulay v. Anas,* 321 F.3d 45, 50 (1st Cir. 2003) ("Since an important **[*10]** object of [*Federal Rules of Civil Procedure 26(a)(2)(B) and 26(e)(1),* concerning disclosure of expert opinions] is to avoid trial by ambush, the district court typically sets temporal parameters for the production of such information. Such a timetable promotes fairness both in the discovery process and at trial. When a party fails to comply with this timetable, the district court has the authority to impose a condign sanction (including the authority to preclude late-disclosed expert testimony).") (citations and internal quotation marks omitted).

**Paragraphs 11-12 of Leavitt Aff.: Granted** (hearsay). Smith does not contest that the statements in question are hearsay; rather, he argues that while they "may be hearsay, they also may be admissible under *[Federal] Rule [of Evidence] 807.*" Strike Opposition at 2. However, he fails to argue how or why, for purposes of consideration in connection with the instant cross-motions, the statements meet the requisites of this residual-exception rule. *See id.; see also* Fed. R. Evid. 807.

**Paragraph 14 of Leavitt Aff.: Denied.** This statement was adequately foreshadowed in Smith's expert designation. *See* Expert Designation **[*11]** at 2 (noting that Leavitt would offer his opinion "that Minott would have known how to respond to an emergency if he had an opportunity to respond."). It cannot fairly be characterized as "conclusory" in the sense contemplated by *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 92 (1st Cir. 1993) ("Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues."). The underpinnings of the statement in question are sufficiently clear: that Leavitt had known Minott well since childhood, that he, like Minott, was an experienced fishing-boat captain, that he knew Minott to be safety-conscious and that two or three boats previously had sunk while Minott was captain of them. *See* Leavitt Aff. PP3-5, 13, 19. This meets the *Hayes* requisites. *See Hayes,* 8 F.3d at 92 ("Although an expert affidavit need not include details about all of the raw data used to produce a conclusion, or about scientific or other specialized input which might be confusing to a lay person, it must at least include the factual basis **[*12]** and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment.").

Nor is the statement, which is not highly technical but rather based on a mixture of specialized knowledge of an industry (fishing) and highly personal knowledge of the habits and character of an individual (Minott), too

Case 1:03-cv-00178-DBH   Document 5-5   Filed 10/15/03   Page 6 of 20

Page 4
2002 U.S. Dist. LEXIS 15574

unreliable to pass muster for *Daubert* purposes. *See, e.g., Elwell v. Conair, Inc.,* 145 F. Supp.2d 79, 89 (D.Me. 2001) ("While it is now clear that the trial judge's general gatekeeping function with respect to expert testimony that was set forth in *Daubert* applies to all expert testimony, not just that based on scientific knowledge, it is also clear that the specific analytic factors listed in *Daubert* neither necessarily nor exclusively apply to all experts or in every case. Relevant reliability concerns may focus on personal knowledge or experience, not just scientific principles.") (citations, footnote and internal punctuation omitted).

**Paragraph 16 of Leavitt Aff.: Granted** (beyond scope of expert designation). The statement in question is primarily an opinion (that it was impossible for the Vessel to travel as far **[*13]** under its own power as the EPIRB hits indicate it traveled), which was not adequately disclosed in Smith's expert designation. *See* Expert Designation at 1-2.

**Paragraph 17 of Leavitt Aff.: Granted** (beyond scope of expert designation). Smith's arguments notwithstanding, *see* Strike Opposition at 2, Leavitt's opinion that the Vessel was struck by a larger, faster vessel was not adequately foreshadowed by the expert-designation statement that Leavitt "will offer his opinion that Minott would have known how to respond to an emergency if he had an opportunity to respond," Expert Designation at 2.

**Paragraph 21 of Leavitt Aff.: Denied.** The substance of this paragraph is neither (i) omitted from Smith's expert designation, *see* Expert Designation at 2 (Leavitt to testify that it defies common sense for person to go out alone on multi-day fishing trip), (ii) conclusory for *Hayes* purposes, *see* Leavitt Aff. P21 (explaining basis for opinion -- that one person cannot stay awake throughout entire fishing trip, and ocean is dangerous when all hands on deck are asleep) nor (iii) unreliable for *Daubert* purposes, inasmuch as it is grounded in a mixture of common sense **[*14]** and the affiant's personal experience as a fishing captain.

**Paragraph 22 of Leavitt Aff.: Granted in part** (beyond scope of expert designation) and **denied in part**. Granted as to the second sentence (that in Leavitt's opinion, the Vessel most likely was run down by a larger vessel while Minott was asleep), which was not adequately foreshadowed in Smith's expert designation. *See* Expert Designation at 1-2. Denied as to the first sentence, which is (i) adequately foreshadowed by Smith's expert designation, *see id.* at 2, (ii) sufficiently reasoned for *Hayes* purposes and (iii) sufficiently reliable for *Daubert* purposes, inasmuch as it is grounded in a mixture of common sense and the affiant's personal experience as a fishing captain.

**Paragraph 23 of Leavitt Aff.: Granted in part** (beyond scope of expert designation) and **denied in part**. Granted as to the first sentence, which opines that the Vessel was rammed, an opinion not fairly disclosed in Smith's expert designation. *See id.* at 1-2. Denied as to the second sentence, the contents of which should come as no surprise in view of Smith's disclosure in his expert designation that Leavitt would testify **[*15]** "that Minott would have known how to respond in an emergency if he had an opportunity to respond." *Id.* at 2. The underpinnings of this opinion are sufficiently clear that the statement cannot fairly be characterized as conclusory for *Hayes* purposes -- *i.e.*, that Leavitt, himself an experienced captain, knew Minott well, knew Minott was safety-conscious and had been involved previously in several vessel sinkings, and that the principal danger of embarking on a multi-day fishing expedition alone is being run down by a larger vessel when one is sleeping. *See* Leavitt Aff. PP3-5, 13-14, 20-22. The statement is sufficiently reliable for *Daubert* purposes inasmuch as rooted in the affiant's personal experience and knowledge of Minott's habits and character.

**Paragraphs 7-8 and 13 of the Affidavit of Craig Mifflin** ("Mifflin Aff."), attached as Exh. 4 to Defendant's SMF: **Denied**. All of these statements are adequately foreshadowed by Smith's disclosure that Mifflin would describe the condition of the Vessel and the state of its safety equipment as of late September 2000. *See* Expert Designation at 2.

**Paragraphs 11-12 and 14 of Mifflin Aff.: Denied.** All **[*16]** of these statements are adequately foreshadowed by Smith's disclosure that Mifflin would testify about his stint as captain of the Vessel, his responsibilities as captain (including safety responsibilities) and his view of the safety responsibilities Minott would have taken on when he became captain. *See id.* at 2-3.

**Paragraph 16 of Mifflin Aff.: Denied**. This statement is adequately foreshadowed by Smith's disclosure that Mifflin would testify that it is against common sense for someone to go out alone on the multi-day trip Minott took. *See id.* at 3.

**Paragraph 17 of Mifflin Aff.: Granted** (hearsay). Smith asserts that this statement is admissible pursuant to *Federal Rule of Evidence 807*, but fails to explain how or why it meets the rule's requisites. *See* Strike Opposition at 4.

**Paragraph 18 of Mifflin Aff.: Granted** (beyond scope of expert designation). Smith's expert designation did not reveal that this opinion would be given. *See* Expert Designation at 2-3.

**Paragraphs 19-20 of Mifflin Aff.: Denied.** Mifflin was designated as a partial fact and partial expert witness. *See id.* at 2. These are purely factual statements and thus need not have [*17] been included in Smith's expert designation.

**Paragraphs 22-24 of Mifflin Aff.: Granted** (beyond scope of expert designation). These statements, which are more in the nature of opinions than facts, were not fairly disclosed by Smith's expert designation. *See id.* at 2-3.

**Paragraph 6 of DuBois Aff.: Granted** (legal conclusion). As discussed above in the context of the Motion To Exclude, DuBois' opinion concerning the nature of the agreement is inadmissible.

**Paragraphs 7-8 of DuBois Aff.: Denied.** While these statements touch on the agreement between Smith and Minott, they do not improperly invade the province of the judge or jury.

**Paragraph 10 of DuBois Aff.: Denied.** As discussed above in the context of the Motion To Exclude, DuBois' opinion concerning the likely cause of the sinking of the Vessel is sufficiently reliable to pass muster for *Daubert* purposes. The statement cannot fairly be characterized as conclusory for *Hayes* purposes inasmuch as the affidavit as a whole illuminates the bases for the opinion. *See* DuBois Aff. PP5, 10-15.

**Paragraphs 11 and 13 of DuBois Aff.: Denied.** These assertions cannot fairly be characterized as conclusory [*18] for *Hayes* purposes inasmuch as DuBois' affidavit, as a whole, sufficiently illuminates his reasoning. *See id.*

**Paragraph 17 of DuBois Aff.: Granted** (beyond scope of expert designation). Smith's arguments notwithstanding, *see* Strike Opposition at 5-6, it does not inexorably follow from the fact that DuBois identified no safety problems with the Vessel and found Minott negligent in going to sea alone that DuBois would opine that Minott's negligence likely was the "sole" cause of his death.

### C. Facts Cognizable on Summary Judgment

With the foregoing peripheral issues resolved, the parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant to this recommended decision:

Smith has owned the Vessel since 1989. Defendant's SMF P1; Plaintiff's Response to Defendant's Statement of Additional Material Facts ("Plaintiff's Opposing SMF") (Docket No. 16) P1. The Vessel, which was forty-four feet long, fished only up to fifty miles offshore. Statement of Material Facts [as] To Which the Plaintiff Contends There Is No Genuine Issue To Be Tried ("Plaintiff's [*19] SMF"), set forth at pages 2-4 of Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on the Issues of Liability, Comparative Negligence and the Primary Duty Rule Defense ("Plaintiff's S/J Memorandum") (Docket No. 6), PP2-3; Defendant's Opposing SMF PP2-3. n2 Over the approximately nine years the Vessel was used as a fishing vessel, Smith was never the captain. Defendant's SMF P2; Rule 30(b)(6) Deposition of David W. Smith ("Smith Dep."), attached as Exh. D to Plaintiff's S/J Memorandum, at 14-15, 17. n3

> n2 I note, for the edification of counsel, that a supporting statement of material facts is to be submitted as a separate document rather than embedded in a legal memorandum. *See* Loc. R. 56(b).

> n3 Here, and repeatedly elsewhere, the Estate responds with a "qualified denial," asserting that "due to the fact that Caryle [sic] Minott is deceased and the Defendant is a hostile witness, the Plaintiff can neither admit nor deny this statement based on the Defendant's testimony alone." *See* Plaintiff's Opposing SMF P2; *see also generally id.* The Estate cites a case standing for the proposition that there are circumstances in which a party legitimately may refrain, on the basis of lack of knowledge, from admitting the truth of a statement in response to a request for admissions pursuant to *Federal Rule of Civil Procedure 36. See id.* P2; *T. Rowe Price Small-Cap Fund, Inc. v. Oppenheimer & Co.,* 174 F.R.D. 38, 42-45 (S.D.N.Y. 1997). Be that as it may, in the context of a motion for summary judgment a response such as the Estate's "qualified denial" does not suffice to controvert an opposing statement of material fact, which is deemed admitted to the extent supported by the record citations given. *See* Loc. R. 56.

[*20]

Case 1:03-cv-00178-DBH    Document 5-5    Filed 10/15/03    Page 8 of 20

Page 6
2002 U.S. Dist. LEXIS 15574

Smith had several captains of the Vessel. Defendant's SMF P3; Plaintiff's Opposing SMF P3. The captain immediately prior to Minott was Craig Mifflin. *Id.* P6. Mifflin had been captain of the Vessel for approximately two years before he left it in late September 2000. *Id.* P7. Minott was the captain of the Vessel as of October 4, 2000. Defendant's SMF P12; Deposition of Michael Monroe ("Monroe Dep."), attached as Exh. C to Plaintiff's S/J Memorandum, at 66. n4 Smith had no written agreement with Minott regarding the operation of the Vessel or the length of time Minott would serve as its captain. Plaintiff's Reply Statement of Genuine Issues of Material Fact ("Plaintiff's Additional SMF") (Docket No. 17) PP7-8; Defendant's Reply SMF PP7-8.

> n4 The Estate attempts to deny this statement, *see* Plaintiff's Opposing SMF P12; however, its denial is disregarded inasmuch as it is not supported by the citation given.

Smith never told his captains where they had to fish or what types of fish they had to fish for [*21] or imposed any restrictions on how far they could go, except that they were restricted to the fifty-mile limit of the insurance policy. Defendant's SMF P23; Smith Dep. at 29.

Prior to Minott's first fishing trip on October 19, 2000, the Vessel had made twenty-eight fishing trips in 2000. Defendant's SMF P35; Smith Dep. at 75-76. It was Minott's responsibility upon taking the job of captain to review all of the safety systems of the boat prior to taking it out because he was responsible for the safety of the crew. Defendant's SMF P36; Mifflin Aff. P14.

Minott took the Vessel out on a solo fishing trip on October 23, 2000. Plaintiff's SMF P4; Defendant's Opposing SMF P4. He left port on the Vessel at approximately 3 a.m. that day. Defendant's SMF P41; DuBois Aff. P16. On October 24, 2000 the Coast Guard received a distress call from the Vessel's EPIRB. Plaintiff's SMF P5; Defendant's Opposing SMF P5. The Vessel and its life raft were never found. *Id.* P6.

On October 9, 2000 Michael Monroe, a marine surveyor, performed a Condition & Value Survey of the Vessel on behalf of a potential buyer. *Id.* P8. Monroe observed and inspected the following safety/life-saving equipment, among [*22] other such equipment, on the Vessel that day: (i) three Type I PFDs without lights, with retro-reflective tape; (ii) three survival suits with chem-lights and retro-reflective tape, (iii) one Viking inflatable four-person life raft with hydrostatic release; and (iv) one Guest 406 EPIRB with hydrostatic release. Plaintiff's SMF P9; Letter dated October 10, 2000 from Capt. Michael J. Monroe to Mr. Richard Bickford, attached as Exh. E to Plaintiff's S/J Memorandum, at 2-3.

The last time the raft had been serviced or inspected prior to October 23, 2000 was on August 17, 1999. Plaintiff's SMF P12; Defendant's Opposing SMF P12. The Vessel's EPIRB was purchased on January 25, 1999. *Id.* P13. Smith does not know when the EPIRB was installed on the Vessel. *Id.* P14. The Vessel's EPIRB was registered on February 16, 1999. *Id.* P15. A Litton hydrostatic release had been installed for the Vessel's previous EPIRB on September 7, 1996. *Id.* P16. Smith does not know whether this was the same hydrostatic release used for the EPIRB on the Vessel on October 23, 2000. *Id.* P17. Smith has no records showing that he purchased a new hydrostatic release at the time he purchased a new EPIRB [*23] in January 1999. *Id.* P18. He has no records showing that he purchased a new hydrostatic release for the EPIRB at any time after September 7, 1996. *Id.* P19. He has no records showing that the hydrostatic release for the EPIRB was ever inspected. *Id.* P20.

The parties dispute whether there were lights on the Type I PFDs (*i.e.*, life jackets) on October 9, 2000. *Compare* Plaintiff's SMF P21; Monroe Dep. at 35 *with* Defendant's Opposing SMF P21; Defendant's Answers to Interrogatories Propounded by the Plaintiff, attached as Exh. B to Plaintiff's S/J Memorandum, P15. Smith does not know the last time that the life jackets were checked or serviced. Plaintiff's SMF P23; Defendant's Opposing SMF P23. Smith does not know the last time that the lights on the Vessel's survival suits were inspected. *Id.* P24. n5

> n5 Smith qualifies paragraphs 23 and 24 of the Plaintiff's SMF, pointing out that per Mifflin, the safety equipment was in place and up to date as of late September 2000. *See* Defendant's Opposing SMF PP23-24; Mifflin Aff. P8.

[*24]

When Mifflin left the Vessel and immediately afterwards, the Vessel was in very good shape. Defendant's SMF P30; Mifflin Aff. P13; Leavitt Aff. P8. Within a few months prior to September 2000, Mifflin had replaced a battery in the EPIRB. Defendant's SMF P32; Mifflin Aff. P9. Mifflin manually tested the EPIRB system during his last trip on the Vessel in 2000.

Case 1:03-cv-00178-DBH   Document 5-5   Filed 10/15/03   Page 9 of 20

Page 7
2002 U.S. Dist. LEXIS 15574

Defendant's SMF P33; Mifflin Aff. P25. The safety equipment on the Vessel was in place and up to date as of late September 2000. Defendant's SMF P34; Mifflin Aff. P8.

The first EPIRB distress signal from the Vessel was received at 3:36 a.m. on October 24, 2000. Defendant's SMF P42; DuBois Aff. P16. n6 The top speed of the Vessel was ten knots. Defendant's SMF P43; Mifflin Aff. P19. The speed at which the Vessel could travel if the fishing nets were out was 2.3 to 3.5 knots. Defendant's SMF P44; Mifflin Aff. P20. The time between the first two EPIRB hits was thirty-nine minutes. Defendant's SMF P45; DuBois Aff. P12. n7 The distance between the first two EPIRB hits was approximately eleven nautical miles. *Id.* The speed of the Vessel and/or the EPIRB device between the first and second EPIRB signals was approximately seventeen [*25] knots. *Id.* The Vessel could not have traveled that distance in that amount of time under its own power. Defendant's SMF P46; DuBois Aff. P12.

> n6 The Estate attempts to deny this statement, *see* Plaintiff's Opposing SMF P42; however, its denial is disregarded inasmuch as it is unsupported by any record citation.

> n7 The Estate attempts to deny this statement, *see* Plaintiff's Opposing SMF P45; however, its denial is disregarded inasmuch as it is unsupported by any record citation.

The likely cause of the sinking of the Vessel is that it was struck and dragged by another vessel. Defendant's SMF P47; DuBois Aff. P10. Minott's decision to go alone on a fishing trip aboard the Vessel on October 23, 2000 was dangerous and represented bad judgment, unsafe practice and negligent behavior on his part. Defendant's SMF P48; Mifflin Aff. PP15-16; Leavitt Aff. PP20-21; DuBois Aff. P15. The principal danger of going on a fishing voyage alone is of being run down by a larger vessel while asleep. Defendant's SMF [*26] P49; Leavitt Aff. P22.

Minott previously had boats sink while he was captain. Defendant's SMF P37; Leavitt Aff. P13. He would have been able to take steps to save himself if he had had the time. Defendant's SMF P38; Leavitt Aff. P14. What happened at sea on October 24, 2000 must have been catastrophic and separated Minott from the Vessel before he had a chance to reach any of the safety equipment. Defendant's SMF P39; Leavitt Aff. P23.

**III. Analysis**

The instant complaint seeks damages predicated on two theories of liability: *Jones Act* negligence (Counts I, III and V) and general maritime law/unseaworthiness (Counts II, IV and VI). *See* Plaintiff's Complaint and Demand for Jury Trial (Docket No. 1) PP18-51. The Estate posits that the existence of a handful of Vessel-related Coast Guard safety-regulation violations both (i) entitles it to summary judgment as to liability on both the Jones Act and unseaworthiness claims and (ii) eviscerates Smith's contributory-negligence and primary-duty-rule affirmative defenses. *See generally* Plaintiff's S/J Memorandum.

Smith contests these points and himself seeks summary judgment as to all claims against him on three alternative [*27] bases: (i) Minott's alleged status as owner *pro hac vice* of the Vessel, (ii) the Estate's failure to show the requisite causation for purposes of either its Jones Act or unseaworthiness theories and (iii) Minott's contributory negligence. *See generally* Defendant's S/J Motion.

In this case, no one knows precisely how the F/V KATINA ASHLEY sank or Captain Minott lost his life. As the parties recognize, the issue of burden of proof hence is critical. For the reasons that follow, I agree with Smith that the Estate falls short of generating any triable issue as to causation with respect to either its Jones Act or unseaworthiness theories of liability, entitling him to summary judgment as to all claims against him. n8

> n8 I need not, and do not, reach Smith's alternative arguments that he is entitled to summary judgment on the bases of Minott's status as owner *pro hac vice* of the Vessel or Minott's contributory negligence, or the Estate's argument that it is entitled to summary judgment with respect to Smith's contributory-negligence and primary-duty-rule affirmative defenses.

[*28]

**A. Jones Act Negligence**

The Jones Act "impose[s] upon the employer the duty of paying damages when injury to the worker is caused, in whole or in part, by the employer's fault." *Kernan v. American Dredging Co., 355 U.S. 426, 432, 2 L. Ed. 2d 382, 78 S. Ct. 394 (1958).* "This fault may consist of a breach of the duty of care, analogous but by no means identical to the general common-law duty, or of a breach of some statutory duty." *Id.*

In the latter instance, a seaman has a cause of action for negligence *per se. See id. at 438-39* ("Where the employer's conduct falls short of the high standard required of him by [the *Federal Employers' Liability] Act* ["FELA"], and his fault, in whole or in part, causes injury, liability ensues."). The burden of proving causation in a Jones Act claim is light. *See, e.g., Gifford v. American Canadian Caribbean Line, Inc., 276 F.3d 80, 83 n.2 (1st Cir. 2002)* ("A plaintiff's burden of proving causation under the Jones Act is featherweight. . . . Liability, therefore, exists if the employer's negligence contributed even in the slightest to the plaintiff's injury.") (citation and internal **[*29]** quotation marks omitted). Nonetheless, a Jones Act plaintiff retains that burden regardless of whether his or her cause of action is predicated on common-law or *per se* negligence. *See, e.g., Pratico v. Portland Terminal Co., 783 F.2d 255, 263 (1st Cir. 1985)* ("failure to follow *any* Coast Guard regulation which is a *cause* of an injury establishes negligence *per se* under the Jones Act") (citation and internal quotation marks omitted) (emphasis in original); *Smith v. Trans-World Drilling Co., 772 F.2d 157, 160 (5th Cir. 1985)* ("Five elements of a Jones Act negligence *per se* claim are the following: (1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation."); *see also, e.g., Moody v. Boston & Maine Corp., 921 F.2d 1, 4 (1st Cir. 1990)* (noting, in context of FELA claim, that although proof of violation of a safety statute relieves plaintiff from pleading the negligence elements of foreseeability, **[*30]** duty and breach, necessity to prove causation remains).

The Estate asserts that as of October 23, 2000, the day Minott left port, the Vessel was in violation of four Coast Guard regulations: (i) its life raft was overdue for inspection as of August 17, 2000, in violation of *46 C.F.R. §§ 25.25-11 and 28.140*, (ii) its life jackets lacked lights, in violation of *sections 25.25-11 and 25.25-13*, (iii) the lights on its survival suits were out of date at least as of October 9, 2000, in violation of *sections 25.25-11 and 25.25-13*, and (iv) the hydrostatic release on its EPIRB had been overdue for servicing since September 7, 1997, in violation of *sections 25.25-11 and 28.140(b). See* Plaintiff's S/J Memorandum at 9-11; Memorandum of Law in Support of Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 15) at 13. n9

n9 The Estate initially identified Smith's asserted failure to provide distress signals (visual signal flares and smoke signals), as required by *46 C.F.R. § 28.145*, as among the regulatory violations entitling it to summary judgment. *See* Plaintiff's S/J Memorandum at 12. However, the Estate subsequently conceded that there is a genuine issue of material fact as to whether Smith did in fact violate this particular regulation, as a result of which it stated that it was refraining from pressing that point further on summary judgment. *See* Plaintiff's S/J Opposition at 15.

**[*31]**

However, as Smith observes, *see* Defendant's Reply to Plaintiff's Opposition to Defendant's Cross Motion for Summary Judgment ("Defendant's S/J Reply") (Docket No. 24) at 4, the Estate makes no argument that any of these asserted violations played the slightest causative role in the Vessel's sinking or Minott's drowning, *see generally* Plaintiff's S/J Memorandum; Plaintiff's S/J Opposition. Nor is there any cognizable evidence to that effect. To the contrary, the only evidence touching on causation is Smith's experts' opinions that the Vessel likely was rammed by another vessel, robbing Minott, who by then had been out fishing alone for approximately twenty-four hours and may have fallen asleep, of the opportunity to reach for safety equipment.

The Estate accordingly fails to generate a triable issue even as to its featherweight burden to prove causation in a Jones Act negligence *per se* case. *See, e.g., Harrah v. United States*, No. Civ.A.2:99CV514, 2000 WL 33177237, at *5 (E.D. Va. Mar. 15, 2000) ("The Court understands that the causation prong on a negligence claim under the Jones Act is substantially less than that under the common law. Nonetheless, even **[*32]** with the lesser burden, the plaintiff has not sufficiently connected his injuries to the two-bolted bracket. The bracket intended to hold a ten pound weight might have fallen even if it was held properly by three bolts when a man of the plaintiff's weight rested his weight on the bracket. Finding causation based on the plaintiff's evidence in this case would amount to conjecture and surmise. In sum, the plaintiff has not satisfied his burden on causation by a preponderance of the evidence.") (citation omitted).

### B. Unseaworthiness

I turn next to the Estate's claim of unseaworthiness - a cause of action that "enforces the shipowner's absolute duty to provide to every member of his crew a vessel and appurtenances reasonably fit for their intended use."

*Boudreau v. S/V Shere Khan C*, 27 F. Supp.2d 72, 82 (1998) (citations and internal quotation marks omitted).

The doctrine of unseaworthiness is not fault-based, and a plaintiff accordingly need not prove negligence. *See, e.g., id.* ("Unseaworthiness is a *condition*, and how that condition came into being - whether by negligence or otherwise - is quite irrelevant to the owner's liability for personal injuries resulting from it.") (citation **[*33]** and internal quotation marks omitted). However, a plaintiff confronts a heavier burden with respect to causation than is the case in the context of a Jones Act claim. *See, e.g., Trans-World Drilling, 772 F.2d at 162* ("While Jones Act negligence is a legally sufficient cause of injury if it played any part, no matter how small, in bringing about the injury, the plaintiff must meet a more demanding standard of causation in an unseaworthiness claim. Unlike the 'featherweight' standard of causation in a Jones Act claim, the standard in an unseaworthiness claim is 'proximate cause in the traditional sense.'") (citations omitted). n10

> n10 As the First Circuit has noted, "To meet the traditional common law burden of proving proximate cause in an action based on unseaworthiness, plaintiff must show that: the act or omission is a cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the results complained of, and without which it would not have occurred." *Brophy v. Lavigne*, 801 F.2d 521, 524 (1st Cir. 1986) (citation and internal quotation marks omitted).

**[*34]**

At least one circuit court of appeals has recognized a doctrine of "unseaworthiness *per se*" based upon the existence of regulatory or statutory violations; however, as in the parallel Jones Act context, the plaintiff retains the burden of proving causation. *See Trans-World Drilling, 772 F.2d at 162* ("Unseaworthiness, like Jones Act negligence, can be the *per se* result of a regulatory violation. However, a crucial distinction between the two claims is the differing standard of causation required to find liability.") (citation and footnote omitted).

The Estate, which does not even meet the featherweight burden of showing causation for purposes of its Jones Act claim, falls far short of generating a trialworthy issue of proximate cause to undergird its unseaworthiness claim.

**C. The Pennsylvania Rule**

In the face of these evidentiary difficulties, the Estate strives to salvage its case by invoking the burden-shifting "Pennsylvania Rule." *See* Plaintiff's S/J Memorandum at 7-8, 12-15. Pursuant to this rule, as articulated by the Supreme Court in 1873 in the context of a case involving the collision of a bark and a steamer in dense fog:

> It must **[*35]** be conceded that if it clearly appears the fault could have had nothing to do with the disaster, it may be dismissed from consideration. The liability for damages is upon the ship or ships whose fault caused the injury. But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania*, 86 U.S. 125, 136, 22 L. Ed. 148 (1873), *overruled in part on other grounds, United States v. Reliable Transfer Co.*, 421 U.S. 397, 44 L. Ed. 2d 251, 95 S. Ct. 1708 (1975).

As the Estate notes, *see* Plaintiff's S/J Memorandum at 8, the Pennsylvania Rule has been extended beyond the confines of ship collisions to other safety-related maritime contexts, *see, e.g., Continental Grain*, 972 F.2d at 436 **[*36]** ("Given the policy underlying the rule, that is to assure strict compliance with rules pertaining to the safe operation of ships, we see no reason why the rule should not apply to the capsizing and sinking of a vessel as well as to a stranding."). Smith picks no quarrel with this proposition; however, he and the Estate sharply dispute whether proof of violation of a Coast Guard safety regulation, without more, suffices to trigger application of the rule. *Compare* Plaintiff's S/J Opposition at 12-13 *with* Defendant's S/J Reply at 1-4. Smith posits, in essence, that to invoke the rule a seaman must make some showing that the violation of which he complains played an actual role in bringing about his damages. *See* Defendant's S/J Reply at 4.

In my view, Smith has the better of the argument. The Estate cites *Continental Grain* for the proposition that pursuant to the Pennsylvania Rule, "the burden of proof on the issue of causation [shifts] once a claimant has established that a vessel has violated a statute or regulation." Plaintiff's S/J Opposition at 12-13 (quoting *Continental Grain, 972 F.2d at 436*). However, as Smith notes, *see* Defendant's S/J Reply **[*37]** at 3-4, in that case there was no question that a key alleged violation (transgression of a regulation intended to ensure that bulk grain stored in partially filled compartments was held securely) was related to the loss of the vessel ALBATROS (which sank as a result of the shifting of free-flowing grain), *see Continental Grain, 972 F.2d at 436*. Tellingly, since the issuance of *Continental Grain*, the First Circuit has made explicit what Smith suggests was implicit in that case: that a plaintiff must establish a nexus between a regulatory violation and his or her injuries as a condition to invocation of the Pennsylvania Rule:

> In its venerable decision *The S.S. Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 134, 22 L. Ed. 148 (1873)*, the Supreme Court established a burden shifting regime for maritime cases. If a plaintiff can establish both that the defendant breached a statutory duty and that the breach is relevant to the casualty in question, the defendant assumes the burden of proving that its breach could not have caused plaintiff's damages. The problem here is that appellant has failed to prove that appellees violated any statutory duty. **[*38]**
>
> ***
>
> Furthermore, even if there were credible evidence of a statutory violation by the appellees, any such violation was not sufficiently related to the casualty in question. The district court found that the casualty in question was a direct result of the fact that the ITB Zorra struck obstructions outside of its proper area of navigation. Additionally, the obstructions which the ITB Zorra struck were properly marked on the charts and known to the master and pilot. Thus, appellant has only its own imprudence to blame for the predictable result, and the district court properly refused to apply the *Pennsylvania* rule.

*Pan Am. Grain Mfg. Co. v. Puerto Rico Ports Auth., 295 F.3d 108, 115-16 (1st Cir. 2002)* (citations omitted). Other courts have reached similar conclusions. *See, e.g., American River Trans Co. v. Kavo Kaliakra SS, 148 F.3d 446, 450 (5th Cir. 1998)* ("This court has stressed that the Pennsylvania Rule is a rule regarding the burden of proof, not a rule of ultimate liability. As we have explained, the Supreme Court in *The Pennsylvania* did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault **[*39]** has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable or remote."); *In re Complaint of Nautilus Motor Tanker Co., 85 F.3d 105, 115 (3d Cir. 1996)* ("In cases where there is no clear link between the statutory violation and the casualty, the party seeking to take advantage of the [Pennsylvania] Rule has been required to make some showing that the statutory violation may have had some relation to the accident. Indeed, a contrary rule, such as is urged upon us by appellants, would result in a presumption of liability following any statutory violation no matter how remote or inconsequential such a violation may have been to the subsequent accident. Neither precedent nor logic compels such a drastic result."); *Candies Towing Co. v. M/V B & C Eserman, 673 F.2d 91, 94 (5th Cir. 1982)* (noting that invocation of Pennsylvania Rule does not impair principle that in Jones Act cases, cause in fact is still necessary); *Associated Dredging Co. v. Continental Marine Towing Co., 617 F. Supp. 961, 968 (E.D. La. 1985)* ("Although the **[*40]** vessel must be manned with a competent crew, a deficiency in manning that has no causal connection to the damages at issue is not significant. . . . Although the rule of *The PENNSYLVANIA* imposes a strenuous burden, it does not negate the clear requirement of causation. While the defendants are guilty of a statutory violation, the violation did not have anything to do with the capsizing of the dredge CAPTAIN ROY BENOIT.") (citations omitted).

In this case the Estate offers not a shred of evidence that the regulatory violations of which it complains had anything to do with Minott's death. Nor is it otherwise clear that they did. A trier of fact could not, except on the basis of sheer speculation, conclude that any of the cited violations bore any relation whatsoever to this tragic event. That is too insubstantial a foundation for invocation of the burden-shifting Pennsylvania Rule.

**IV. Conclusion**

For the foregoing reasons, I **GRANT** the Motion To Construe, **GRANT** in part and **DENY** in part the Motion To Strike, **GRANT** in part, **DENY** in part and in part defer decision on the Motion To Exclude, and recommend that the court **GRANT** Smith's motion **[*41]** for summary judgment and **DENY** that of the Estate.

Dated this 5th day of September, 2003.

David M. Cohen

United States Magistrate Judge

LEXSEE 2002 US DIST LEXIS 24059

**RICHARD SOLY, JR., Plaintiff, v. UNITED PARCEL SERVICE, INC., Defendant.**

02-CV-10499-MEL

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

*2002 U.S. Dist. LEXIS 24059*

**August 22, 2002, Decided**

**DISPOSITION:** [*1] Motion to dismiss was granted.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** For Richard Soly, Jr, PLAINTIFF: P Scott Bratton, Lowell, MA USA.

For United Parcel Service, Inc, DEFENDANT: Susan J Baronoff, Murtha Cullina Roche Carens & Degiacomo, Boston, MA USA.

**JUDGES:** Morris E. Lasker, United States District Judge.

**OPINIONBY:** Morris E. Lasker

**OPINION:**

MEMORANDUM AND ORDER

LASKER, D.J.

Richard Soly, Jr., sues United Parcel Service, Inc. (UPS), for negligent and intentional infliction of emotional distress stemming from the delivery of packages apparently contaminated with Anthrax. UPS moves to dismiss the complaint. The motion is granted and the complaint is dismissed without prejudice to renew under the Carmack Amendment to the Interstate Commerce Act, ch. 3591, Pub. L. No. 337, Title I, § 103, 34 Stat. 584 (1906) (codified as amended at *49 U.S.C. § 14706*) (the Carmack Amendment).

I.

On October 18, 2001, Soly received a phone call at his business, R&D Custom Exhaust in Billerica, Massachusetts, from an employee at the UPS facility in Chelmsford, Massachusetts. The employee informed Soly that two packages addressed to him would be delivered that afternoon to his place of business. The packages had [*2] a white powdery substance on them. Although the UPS employee had called the powdery substance to the attention of his supervisors, the supervisors told the employee that the facility would not be shut down, and neither the health department nor the local police would be called. The employee was also told to go home and get tested for exposure to Anthrax.

The packages were soon brought to Soly, and he refused them. The UPS employee who delivered the packages left them anyway. Soly called the local police, who were then told by UPS that the packages had not been tested. The police secured the packages and Soly was isolated and tested for exposure to Anthrax. Neither Soly nor the packages were contaminated.

Soly alleges that this incident caused him to suffer severe emotional distress resulting in physical manifestations. He has not alleged any permanent physical or emotional disabilities, but sues for medical expenses in the amount of $ 1,125 and damages in the amount of $ 1,000,000,000.

This action was removed to this court on March 19, 2002, from Middlesex Superior Court. Soly filed a motion to remand in which he asked that if the action was not remanded, he be allowed to amend [*3] the complaint to include federal causes of action. The motion was denied on May 9, 2002.

II.

UPS moves to dismiss the complaint on the grounds that the claims are preempted by the Federal Aviation Administration Authorization Act of 1994, *49 U.S.C. § § 14501*(c)(1), 41713(b)(4) (FAAAA), and by the Carmack Amendment.

A. The FAAAA

Section 14501(c)(1) of Title 49 of the United States Code, which applies to motor carriers, provides that "states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier ... with respect to the transportation of property." In the instant petition, Soly's claims do not merely "relate to" UPS services, they arise directly from core services provided by UPS, going to "the heart of the 'services' that [UPS] provides." *Somes v. United Airlines, 33 F. Supp. 2d 78, 85 (D. Mass 1999);* see *Morales v. TransWorld Airlines, Inc., 504 U.S. 374, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992)* (interpreting nearly identical language in the preemption provision of the Airline Deregulation Act of 1978, *49 U.S.C. App. § 1305*(a)(1), **[*4]** as preemptive of claims having a connection or reference to UPS's services); *Wine & Spirits Wholesalers v. Net Contents, Inc. 10 F. Supp. 2d 84, 87 (D. Mass. 1998)* (tortious interference claim preempted by the FAAAA); *Chukwu v. Board of Dirs. of British Airways, 889 F. Supp. 12, 13-14 (D. Mass. 1995)* (intentional infliction of emotional distress claim preempted by the FAAAA because it related to airline service). Thus, Soly's emotional distress claims are preempted by the FAAAA.

B. The Carmack Amendment

Even if Soly's claims were not preempted under the FAAAA, they are preempted under the Carmack Amendment and federal common law. The Carmack Amendment governs the entire field of carrier liability and was enacted with the purpose of superseding "diverse state laws with a nationally uniform policy governing interstate carrier's liability." *N.Y., New Haven & Hartford R.R. Co. v. Nothnagle, 346 U.S. 128, 131, 97 L. Ed. 1500, 73 S. Ct. 986 (1953);* see also *Adams Express Co. v. Croninger, 226 U.S. 491, 505, 57 L. Ed. 314, 33 S. Ct. 148 (1913).* Additionally, emotional distress claims related to the transportation **[*5]** process should be determined by the Carmack Amendment and federal common law. *Southern Express Co. v. Byers, 240 U.S. 612, 614-15, 60 L. Ed. 825, 36 S. Ct. 410 (1916).*

In *Rini v. United Van Lines, Inc., 104 F.3d 502, 504 (1st Cir. 1997),* the Court of Appeals for the First Circuit indicated that if the plaintiff's claims for emotional distress had been before the Court, they would not have been preempted by the Carmack Amendment because the alleged harm was independent from the transportation process. Soly's claims, unlike those in Rini, were directly related to delivery, an intrinsic part of the transportation process.

Recently, the Court of Appeals for the Eleventh Circuit ruled in support of this position, holding that a claim for intentional infliction of emotional distress asserted against UPS was preempted by the Carmack Amendment because the claims arose from "conduct involving UPS's transportation and delivery services." *Smith v. UPS, 296 F.3d 1244* Soly's emotional distress claims arise from the transportation process. Accordingly, they are preempted by the Carmack Amendment.

III.

The **[*6]** motion to dismiss is granted.

It is so ordered.

Morris E. Lasker

United States District Judge

Dated: August 22, 2002

Boston, Massachusetts

1 of 2 DOCUMENTS

NEW YORK CONSOLIDATED LAW SERVICE
Copyright (c) 2003 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

\*\*\* THIS SECTION IS CURRENT THROUGH CH. 458, 08/29/2003 \*\*\*
\*\*\* WITH THE EXCEPTION OF CHS. 1-3, 282-283, 385 and 443 \*\*\*

PUBLIC HEALTH LAW

ARTICLE 13-F.  REGULATION OF TOBACCO PRODUCTS AND HERBAL CIGARETTES; DISTRIBUTION TO MINORS

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

NY CLS Pub Health § **1399-ll** (2003)

§ **1399-ll.**  \*Unlawful shipment or transport of cigarettes
 \* There are two sections **1399-ll.**

  1. It shall be unlawful for any person engaged in the business of selling cigarettes to ship or cause to be shipped any cigarettes to any person in this state who is not: (a) a person licensed as a cigarette tax agent or wholesale dealer under article twenty of the tax law or registered retail dealer under section four hundred eighty-a of the tax law; (b) an export warehouse proprietor pursuant to chapter 52 of the internal revenue code or an operator of a customs bonded warehouse pursuant to section 1311 or 1555 of title 19 of the United States Code; or (c) a person who is an officer, employee or agent of the United States government, this state or a department, agency, instrumentality or political subdivision of the United States or this state, when such person is acting in accordance with his or her official duties. For purposes of this subdivision, a person is a licensed or registered agent or dealer described in paragraph (a) of this subdivision if his or her name appears on a list of licensed or registered agents or dealers published by the department of taxation and finance, or if such person is licensed or registered as an agent or dealer under article twenty of the tax law.

2. It shall be unlawful for any common or contract carrier to knowingly transport cigarettes to any person in this state reasonably believed by such carrier to be other than a person described in paragraph (a), (b) or (c) of subdivision one of this section. For purposes of the preceding sentence, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in paragraph (a), (b) or (c) of subdivision one of this section. It shall be unlawful for any other person to knowingly transport cigarettes to any person in this state, other than to a person described in paragraph (a), (b) or (c) of subdivision one of this section. Nothing in this subdivision shall be construed to prohibit a person other than a common or contract carrier from transporting not more than eight hundred cigarettes at any one time to any person in this state.

3. When a person engaged in the business of selling cigarettes ships or causes to be shipped any cigarettes to any person in this state, other than in the cigarette manufacturer's original container or wrapping, the container or wrapping must be plainly and visibly marked with the word "cigarettes".

4. Whenever a police officer designated in section 1.20 of the criminal procedure law or a peace officer designated in subdivision four of section 2.10 of such law, acting pursuant to his or her special duties, shall discover any cigarettes which have been or which are being shipped or transported in violation of this section, such person is hereby empowered and authorized to seize and take possession of such cigarettes, and such cigarettes shall be subject to a forfeiture action pursuant to the procedures provided for in article thirteen-A of the civil practice law and rules, as if

such article specifically provided for forfeiture of cigarettes seized pursuant to this section as a preconviction forfeiture crime.

5. Any person who violates the provisions of subdivision one or two of this section shall be guilty of a class A misdemeanor and for a second or subsequent violation shall be guilty of a class E felony. In addition to the criminal penalty, the commissioner may impose a civil fine not to exceed five thousand dollars for each such violation on any person who violates subdivision one or two of this section. The commissioner may impose a civil fine not to exceed five thousand dollars for each violation of subdivision three of this section on any person engaged in the business of selling cigarettes who ships or causes to be shipped any such cigarettes to any person in this state.

HISTORY:   Add, L 2000, ch 262, § 2, eff Nov 14, 2000 (see 2000 note below).

NOTES:

EDITOR'S NOTES:
   Laws 2000, ch 262, § 1, eff Nov 14, 2000, provides as follows:
   Section 1. Legislative findings. The legislature finds and declares that the shipment of cigarettes sold via the internet or by telephone or by mail order to residents of this state poses a serious threat to public health, safety, and welfare, to the funding of health care pursuant to the health care reform act of 2000, and to the economy of the state. The legislature also finds that when cigarettes are shipped directly to a consumer, adequate proof that the purchaser is of legal age cannot be obtained by the vendor, which enables minors to avoid the provisions of article 13-F of the public health law. It is also the legislature's finding that by preventing shipment of cigarettes directly to consumers, the State will be better able to measure and monitor cigarette consumption and to better determine the public health and fiscal consequences of smoking. The legislature further finds that existing penalties for cigarette bootlegging are inadequate. Therefore, the bill enhances existing penalties for possession of unstamped or unlawfully stamped cigarettes.

### CASE NOTES

   *N.Y. Pub. Health Law §  1399-ll(1)-(2)*, which restricts the direct shipment of cigarettes to New York consumers by all direct shippers and transporters, whether in or out of state, is constitutional under the Commerce Clause, as the effects on interstate commerce are de minimis.*Brown & Williamson Tobacco Corp. v Pataki (2003, CA2 NY) 320 F3d 200.*

KANSAS BILL TEXT

Session of 2003

HOUSE BILL No. 2422

By Committee on Taxation

2-28

VERSION: Introduced

February 28, 2003
House Committee on Taxation

AN ACT concerning cigarettes; relating to unlawful shipment or transport thereof; prescribing certain penalties therefor.

TEXT:

Be it enacted by the Legislature of the State of Kansas:

Section 1. (a) Unlawful shipment of cigarettes is shipping or causing to be shipped any cigarettes by any person engaged in the business of selling cigarettes to any person in this state who is not: (1) A person licensed to sell cigarettes as provided by K.S.A. 79-3301 et seq. and amendments thereto; (2) an export warehouse proprietor pursuant to chapter 52 of the internal revenue code or an operator of a customs bonded warehouse pursuant to section 1311 or 1555 of title 19 of the United States Code; or (3) a person who is an officer, employee or agent of this state or the United States government, or a department, agency, instrumentality or political subdivision of this state or the United States government, when such person is acting in accordance with such person's official duties.

(b) Unlawful transport of cigarettes is: (1) Knowingly transporting cigarettes by any common or contract carrier to any person in this state reasonably believed by such carrier to be other than a person described in subsection (a)(1), (a)(2) or (a)(3). For purposes of this subsection, if cigarettes are transported to a home or residence, it shall be presumed that the common or contract carrier knew that such person was not a person described in subsection (a)(1), (a)(2) or (a)(3); or (2) knowingly transporting cigarettes by any person other than a common or contract carrier to any person in this state, other than to a person described in subsection (a)(1), (a)(2) or (a)(3). Nothing in this subsection shall be construed to prohibit a person other than a common or contract carrier from transporting not more than 800 cigarettes at any one time to any person in this state.

(c) When a person engaged in the business of selling cigarettes ships or causes to be shipped any cigarettes to any person in this state, other than in the cigarette manufacturer's original container or wrapping, the container or wrapping must be plainly and visibly marked with the word "cigarettes."

(d) Whenever a law enforcement officer discovers any cigarettes which have been or which are being shipped or transported in violation of this section, such law enforcement officer is hereby empowered and authorized to seize and take possession of such cigarettes, and such cigarettes shall be subject to a forfeiture action pursuant to the procedures provided for in K.S.A. 79-3324a and amendments thereto.

(e) (1) Except as otherwise provided in subsection (e)(3), unlawful shipment of cigarettes is a class A nonperson misdemeanor.

Case 1:03-cv-00178-DBH   Document 5-5   Filed 10/15/03   Page 19 of 20

2003 KS H.B. 2422 (SN)
2003 Kansas House Bill No. 2422, Kansas 80th Legislature -- 2003 Regular
Session (FULL TEXT - STATE NET)

Page 17

(2) Except as provided in subsection (e)(3), unlawful transport of cigarettes is a class A nonperson misdemeanor.

(3) Unlawful shipment of cigarettes or unlawful transport of cigarettes by a person or common or contract carrier who has one or more prior convictions of a violation of this section or substantially similar offenses from another jurisdiction is a severity level 8, nonperson felony.

(f) The director of taxation may impose a civil fine not to exceed $5,000 for each violation on any person who violates the provisions of subsection (a) or (b).

Sec. 2. This act shall take effect and be in force from and after its publication in the statute book.

2003 KS H.B. 2422 (SN)
END OF DOCUMENT

Case 1:03-cv-00178-DBH   Document 5-5   Filed 10/15/03   Page 20 of 20

2003 MA S.B. 67 (SN)                                                                                              Page 18
2003 Massachusetts Senate Bill No. 67, Massachusetts 183rd General Court --
2003 Regular Session (FULL TEXT - STATE NET)

MASSACHUSETTS BILL TEXT

SENATE, NO. 67

By Mr. Lees, a petition (accompanied by bill, Senate, No.67) of Brian P. Lees, Richard R. Tisei, Bruce E. Tarr, Michael R. Knapik and Jo Ann Sprague for legislation to prohibit the sale of tobacco products to persons under the age of 18 through online transactions. Commerce and Labor

THE COMMONWEALTH OF MASSACHUSETTS

In the Year Two Thousand and Three.

VERSION: Introduced

January 9, 2003
Lees

AN ACT RELATIVE TO ONLINE TOBACCO SALES .

TEXT:

Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same, as follows:

SECTION 1. Chapter 64C of the General Laws, as appearing in the 2000 Official Edition, is hereby amended by inserting after section 10 the following new section:-

Section 10A. Online Cigarette Sales. It is unlawful for any public or private postal or package delivery service to knowingly deliver a tobacco product to a person under the age of 18 years. A tobacco product shall not be accepted for delivery by such a package delivery service if the package does not have affixed thereto a label which plainly and visibly states that the package contains tobacco and that it is not for delivery to any person under age 18. Any public or private postal or package delivery service that knowingly delivers a tobacco product directly to a purchaser shall: (a). Deliver solely to the purchaser at the address given by the purchaser as specified on a valid Massachusetts driver's license, passport, state issued identification, United States military identification, or immigration card. (b). Require the signature of the purchaser. (c). Receive and inspect the identification of the purchaser showing the purchaser's date of birth to verify that he is 18 years of age or older. (d). Receive an attestation from the purchaser, on a form prepared by the delivery service, certifying that the information on the identification required under subsection (a) of this section truly and correctly identifies the purchaser, his current address and age. The certification shall be retained on file by the distributor for no less than one year. (e). Submit a copy of the invoice for each delivered package to the Department of Revenue which shall ensure that the appropriate excise taxes are paid thereon. To be accepted by the delivery service, each invoice shall include the name and address of the purchaser, the brand, and the type and quantity of tobacco.

Any person who delivers a tobacco product in violation of this act shall be fined no less than $250 or more than $1,000 for each offense. A person who falsely certifies information required by this act shall be fined no less than $100 or more than $500 for each offense.

2003 MA S.B. 67 (SN)

END OF DOCUMENT

sf-1581883