UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, ET AL., ) ) ) ) | |
| PLAINTIFFS ) ) | |
| v. ) ) | CIVIL NO. 03-178-B-H |
| G. STEVEN ROWE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF MAINE, ) ) ) ) | |
| DEFENDANT ) | |

MEMORANDUM DECISION ON PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT

Does a federal statute that regulates interstate trucking preempt Maine's Tobacco Delivery Law, a law newly enacted to regulate delivery sales[1] of cigarettes and reduce teens' access to tobacco? Three truckers' associations have sued the Maine Attorney General seeking a declaration that federal law preempts the Maine legislation and an injunction against its enforcement. The truckers have moved for immediate summary judgment arguing that on their face federal and state law are in direct conflict and that the Maine law must give way. I disagree. I

---

[1] Generally speaking, delivery sales are sales made by telephone, the internet, or other means such that the tobacco has to be delivered to the purchaser. 22 M.R.S.A. § 1551(1-B) (2003).

conclude that federal law does not completely foreclose Maine from exercising its traditional police powers to restrict delivery of tobacco.  I therefore **DENY** the truckers' motion, pending further development of the record on how the law is applied.[2]

## I. FACTS

New Hampshire Motor Transport Association, Massachusetts Motor Transport Association, Inc., and Vermont Truck & Bus Association, Inc. ("the truckers") are non-profit trade associations whose members are in the interstate transportation business.  The truckers have brought suit against the Maine Attorney General to challenge provisions of Maine's Tobacco Delivery Law, 22 M.R.S.A. § 1551 et seq., enacted on June 9, 2003.  According to its title, the Tobacco Delivery Law is intended to regulate the delivery and sale of tobacco products, and to prevent the sale of tobacco products to minors.  2003 Me. Laws 444.  See also L.D. 1236, Summary (121st Me. Legis. 2003); Comm. Amend. A to H.P. 910, L.D. 1236 (121st Me. Legis. 2003).

The truckers argue that, by their express terms, three provisions—22 M.R.S.A. §§ 1555-C(3)(A), 1555-C(3)(C), and 1555-D—are facially preempted by

---

[2] At this stage of the proceedings, the truckers have asserted a facial preemption argument (determined by reading only the words of the Maine statute), not an as-applied challenge (determined by examining the actual effect of the law). The Maine Attorney General agreed at a January 8, 2004 conference of counsel that there is no pending cross-motion for summary judgment, and therefore the truckers' motion to strike is moot.

2

the Federal Aviation Administration Authorization Act of 1994 ("FAAAA").[3] Section 1555-C(3)(A) directs that when tobacco retailers ship products pursuant to a delivery sale, the tobacco retailers must give the delivery service the age of the purchaser.  Section 1555-C(3)(C) directs that tobacco retailers use only a delivery service that: (a) requires the purchaser and the addressee to be the same person; (b) requires the addressee to be of legal age to purchase tobacco products; and (c) requires the addressee to sign for the package, and, if under 27 years old, to present a valid identification showing proof of legal age.  Section 1555-D, entitled "Illegal Delivery of Tobacco Products," provides:

> A person may not knowingly transport or cause to be delivered to a person in this State a tobacco product purchased from a person who is not licensed as a tobacco retailer in this State, except that this provision does not apply to the transportation or delivery of tobacco products to a licensed tobacco distributor or tobacco retailer. [4]

The truckers are presenting a "facial" challenge to the Maine law, arguing that preemption can be determined merely by reading its terms.  Therefore, I do

---

[3] That statute extends to trucking so as to level the playing field between air and motor carriers who, despite conducting similar operations, previously faced a patchwork of inconsistent regulation.  H.R. Conf. Rep. No. 103-677, at 82, 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1754, 1759 (citing Federal Express Corp. v. California Pub. Utils. Comm'n, 936 F.2d 1075 (9th Cir. 1991)).

[4] Section 1555-D provides that a transporter is "deemed to know that package contains a tobacco product" if it is marked in accordance with section 1555-C(3)(B) ("The tobacco retailer shall clearly mark the outside of the package of tobacco products to be shipped to indicate that the contents are tobacco products and to show the name and State of Maine tobacco license number of the tobacco retailer."), or "if the person receives the package from a person listed as an unlicensed tobacco retailer by the Attorney General under this section."

not at this point have information on how the law is actually being enforced or what its present effect is.[5]

## II. ANALYSIS

### A. *Federal Preemption and the FAAAA*

The Supremacy Clause of the United States Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, §1, cl. 2.  Because of the Supremacy Clause, state laws that "interfere with, or are contrary to" constitutional federal law are preempted. Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 822 (1st Cir. 1992), cert. denied, 506 U.S. 1052 (1993) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824)).  According to the Supreme Court, "pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose."  Morales v. Trans World Airlines, Inc., 504 U.S. 374, 383 (1992) (quoting FMC Corp. v. Holliday, 498 U.S. 52, 56-57 (1990)).  Whether express or implied, the fundamental question is Congress's intent, as revealed in the

---

[5] As of January 2004, no administrative rules have been adopted or proposed by Maine's Department of Human Services or Department of Administrative and Financial Services regarding the implementation of 22 M.R.S.A. §§ 1555-C, 1555-D.  Human Services did publish rules implementing 22 M.R.S.A. § 1551-A.  See Me. Code R. 10-144-203 (2004).

On August 28, 2003, the Tobacco Enforcement Coordinator of the State of Maine Office of the Attorney General did send letters to delivery services explaining the law's requirement.  See *(continued on next page)*

4

language of the provisions as well as the structure and purpose of the statute. See United Parcel Service, Inc. v. Flores-Galarza, 318 F.3d 323, 334 (1st Cir. 2003) (citing Morales, 504 U.S. at 383).  See also Rhode Island Public Towing Assoc., Inc. v. State of Rhode Island, 1997 U.S. Dist. LEXIS 3316, *9 (D. R.I. 1997) (citing Morales, 504 U.S. at 383; Greenwood Trust, 971 F.2d at 823; French v. Pan Am Express, Inc., 869 F.2d 1, 2 (1st Cir. 1989)).

The FAAAA is a constitutional law passed by Congress to regulate interstate trucking.  The purpose of the FAAAA is to prevent states from interfering with the goal of federal deregulation by imposing regulations of their own.[6] Flores-Galarza, 318 F.3d at 335 (citing Morales, 504 U.S. at 378).  Congress was explicit as to the law's preemptive effect:

> [A] State, political subdivision of a State, or political authority of 2 or more states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (1997).[7]  The First Circuit recently interpreted identical

---

Pls.' Statement of Material Facts ¶ 4.

[6] According to the federal drafters, a patchwork of state regulations of carriers, including "entry controls, tariff filing and price regulation, and types of commodities carried," had caused "significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets." H.R. Conf. Rep. No. 103-677, at 86-87, *reprinted in* 1994 U.S.C.C.A.N. at 1758-59.

[7] A number of state regulations and controls are expressly saved from preemption, for example: the safety regulatory authority of a state with respect to motor vehicles, the authority of a state to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of a state to regulate motor carriers with
*(continued on next page)*

language in a parallel preemption provision.⁸  It ruled that the phrase "related to" has a broad meaning in ordinary usage, and when used in the FAAAA the preemption provision must likewise be given a broad reach.⁹  See Flores-Galarza, 318 F.3d at 335.  The First Circuit has concluded that state laws and regulations "having a connection with or reference to" a motor carrier's prices, routes or services are eligible for preemption.  See id. (citing Morales, 504 U.S. at 384).  According to the First Circuit, "[a] sufficient nexus [for preemption] exists if the law expressly references the [motor] carrier's prices, routes or services, *or* has a 'forbidden significant effect' upon the same."  Id. (emphasis added) (citing Morales, 504 U.S. at 388).

### B. *Sections 1555-C(3)(A) and 1555-C(3)(C)*

The truckers challenge sections 1555-C(3)(A), 1555-C(3)(C), and 1555-D.

---

regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.  See 49 U.S.C. § 14501(c)(2).

None of the express exemptions applies to the challenged Maine Tobacco Delivery Law provisions.  This is not a case about cargo liability or safety over the road, like speed limits or the transportation of hazardous materials.  Tobacco is not hazardous in transit, but only when consumed.  However, the quoted list is not exclusive, although Congress did not want states to use safety rules as a guise for economic regulation.  H.R. Conf. Rep. No. 103-677, at 84, *reprinted in* 1994 U.S.C.C.A.N at 1756. ("This list is not intended to be all inclusive . . . . The conferees do not intend the regulatory authority which States may continue to exercise . . . to be used as a guise for continued economic regulation . . . .").

⁸ In Flores-Galarza, the First Circuit interpreted 49 U.S.C. § 41713(b)(4)(A), a parallel provision that contains text identical to 49 U.S.C. § 14501(c)(1) but applies to air rather than motor carriers.

⁹ The First Circuit observed that in passing the FAAAA, Congress did not intend to alter the broad preemption interpretation adopted by the United States Supreme Court interpreting a comparable ERISA provision in Morales, even though the Supreme Court later stepped back from this expansive preemption interpretation in ERISA cases. Flores-Galarza, 318 F.3d at 334 n.17 (citing H.R. Rep. No. 103-240, at 83 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1676, 1755).

6

Sections 1555-C(3)(A) and 1555-C(3)(C), however, apply only to tobacco retailers who ship tobacco products. These sections do not apply to delivery carriers, and truckers face no penalties under these provisions. 22 M.R.S.A. § 1555-C(3) ("The following provisions apply to a tobacco retailer shipping tobacco products pursuant to a delivery sale."). To be sure, the provisions do force retailers to use delivery carriers that offer certain services. See 22 M.R.S.A. §1555-C(3)(C) (requiring tobacco retailers to use a delivery service that requires the purchaser to be the addressee, the addressee to be of legal age to purchase tobacco products and sign for the package, and, if the addressee is under 27 years old, to present a valid identification showing proof of age); 22 M.R.S.A. § 1555-C(3)(A) (requiring the tobacco retailer, prior to shipping, to provide the delivery service the age of the purchaser). Ultimately that restriction may significantly affect the business of interstate trucking, but that can be determined only by examining the law as it is applied, not by the facial challenge that the truckers have raised in this motion. Sections 1555-C(3)(A) and 1555-C(3)(C) do not facially apply to carriers and do not expressly reference motor carrier prices, routes or services. I therefore conclude that 22 M.R.S.A. §§ 1555-C(3)(A) and 1555-C(3)(C) are not facially preempted by the FAAAA, 49 U.S.C. § 14501(c)(1).[10]

---

[10] I express no opinion as to whether 22 M.R.S.A. §§ 1555-C(3)(A) and 1555-C(3)(C) may in practice have a forbidden significant effect upon motor carrier prices, routes or services.

*C.  Section 1555-D*

Section 1555-D "refers to" motor carrier services directly:  "A person may not knowingly transport or cause to be delivered to a person in this State a tobacco product purchased from a person who is not licensed as a tobacco retailer in this State, except that this provision does not apply to the transportation or delivery of tobacco products to a licensed tobacco distributor or tobacco retailer."   22 M.R.S.A. §1555-D.  The truckers point out that this provision will require them to ensure that any packages containing tobacco products are delivered only if the shipper is licensed or the packages are addressed to licensed cosignees.  Ennis Decl. ¶ 4.  Thus, it satisfies one of the criteria that lead to preemption under the First Circuit test.  But in determining preemption I must also assume that "the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."  Greenwood Trust, 971 F.2d at 823 (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  That is so because the authority to preempt state law is "an extraordinary power . . . that we must assume Congress does not exercise lightly."  Id. (citing Gregory v. Ashcroft, 501 U.S. 452, 460 (1991)).  According to the First Circuit ruling on the parallel FAAAA preemption question for air transport, there is a presumption *against* preemption when Congress legislates in a field that has traditionally been regulated by the

states.  Flores-Galarza, 318 F.3d at 336 (internal citations omitted).  See also Hillsborough County v. Automated Medical Labs., Inc., 471 U.S. 707, 715 (1985) (recognizing presumption that state and local regulation of matters related to health and safety is not invalidated under the Supremacy Clause); Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996); Rice, 331 U.S. at 230.

In Flores-Galarza, the First Circuit found federal preemption of a Puerto Rico law because the law dealt with air transportation, an area where Congress, not the states, has had a significant and undisputed presence.[11]  Flores-Galarza, 318 F.3d at 336.  Air transportation was not traditionally regulated by states.  In contrast, states have historically regulated the ground transport or delivery of dangerous products, especially to minors in order to protect their health, a traditional state concern.  For Maine examples, see 17-A M.R.S.A. §§ 554-A, 554-B(2) (2003) (unlawful to deliver handgun to a minor); 28-A M.R.S.A. § 2081 (2003) (unlawful to deliver liquor to a minor).  See also Wis. Stat. § 961.575 (2003) (unlawful to deliver drug paraphernalia to a minor); Mass. Gen. Laws Ann. ch. 94, § 307C (2004) (permitting establishment of regulations to prevent the sale or delivery of tobacco to minors); 720 Ill. Comp. Stat. 685/4 (2004) (unlawful to

---

[11] Under the Puerto Rico statute, no interstate carrier transporting any package subject to an excise tax could deliver the package unless the recipient presented a certificate from the Department of the Treasury evidencing payment of the tax.  In the alternative, a carrier could prepay the taxes owed, deliver the packages and seek reimbursement.  Flores-Galarza, 318 F.3d at 326 (citing 13 P.R. Laws Ann. §§ 9066, 9077).  Puerto Rico was trying to find an effective way to *(continued on next page)*

deliver tobacco or smoking herbs to minors).  Moreover, Congress has explicitly recognized the states' traditional authority to tax the sale and use of tobacco products, see 15 U.S.C. § 375 et seq. (1997), and has sought to help states collect cigarette taxes, recognizing that interstate shipments to consumers deprived states of large amounts of revenue. S. Rep. No. 644, *reprinted in* 1949 U.S. Code Cong. Service 2158, 2158-59; S. Rep. No. 1147, *reprinted in* U.S.C.C.A.N. 2423, 2423.

Maine enacted its Tobacco Delivery Law with two primary goals:  to limit the consumption of tobacco products by minors, and to track delivery sales in order to acquire lost tax revenue.[12]  See 22 M.R.S.A. §§ 1555-B, 1555-C(3), (4); L.D. 1236, Summary (121st Me. Legis. 2003).  The law both protects public health and aids in the state's ability to collect taxes on tobacco.  Laws concerning the delivery of

---

collect taxes and in doing so created significant burdens on air transportation, resulting in preemption by the FAAAA.

[12] The growing incidence of internet and telephone delivery sales of tobacco products had two negative effects—increased accessibility of tobacco products to minors, and lost tax revenue for the state.  See Committee File of the Committee on Health and Human Services and Committee on Taxation on "An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors" (April 29, 2003).  The Maine law requires retailers selling tobacco products in Maine to be licensed.  22 M.R.S.A § 1551-A.  Licensed retailers must file reports so that they will be properly taxed, and must use a delivery service that confirms the purchaser/addressee is of legal age to buy tobacco products.  See 22 M.R.S.A. §§ 1555-C(3), (4). The deliverers are the enforcement mechanism—they can only deliver tobacco products purchased from a licensed retailer (*i.e.,* those retailers who won't sell to minors and who pay taxes). I do recognize that the First Circuit in Flores-Galarza found that United Parcel Service, forced to collect excise taxes under the Puerto Rico statute which forbade delivery unless and until a recipient produced a treasury certificate, faced significant delay and additional costs.  318 F.3d at 336.  But such significant forbidden effects are not apparent on the face of this Maine statute.

10

hazardous substances and the collection of taxes on the sale of tobacco products are historically within the state's police power. This is not a disguised attempt to impose state regulations on interstate trucking. The challenged provisions are not limited to carriers; they prohibit *any* person from knowingly delivering cigarettes purchased from anyone but a licensed retailer. See 22 M.R.S.A. § 1555-D. The Maine Tobacco Delivery Law is like a variety of other statutes regulating the transportation and distribution of potentially harmful items, and requiring carriers to conform to state administrative regulations, receive state authorization, or limit transport to certain parties.[13]

---

[13] For Maine examples, see, e.g., 12 M.R.S.A. § 8306 (2003) ("may . . . prohibit the transportation . . . of any forest or shade tree or part of any forest or shade tree . . . capable of supporting a disease or insect infestation . . . ."); 8 M.R.S.A. § 225 (2003) ("No person may transport fireworks in any motor vehicle or in any conveyance except as may be permitted by the rules promulgated by the Commissioner of Public Safety."); 17-A M.R.S.A. §1118 (2003) ("A person is guilty of illegal importation of scheduled drugs if the person intentionally or knowingly brings, carries or transports a scheduled drug other than marijuana into the State from another state or country . . . ."); 28-A M.R.S.A. § 2073 (2003) ("No person may knowingly transport within the State any liquor: A. With intent to sell the liquor in the State in violation of law; B. With intent that the liquor be illegally sold by any person; or C. With intent to aid any person in illegal sale of liquor."); 28-A M.R.S.A. § 2077 (2003) ("No person other than a wholesale licensee, small brewery licensee or farm winery licensee may transport or cause to be transported malt liquor or wine into the State in a quantity greater than 3 gallons for malt liquor and 4 quarts for wine, unless it was legally purchased in the State."); 7 M.R.S.A. § 3981(2002) (regulating periods of confinement and conditions for transportation of animals); 12 M.R.S.A. §§ 7534, 12354 (2003) ("[C]ommon carrier accepting any wild animal or wild bird for transportation shall: 1. CHECK LICENSE. Be satisfied that the person presenting that animal or bird for shipment is the person to whom the hunter's license offered for inspection was issued; 2. AFFIX TAGS. Securely affix any tags and identification required by this chapter; and 3. MAKE RETURNS. Make such returns to the commissioner as he may require."); 17-A M.R.S.A. § 554-B(2) ("A person is guilty of unlawfully transferring a handgun to a minor if that person knowingly transfers a handgun to a person who the transferor knows or has reasonable cause to believe is a minor.").

11

The truckers argue that the FAAAA's goal to eliminate state regulation included state restrictions on "types of commodities carried," citing a statement in the conference committee report that led to the FAAAA's enactment. Pl.'s Mot. at 8 (citing H.R. Conf. Rep. No. 103-677, at 86, *reprinted in* 1994 U.S.C.C.A.N. at 1758).[14] But the same report stated that as of August 1994, Maine was not a jurisdiction that impermissibly regulated prices, routes, and services. H.R. Conf. Rep. No. 103-677, at 86, *reprinted in* 1994 U.S.C.C.A.N. at 1758. (Nor were Alaska, Arizona, Delaware, District of Columbia, Florida, Maryland, New Jersey, Vermont, and Wisconsin.) Many of the Maine statutory provisions regulating the transportation of potentially harmful products were already in affect when Congress passed the FAAAA in 1994. See, e.g., 28-A M.R.S.A. §§ 2073, 2077 (liquor transportation provisions; originally enacted in 1987); 12 M.R.S.A. § 7534 (2003) (requirements for carriers transporting wild animals; originally enacted in 1979). See also Wis. Stat. § 29.357 (2003) (provision requiring labeling wild game shipments; originally enacted in 1985); N.J. Stat. §23:3-33 (2003) (labeling requirements for killed game; enacted pre-1994). Thus, the legislative history does not persuade me that Congress intended to preempt outright that

---

[14] Although the legislative history indicates that state regulation of the "types of commodities carried" is typical, there is no further discussion of such regulation, and thus I can make no inferences from the legislative history as to what types of restrictions on commodities, if any, Congress meant to preempt.  See H.R. Conf. Rep. No. 103-677, at 86-87, *reprinted in* 1994 U.S.C.C.A.N. at 1758-59.

12

traditional area of state concern. To adopt the truckers' argument would mean that states are foreclosed from regulating or prohibiting the transport of drugs, poached game, or other contraband, an unlikely result.[15] See <u>Robertson v. State of Washington Liquor Control Bd.</u>, 10 P.3d 1079, 1084 (Wash. Ct. App. 2000).

### III. CONCLUSION

I conclude that 22 M.R.S.A. § 1555-C(3)(A), 22 M.R.S.A. § 1555-C(3)(C), and 22 M.R.S.A. § 1555-D are not facially preempted by the FAAAA. I therefore **DENY** the truckers' motion for summary judgment.

The parties shall confer and by March 26, 2004, provide a stipulation of facts for the Court's ruling or, if they are unable to reach a stipulation, request an early conference with the Court to determine how the motion will proceed on the "as applied" challenge.

**SO ORDERED.**

**DATED THIS 6TH DAY OF FEBRUARY, 2004.**

/s/D. BROCK HORNBY
D. BROCK HORNBY
UNITED STATES DISTRICT JUDGE

---

[15] The truckers also argue that if Maine prevails, then states can varyingly prohibit or regulate the delivery of junk foods, diet aids, herbal remedies, and the like. Perhaps so; perhaps not. Each such law will have to be evaluated separately.

U.S. DISTRICT COURT
DISTRICT OF MAINE (BANGOR)
CIVIL DOCKET FOR CASE #: 1:03CV178

| | | |
|---|---|---|
| **NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION**<br><br>**MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC.**<br><br>**VERMONT TRUCK AND BUS ASSOCIATION, INC.**<br><br>   **Plaintiffs** | represented by | **MICHAEL A. NELSON**<br>Jensen, Baird, Gardner & Henry<br>P.O. Box 4510<br>Portland, ME 04112<br>(207) 775-7271<br>email: mnelson@jbgh.com |
| | | **LAWRENCE R. KATZIN**<br>**PAUL T. FRIEDMAN**<br>**RUTH N. BORENSTEIN**<br>Morrison & Foerester LLP<br>425 Market Street<br>San Francisco, CA 94105<br>(415) 268-7000<br>email: LKatzin@mofo.com |

v.

| | | |
|---|---|---|
| **G. STEVEN ROWE**, in his official capacity as Attorney General for the State of Maine<br><br>   **Defendant** | represented by | **MELISSA REYNOLDS O'DEA**<br>Assistant Attorney General<br>State House Station 6<br>Augusta, ME 04333-0006<br>(207) 626-8800<br>email: melissa.odea@maine.gov |