# UNITED STATES DISTRICT COURT

## FOR THE
## DISTRICT OF MAINE

|  |  |
|---|---|
| NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC., AND VERMONT TRUCK & BUS ASSOCIATION, INC.,<br><br>     Plaintiffs,<br><br>       v.<br><br>G. STEVEN ROWE, in his official capacity as Attorney General for the State of Maine,<br><br>     Defendant. | CIVIL ACTION NO.: 03-CV-178-B-DBH |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

NOW COMES the defendant, G. Steven Rowe, in his official capacity as Attorney General for the State of Maine, and, pursuant to Fed. R. Civ. P. 56, moves this Court for entry of summary judgment against plaintiffs for the reasons set forth below and in the accompanying Statement of Undisputed Material Fact.

### STATEMENT OF FACTS

**The Challenged Provisions.**  The substantial, adverse consequences of teenage addiction to tobacco and long-term use of tobacco products are well documented, and not in dispute.[1]

(Indeed, tobacco is now so abhorrent a substance that the carriers brought this suit through the

---

[1] Early addiction plays a key role in the deaths of hundreds of thousands of adult smokers each year from tobacco-related illnesses.  CDC, "Projected Smoking-Related Deaths Among Youth – United States," *MMWR* (November 8, 1996) (accessible at http://www.cdc.gov/mmwr/preview/mmwrhtml/00044348.htm).  Smoking exacts a heavy toll on the nation. As the United States Supreme Court has recognized, "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *Federal Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).  The human and financial costs of the death and disease caused by smoking are enormous. *Id.*

plaintiff associations in large part to avoid being linked with tobacco products.  *New Hampshire Motor Transport Association  v. Rowe* ("*N.H. Motor Trans. II*")*,* 2004 U.S. LEXIS 12105, at *16 n.7; *Transcript of June 25, 2004, Oral Argument,* at 18.)  In light of this public health threat, Maine adopted laws intended to preclude the sale and distribution of tobacco products to minors. In particular, "[t]obacco products may be…offered for sale only in a manner that does not allow the purchaser direct access to the tobacco products."  22 M.R.S.A. § 1555-B(11).   It is illegal in Maine for a minor to "purchase, possess or use cigarettes, cigarette paper or any other tobacco product." 22 M.R.S.A. § 1555-B(5).   Under Maine law, a person "may not sell, furnish, give away or offer to sell, furnish or give away a tobacco product to any person under 18 years of age" and may not sell "to any person under 27 years of age unless the seller first verifies that person's age by means of reliable photographic identification containing the person's date of birth."  22 M.R.S.A. § 1555-B(1) & (2).

Internet and telephone sales have become a serious problem.  *New Hampshire Motor Transport Ass'n v. Rowe* ("*N.H. Motor Trans. I*"), 301 F.Supp. 38, 45 n. 12 (D.Me. 2004) (citing Committee File of the Committee on Health and Human Services and Committee on Taxation on "An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors" (April 29, 2003)).  By means of delivery services, enterprising retailers seek to avoid "over the counter" age verification requirements by selling the tobacco products to minors and delivering them not "over-the-counter" but rather through third party carriers.  In order to deal with this particular problem, during the Spring 2003 legislative session the Maine Legislature passed Public Law Chapter 444, titled "An Act To Regulate the Delivery and Sales of Tobacco Products and To Prevent the Sale of Tobacco Products to Minors" (the "Act" or "Tobacco Delivery Law").

The Act requires a person who engages in the sale of tobacco products by means of delivery other than over-the-counter to take a number of steps to ensure that tobacco products do not reach the hands of minors.  Retailers engaged in delivery sales of tobacco to Maine citizens must obtain a retail license from the Maine Department of Human Services (22 M.R.S.A. § 1555-C(1)), just as over-the-counter retailers must (22 M.R.S.A. § 1551-A).  Just as age verification for persons under 27 years of age is called for when over-the-counter sales occur (22 M.R.S.A. § 1555-B(2)), the new Act requires the internet or telephone tobacco retailer to obtain age verification (22 M.R.S.A. § 1555-C(2)).

Plaintiffs focus on sections 1555-C(3)(A) and (C) and 1555-D (the "Challenged Provisions").  Subsections 1555-C(3)(A) and (C) apply only to retailers who ship tobacco products, not to the Members.  22 M.R.S.A. § 1555-C(3); *N.H. Motor Transp. I,* 301 F.Supp.2d at 43.  Section 1555-C(3)(C) requires tobacco retailers to use a delivery service that requires the purchaser to be the addressee, the addressee to be of legal age to purchase tobacco products and sign for the package, and, if the addressee is under 27 years old, to present a valid identification showing proof of age; and section 1555-C(3)(A)  requires the tobacco retailer, prior to shipping, to provide to the delivery service the age of the purchaser. These provisions only require a retailer who chooses to deliver tobacco products by means of a third party to do that which a retailer is required to do when delivering in-person "over-the-counter."  It does not require a *delivery service* to do anything unless it *chooses* to take on the delivery.

Section 1555-D, in pertinent part provides:

> A person may not *knowingly* transport or cause to be delivered to a person in this State a tobacco product purchased from a person who is not licensed as a tobacco retailer in this State, except that this provision does not apply to the transportation or delivery of tobacco products to a licensed tobacco distributor or tobacco retailer. A person is deemed to know that a package contains a tobacco product if the package is marked in accordance with the requirements of section

1555-C, subsection 3, paragraph B or if the person receives the package from a person listed as an unlicensed tobacco retailer by the Attorney General under this section.

> **1. Lists.** The Attorney General shall maintain lists of licensed tobacco retailers and known unlicensed tobacco retailers. The Attorney General shall provide to a delivery service lists of licensed tobacco retailers and known unlicensed tobacco retailers. The list of known unlicensed tobacco retailers is confidential. A delivery service that receives a list of known unlicensed tobacco retailers shall maintain the confidentiality of the list.
>
> * * * *
>
> **4. Affirmative defense.** It is an affirmative defense to a prosecution under this section that a person who transported tobacco products or caused tobacco products to be delivered reasonably relied on licensing information provided by the Attorney General under this section.

(Emphasis added.) [2]  The retailer is required to mark the package to indicate it contains tobacco products and to show its Maine tobacco license. 22 M.R.S.A. § 1555-C(3)(B).  These provisions, thus, effectively prevent the delivery services from "laundering" illegal sales of tobacco products.

The State has drafted rules for the administration and enforcement of this law.  *DSMF* ¶ 165.  A public hearing on these proposed rules has been scheduled for August 23, 2004, and the deadline for submitting comments is September 2, 2004.  *Id.*  The rules are expected to be effective on October 1, 2004.  *Id.*  Among other things, the proposed rules require the retailer to mark the label side of the package with a tobacco marking, and does not require a carrier to look at or visually scan the bottom of a package for tobacco markings.  *Id.*; Proposed 10-144 CMR Chapter 203, sections 10(C)(2) & 11.

**Factual Background.**  Plaintiffs are associations of entities that deliver packages to homes and businesses. (This brief will refer to these entities as the "Members.")   In this suit, plaintiffs seek to have this Court conclude that Congress intended, when it enacted the Federal

---

[2] Violations are civil violations punishable by fines of from $50 to $1500, and the Attorney General may enforce the law by seeking injunctive relief.  22 M.R.S.A. § 1555-D(2) & (3).

Aviation Administration Authorization Act of 1994 (the "FAAAA"), that the Members may *knowingly* facilitate illegal sales of goods to minors with complete immunity from state regulation.  Plaintiffs' argument would allow the Members to knowingly transport for third party customers any substance or article determined to be illegal by state legislatures, no matter how abhorrent the substance or article may be.  We are aware of no statutory provision or constitutional concept that contemplates such a result, and plaintiffs have yet to refer to any.

The facts relevant to this inquiry are set forth in detail in defendant's Statement of Undisputed Material Facts ("*DSMF*").  Those most pertinent, however, are as follows:

Plaintiffs rely entirely upon the experience of UPS regarding the Challenged Provisions. Ordinarily, UPS employees XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 2-4, 9, 11, 22, 27, 29-30, 37-38, 47-48.  In response to the Tobacco Delivery Act, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 105, 108-110, 112-113.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 112, 115. XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 106-108, 116.  XXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 117.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXX.  *DSMF* ¶ 147.  UPS XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 132-133.  XXXXXXXXX

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXX.  *DSMF* ¶ 114.  Although XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.
*DSMF* ¶ 111.  This opinion is tendered through a UPS sales manager XXXXXXXXXXXXXX
XXXXXXXXXXX.  *DSMF* ¶¶ 111, 133,157.  XXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXX ( *DSMF* ¶ 132), XXXXXXXXXXXXXX.  According
to this hypothesis, in Maine, therefore, XXXXXXXXXXXXXXXXXXXXXXXX[3] XXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXX[4] XXXXXXXX.  This XXXXXX increase finds no support in the record
– there is no evidence of XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 96, 124-
125, 127.  Based upon this figure, plaintiffs opine that it costs XXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 160-161.
UPS states that its net revenue per package is approximately XXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 100, 163.   Thus,
according to UPS's figures, the additional cost per package of the Challenged Provisions was
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 164.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 126.  XXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 128.  XXXXXXXXXXXXXXXXX

---

[3] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 111, 132.
[4] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXX.  *DSMF* ¶¶ 111, 132.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 128.

UPS's computer systems currently have the capability to XXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 67, 69.  For
each and every delivery, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXX.  *DSMF* ¶¶ 64, 65.  The XXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXX.  *DSMF* ¶ 134.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 135.  UPS had in place
before the Challenged Provisions a delivery confirmation and adult signature required service,
for a fee of $1.75 or $2.75, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXX.  *DSMF* ¶¶72-78.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 118.  XXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 136.  XXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF*
¶ 148.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶
124.

**Procedural History.**  At the outset, plaintiffs moved for summary judgment that the
Challenged Provisions are facially preempted by the FAAAA. On February 6, 2004, this Court
denied plaintiffs' motion, holding that the Tobacco Delivery Act is not facially preempted.  *N.H.*
*Motor Transp. I,* 301 F. Supp. 2d at 46.  In reaching that conclusion, this Court noted that the

Challenged Provisions are a legitimate exercise of the state's historic police powers to prevent the delivery of contraband tobacco to minors, and that Congress did not intend to preempt such laws. *Id.*

Defendant filed a motion for summary judgment on the facial challenge for the reasons set forth in the Court's denial, and to dismiss the remaining "as applied" claim on the ground that plaintiffs can not prosecute such a claim by means of associational standing. On June 30, 2004, the Court entered summary judgment for the defendants on plaintiff's facial preemption claim. *N.H. Motor Transp. II,* 2004 U.S. Dist. LEXIS 12105. However, the Court denied the motion regarding associational standing on the "as applied" preemption claim.

## **ARGUMENT**

This Court has concluded that, under the FAAAA[5] "there is a presumption *against* preemption when Congress legislates in a field that has traditionally been regulated by the states," and that the Challenged Provisions legislate in such fields – in particular public health and taxation of tobacco products. *N.H. Motor Transport I,* 301 F.Supp.2d at 43, 45; *see also, Hillsborough County v. Automated Med. Lab., Inc.,* 471 U.S. 707 (1985); *Davies Warehouse Co. v. Bowles,* 321 U.S. 144 (1944); *Ward v. New York,* 291 F.Supp.2d 188, 196-97 (W.D. N.Y. 2003). Plaintiffs' "facial," or "express terms," challenge was therefore rejected.

Plaintiffs are left with their "as applied" or "in effects" challenge, and in order to succeed must prove that the Challenged Provisions have a "forbidden *significant* effect upon [Members'] prices, routes or services". *N.H. Motor Transp. I,* 301 F.Supp.2d at 43 n.10 (emphasis added). Plaintiffs have chosen to rely entirely upon the experience of UPS, and, therefore, must convince the Court that the Challenged Provisions cause forbidden *significant* delays, *significant* changes

---

[5] The FAAAA provides that a state "may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).

in routes or services, or *significant* additional costs to UPS's operations.  Plaintiffs face a

particularly heavy burden here because "the historic police powers of the States [are] not to be

superceded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress."

*Hillsborough County,* 471 U.S. at 715; *see also, Pharmaceutical Research & Mfrs. of Am. v.*

*Concannon,* 249 F.3d 66 249 F.3d 66, 75 (1ˢᵗ Cir. 2001), *aff'd sub nom Pharmaceutical Research*

*& Mfrs. of Am. v. Walsh,* 538 U.S. 644 (2003)(federal preemption of a state law is "strong

medicine," and is "not casually to be dispensed.")  As the record shows, plaintiffs have not

carried this burden.

The Challenged Provisions are not preempted by the FAAAA for two reasons.  First,

Congress did not intend to preempt state laws enacted to prevent minors from acquiring tobacco

products.  Second, there is no evidence in the record to demonstrate that the Challenged

Provisions have a forbidden significant effect of any carrier's services.

### CONGRESS DID NOT INTEND TO PREEMPT THE STATES FROM REGULATING DELIVERY OF TOBACCO PRODUCTS.

The legislative history of the FAAAA demonstrates that the Congressional purpose was

two-fold.  *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d

1184, 1187 (9ᵗʰ Cir. 1998), *cert. denied* 526 U.S. 1060 (1999).  First, Congress intended "to

eliminate non-uniform state regulations of motor carriers which had caused 'significant

inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology,

and curtailed the expansion of markets.'"  *Id., quoting* H.R. Conf. Rep. No. 103-677, at 86-88

(1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1758-60.  Second, Congress sought to "even the

playing field" between air carriers and motor carriers.  *Mendonca*, 152 F.3d at 1187, *citing to*

H.R. Conf. Rep. No. 103-677, at 85, *reprinted in* 1994 U.S.C.C.A.N. at 1757, 1759.   Thus, the

FAAAA was intended to preempt economic regulation, and "the regulatory authority retained by

the states was not 'to be used as a guise for continued economic regulation as it relates to prices, routes or services.'" *United Parcel Service v. Flores-Galarza*, 318 F.3d 323, 337 (1st Cir. 2003), *quoting* H.R. Conf. Rep. No. 103-677 at 84 (1994), reprinted in 1994 U.S.C.C.A.N. 1676, 1756; *see, Ace Auto Body & Towing, Ltd. v. City of New York,* 171 F.3d 765, 776 (2d Cir. 1999); *Ward,* 291 F.Supp.2d at 210.  The effects are "forbidden," therefore, only if they relate to economic regulation of the carriers.

Without a doubt, the Tobacco Delivery Act is not *economic* regulation.  Rather, it is solidly within the ambit of traditional state regulation over public health and welfare, here intended to combat the "pernicious effects of cigarette smoking and the possibility that purchasers of any age may supply youthful smokers who do not themselves purchase through direct channels." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 217 (2d Cir. 2003).  Just as Maine clearly is fully within its sovereign powers to outlaw the sale and furnishing of tobacco products to minors, certainly it may plug the conduits through which the illegal trade to minors may flow.  The plaintiffs have pointed to no legislative history or case law which supports the notion that by passing the FAAAA, Congress intended to preempt the states from enacting laws to prevent tobacco products, or other noxious substances or items, from ending up in the hands of minors.     Plaintiffs may argue that the list of those particular types of state regulation which are not intended to be preempted (49 U.S.C. § 14501(c)(2)),[6] somehow precludes the state from engaging in public health regulation that may have some affect on carriers.  However, the legislative history clearly provides that the list of permissible areas of

---

[6] 49 U.S.C. § 14501(c)(2) provides:

> Paragraph (1) shall not restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle, or the authority of a State to regulate carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

state regulation contained in the FAAAA "is not intended to be all inclusive, but merely to specify some of the matters which are not 'prices, [routes], or services' and which are therefore not preempted."  1994 U.S.C.C.A.N. at 1756; *N.H. Motor Transp. I,* 301 F.Supp.2d at 41 n.7. Thus, plaintiffs can find no support for this theory that state public health laws are preempted by the FAAAA.  In light of this, without more, the plaintiffs' as applied claim should be denied.

## NO SIGNIFICANT EFFECTS.

Assuming the Court finds it necessary to delve into the actual effects of the Challenged Provisions on UPS's routes, services and prices,[7] there has been no showing of "forbidden significant effects."[8]   In assessing the effects, if any, the courts consider the "proper and legitimate balance between federal and state authority."  *Mendonca*, 152 F.3d at 1189.  Thus, plaintiffs do not succeed by proving some effects, but can only sustain their claim by showing significant ones.

---

[7] Under *Flores-Galarza,* there is a sufficient nexus if the state law expressly references the carriers' prices, routes or services or has a "forbidden significant effect" upon them.  318 F.3d at 335.  This Court has already found that the Challenged Provisions do not make express reference to carriers' prices, routes or services.  *N.H. Motor Transp. I*, 301 F.Supp. at 43 & 46.

[8] This Court has rejected defendant's argument that associational standing is inappropriate in the circumstances presented by this case.  A tangential issue is the scope and effect of any decision based upon only the experience and facts related to UPS.  *Transcript of June 25, 2004 Argument,* at 18-19.  As noted by the Court, plaintiffs' view is that if a state law has a "significant effect" on a single service or route of a single carrier, the law is preempted in its entirety under 49 U.S.C. § 14501(C)(1).   Thus, for example, if plaintiffs were to present as its "test" case a tiny carrier whose business was based entirely upon transporting tobacco products from an unlicensed, internet retailer to residential customers in Maine, the Challenged Provisions would be preempted as against all carriers.  We do not believe there is support in the FAAAA for such an extreme result.  In the present case, the hundreds of carriers comprising the plaintiff associations appear to have tied their cases entirely to the experience of UPS, choosing not to present any other evidence and are therefore bound by any adverse decision arising therefrom.  In other words, that is how they have chosen to vindicate their claims, and they are thus bound by that strategic decision.  On the other hand, for the state likewise to be bound by a ruling based upon the facts relating to a single carrier when, with all due respect to the Court's ruling, discovery on the effects on the other carriers by means of third-party discovery is extraordinarily difficult and problematic, turns the purpose of associational standing on its head.  For these reasons, it is the defendant's position that a ruling adverse to it should be binding only "as applied" to UPS.

**Section 1555-C:  Requirements Imposed Upon Tobacco Retailers**

This Court concluded that section 1555-C(3)(A) and 1555-C(3)(C) do not expressly reference carrier prices, routes or services, but afforded plaintiffs the opportunity to prove that these provisions "in practice have a forbidden significant effect" even though the provisions do not directly regulate the Members.  *N.H. Motor Transp. I,* 301 F.Supp.2d at 43  n.10.   Section 1555-C imposes a duty on tobacco retailers engaged in delivery sales to obtain a license from the state of Maine, and to use a delivery service that requires the purchaser to be the addressee and provides age verification services.  Section 1555-C further provides that any tobacco product sold in a delivery sale that does not meet those requirements is contraband, subject to forfeiture (22 M.R.S.A. § 1555-C(7)), and imposes a civil penalty on the shipper, but not on the carrier. These provisions do not directly apply to the Members, and thus they must show some sort of indirect significant impact.  The only effect would appear to be a loss of business to a particular Member if it did not already provide, or agree to provide, the service.

First, loss of business does not support a finding of preemption where the state statute, as here, is designed to foster public health.  *PhRMA,* 538 U.S. at 666 & 668.  The exercise of the states' police powers often results in the loss of or transfer of some business, but such a result does not support a claim under preemption.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶¶ 101, 138-141) is a business decision of no constitutional consequence.  *Id.*  More importantly, section 1555-C has no effect whatsoever on the Congressional purpose of the FAAAA – economic deregulation of motor carriers.  The only effect it has on plaintiffs' Members is potential loss of illegal trade – that is, unlicensed tobacco retailers are prohibited from using Members' services to unlawfully deliver tobacco to minors.

Indeed, here, the only claim XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXX.  *DSMF* ¶¶ 87-88, 90.  There is no evidence in the record, however, that any XXXXXXXXXX was attributable to the Challenged Provisions.  *DSMF* ¶ 89.  In fact, XXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 96.  Moreover, the information presented – XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX – is double hearsay, based upon statements allegedly made XXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXX, and therefore cannot be considered.  Fed.R.Evid. 802.  In any event, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, and accordingly their packages are contraband in Maine.  *DSMF* ¶ 91; 22 M.R.S.A. § 1555-C(7).  Therefore, the only effect of the Challenged Provisions on UPS is XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  Thus, any effect of the Challenged Provisions on the plaintiffs' members is not of the type Congress intended to trigger preemption.

Second, to the extent the Court believes it must venture further to consider what effects there would be if UPS intended to take on such business (a somewhat hypothetical undertaking), plaintiffs have not shown that such effects are in any way significant.  There is no evidence that these provisions have had any or would have any significant effect on UPS's prices, routes or services.  Regarding the age verification requirements, if UPS chose to provide for such in tobacco deliveries, it already has an age verification service in place, XXXXXXXXXXXXXXXX. *DSMF* ¶ 74-78.  There is no evidence that XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13

XXXXXXXXXXXX.  *DSMF* ¶ 74, 140-141.  XXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.
*DSMF* ¶ 54, 59-61.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 54-61.
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶ 64-65.  UPS's XXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXX (*DSMF* ¶ 121) XXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX,
XXXXXXXXXX.  *DSMF* ¶ 134-135, 140-147.  XXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶¶ 101,
138, 140-141), therefore seems not to be based upon any facts but upon mere conjecture.
Without evidence regarding how easy or difficult such a change might entail, UPS cannot prove
any "forbidden significant effects."

### Section 1555-D:  All Persons Prohibited from Knowingly Delivering Tobacco from Unlicensed Retailer to Maine Consumer

As this Court has already found, the purpose of section 1555-D is not to impose
economic regulation on motor carriers but rather is to further traditional state fields of regulation.
Section 1555-D is a law of general application that prohibits *any person* from *knowingly*
delivering contraband cigarettes to Maine children.  22 M.R.S.A. § 1555-D.  Tobacco sold to a
Maine consumer by an unlicensed tobacco retailer is contraband, subject to forfeiture.  22
M.R.S.A. §§ 1555-C(7), 1555-D(6).  Therefore, in order to enter judgment for the plaintiffs, this
Court would need to find that when enacting the FAAAA, Congress clearly and manifestly
intended to eliminate the state's ability to prevent any person, including common carriers, from

*knowingly* transporting or delivering contraband.  Such a finding is unsupported in the statute, case law or the record.[9]

Addressing a similar issue, the Washington State Court of Appeals held that a state statute that prohibits any person from "transporting unstamped cigarettes" is not preempted by the FAAAA.  *Robertson v. State of Washington Liquor Control Board,* 10 P.3d 1079, 1083 (Wash. App. Ct. 2000).  The Washington court found that when enacting the FAAAA, Congress did not have any "clear and manifest interest" to preempt the field of transportation of cigarettes "considered contraband under state law," even if this was a "service" provided by a motor carrier.  *Id.*  Thus, while enforcement of the state statute directly affected the plaintiff's use of his truck to provide this "service," the state statute was not preempted because it had no more than an "indirect, remote and tenuous" relationship with the deregulatory purpose of the FAAAA.  *Id.* at 1084.

Plaintiffs place heavy reliance on the First Circuit's decision in *United Parcel Service, Inc. v. Flores-Galarza,* 318 F.3d 323 (1st Cir. 2003).  *Flores-Galarza* involved a challenge to Puerto Rico's statutory scheme governing deliveries by interstate carriers in order to ensure payment of certain taxes.  *Id.* at 325.  The law provided that an interstate carrier could not deliver any package "unless the carrier first provide[d] proof that the package's addressee had paid the appropriate excise tax, or the carrier prepays the amount of the tax on the addressee's behalf." *Id.*  The First Circuit found that the Puerto Rican law was preempted by the FAAAA.  *Id.* at 332. That case is easily distinguishable for several reasons.

---

[9] Under plaintiffs' theory, their members could knowingly receive and transport stolen property, or knowingly participate in other illegal ventures, such as arms trading with no repercussions for their actions.  Further, state laws related to the transportation of explosives, liquor or wild birds would have no force or effect upon them.

15

First, because the Puerto Rico law was not legislation "in a field traditionally occupied by the states," the First Circuit did not apply the "presumption against preemption." *Id.,* at 336. Here, the Tobacco Delivery Act deals directly with a matter that is traditionally within the ambit of state regulation:  preventing children from obtaining unhealthy products.

Second, the Puerto Rico law was economic regulation specifically directed at interstate carriers, therefore falling clearly within the preemptive intent of Congress.  Its sole purpose was to ensure that the commonwealth of Puerto Rico collected tax revenues due it from its own citizens.  It did so by expressly imposing significant administrative and financial burdens on carriers for every package they delivered.  That is the type of law that Congress clearly and manifestly intended to preempt.  Further, the challenge in that case was based on a record that revealed that the plaintiff in that action would incur more than $4.6 million in costs associated with compliance.  *Id.,* at 327.  No such showing is, or can be, made here.  Indeed, the only estimates presented, to the extent they are even cognizable XXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 100, 111, 114, 124, 126, 128, 133, 136, 140, 158-164.

Finally, in *Flores-Galarza,* the Court found, based upon an undisputed record, that the Puerto Rico law significantly affects "the timeliness and effectiveness of … services" and "imposes extensive requirements," which create a substantial burden in the form of additional labor, costs and delays.  318 F.3d at 336.  Here, plaintiffs have failed to present evidence supporting such a finding.

Plaintiffs have presented no evidence that XXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXX.  Regarding prices, XXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXX.  With respect to services, as to the provision regarding *knowing* transportation due to

16

tobacco markings on the package, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶¶ 2-4, 9, 11, 22, 27, 29-30, 37-38, 47-48.  In response to the Tobacco Delivery Act, XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXX. *DSMF* ¶¶ 105, 109-110.  XXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXX. *DSMF* ¶¶ 112, 115.  XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶¶ 106-107.  XXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶ 117.  This XXXXX cannot be considered a significant deleterious impact.

The only evidence of any effect on UPS's prices and services is XXXXXXXXXXXXX XXXXXXXXXXXXXXXXXX[10] costs XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶¶ 100, 164.  By no stretch of the imagination can XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX be considered significant. Indeed, even that estimate is suspiciously high because it is based upon the notion that XXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXX. *DSMF* ¶¶ 111, 132.  UPS presents no facts to support that notion, and it defies common sense that XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

---

[10] XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX. *DSMF* ¶ 126. XXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶ 128) XXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶ 128XXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXX.

XXXXXXXX.  Indeed, as it turns out, this suggestion is the bare opinion of a sales manager not identified or qualified as an expert (*DSMF* ¶¶ 157-159), and therefore should be discounted in its entirety on that basis alone.  Fed. R. Civ. P. 26(a)(2); Fed.R.Evid. 701.[11]  XXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 114, 133, 147.  XXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 124.

Regarding the concern over having to identify licensed and unlicensed retailers and consignees from lists provided by the State, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXX.  *DSMF* ¶¶ 67, 69.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶¶ 64, 65.  XXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXX.  *DSMF* ¶¶ 134, 135.  XXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXX (*DSMF* ¶ 121),  XXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶¶ 142-146) XX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (*DSMF* ¶ 141)**,** XXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXXXX.  *DSMF* ¶ 148.

---

[11] In addition, XXXXXXXXXXXXXXXXXXXXXXXXXXXX when the proposed rules are promulgated, which require the shipper to place the tobacco markings on the same side as the label and do not require the carrier to look at the "bottom" of the package.  *Proposed 10-144 CMR Chapter 203*.

Plaintiffs have failed to present evidence that the Challenged Provisions have had a significant effect on UPS's routes, prices or services.[12]   Therefore, summary judgment must be entered against the plaintiffs.

## SEVERABILITY

There is a presumption that Maine statutes are severable.  1 M.R.S.A. § 71.  To the extent that this Court concludes that some of the Challenged Provisions are unconstitutional, the others should remain enforceable.  We suggest that in such circumstances, the parties should be permitted to further brief the severability issue in view of the numerous permutations that may occur.

---

[12] Although it is not necessary for the Court to reach the issue, it should be noted that the expansive and literal interpretation of the statutory language "relates to" has undergone a contraction.  *N.H. Motor Transp. I,* 301 F.Supp.2d at 335 n.19.  When applying FAAAA, the courts have looked to the construction of identical language in ERISA.  *Id.*  The language was given a "deliberately expansive" interpretation early on, whereby a state law "relates to" something if it simply has any possible connection with or reference to the object of federal regulation.  *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 n.16 (1983); *see, Morales,* 504 U.S. at 384; *see also, Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 46 (1987).  More recently, however, the courts have moved away from its prior "uncritical literalism" and adopted a far narrower and more practical analysis.  *Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A.,* 519 U.S. 316 at 325 & 335 (1997) (Scalia, J., concurring) ("Applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.")  Rejecting the inclusive and mechanical reading of the 'related to' statutory language, the Supreme Court now favors an approach that centers on whether or not the challenged statute's effects interfere in a meaningful manner with the federal statute's purpose.  *Id.; New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 655 (1995) (interpreting identical 'related to' language in ERISA preemption); *Carpenters Local Union No. 26 v. United States Fidelity & Guar. Co.,* 215 F.2d 136, 139-40 (1st Cir. 2000).

The First Circuit in *Flores-Galarza,* 318 F.3d at n.19, chose not to follow those courts who have applied the "narrowing preemptive effect," in large part we believe because the case clearly involved economic regulation and even under the narrower view it could not withstand scrutiny.  The narrower view is well-reasoned, and we suggest will eventually carry the day.  *See, Mendonca,* 152 F.3d at 1188-89; *Ward,* 291 F.Supp.2d at , at 208-09.  Otherwise, under plaintiffs' view, the preemption provision here would be read so broadly that "preemption would never run its course, for really, universally, relations stop nowhere."  *Travelers,* 514 U.S. at 655 (interpreting identical 'related to' language in ERISA preemption).  In any event, this Court need not reach the issue in the present case as *Flores-Galarza* is clearly distinguishable, and the Act is not preempted even under the broader interpretation.

## CONCLUSION

For the reasons set forth above, summary judgment should be entered for defendant on all of plaintiffs' claims.

Dated:  August 9, 2004                Respectfully submitted,

                                       G. STEVEN ROWE
                                       Attorney General

                                        PAUL STERN
                                        Deputy Attorney General

                                        /s/ MELISSA REYNOLDS O'DEA
                                        Assistant Attorney General
                                        Six State House Station
                                        Augusta, ME 04333-0006
                                        Tel. (207) 626-8800
                                        Fax (207) 287-3145

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of August, 2004, I electronically filed a redacted version of this, *Defendant's Motion for Summary Judgment with Incorporated Memorandum of Law,* with the Clerk of Court, and caused to be delivered an unredacted version under seal with the Court and the parties.  There are no non-registered parties requiring service by mail.

                                        /s/ MELISSA REYNOLDS O'DEA