## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | | |
|---|---|---|
| NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION, ET AL., | ) ) ) | |
| | ) | |
| PLAINTIFFS | ) ) | |
| v. | ) ) | CIVIL NO. 03-178-B-H |
| G. STEVEN ROWE, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL FOR THE STATE OF MAINE, | ) ) ) ) | |
| DEFENDANT | ) ) | |

## DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

The Interstate Commerce Clause gives Congress the authority "[t]o regulate commerce with foreign nations, and among the several States."[1]  Congress has exercised this constitutional power to enact legislation that limits state authority over the transportation of goods by air and motor carriers.  Does this federal legislation preempt a Maine statute that regulates carriers when they deliver tobacco products in Maine?  Maine lawmakers had two worthy objectives in enacting the state statute:  to reduce Maine teenagers' access to tobacco products and to collect tobacco taxes.[2]  But worthy motives are not enough to avoid federal preemption, as other states learned when they tried to regulate consumer fraud or

---

[1] U.S. Const. art. I, § 8, cl. 3.
[2] I have provided more detail on the reasons for the Maine legislation in New Hampshire Motor Transport Ass'n v. Rowe ("N.H. Motor I"), 301 F. Supp.2d 38, 44-45 & n.12 (D. Me. 2004).

deceptive advertising in the airline industry.[3]  I denied a preliminary request to enjoin enforcement of the Maine statute.[4]  But now I conclude that two of the three challenged state provisions cannot survive the broad preemptive language of the federal legislation and two recent First Circuit decisions.  If there is to be regulation in this area, it will have to come from the federal government.

## I. Procedural Background

New Hampshire Motor Transport Association, Massachusetts Motor Transportation Association and the Vermont Truck & Bus Association ("the associations") are non-profit trade associations.  Their members include motor carriers and air/ground carriers in the cargo transportation business.[5]  The associations sued the Maine Attorney General, seeking a declaration that the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"),[6] preempts three provisions of Maine's law regulating the retail sale and delivery of tobacco

---

[3] See Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 228 (1995); Morales v. Trans World Airlines, Inc., 504 U.S. 374, 388-89 (1992).

[4] N.H. Motor I, 301 F. Supp.2d at 46.  Judge Daniels issued a similar decision in New York State Motor Truck Ass'n v. Pataki, 2004 WL 2937803, at *3-*6 (S.D.N.Y. Dec. 17, 2004).

[5] See Statement of Undisputed Material Facts in Support of Pls.' "As Applied" Mot. for Summ. J. ("Pls.' SMF") ¶ 1 (Docket Item 61); Def.'s Resp. to Pls.' Statement of Undisputed Material Facts ("Def.'s Responsive SMF") ¶ 1 (Docket Item 69).

The associations ask me to take judicial notice of the following items as facts "not subject to reasonable dispute" under Federal Rule of Evidence 201:  the affidavits filed in their earlier motion for summary judgment; the Maine Department of Health and Human Services' ("DHHS") proposed (now final) "Rules Related to the Retail Sale and Delivery of Tobacco Products in Maine"; and the public hearing and comment period for those rules.  Req. for Judicial Notice in Support of Pls.' "As Applied" Mot. for Summ. J. (Docket Item 62).  The Attorney General does not object to this motion. Def.'s Resp. to Pls.' Req. for Judicial Notice (Docket Item 67).

The associations cite the affidavits only in paragraph one of their Statement of Material Facts for the basic fact, admitted by the Attorney General, that the associations engage in the commercial delivery of property.  I consider the affidavits only for this limited purpose.  I am not sure that Rule 201 judicial notice is necessary for the state rules and the procedures for enacting them, but I do not need to decide the issue because there is no dispute about these rules and procedures.

[6] Pub. L. No. 103-305, 108 Stat. 1569 (codified in scattered sections of 49 U.S.C.).

("the Maine Tobacco Delivery Law").[7]   They also ask that I permanently enjoin enforcement of these provisions.

I previously denied the associations' motion for summary judgment, and granted the Maine Attorney General's subsequent motion for partial summary judgment, rejecting the argument that the FAAAA facially preempts the Maine law.[8]  Both parties now move again for summary judgment.  The associations continue to argue facial preemption, and also bring an as-applied challenge based upon the Maine law's effects on one of their members, United Parcel Service ("UPS").[9]  The Maine Attorney General argues that the FAAAA does not preempt the challenged provisions either facially or as applied.[10]

## II.  LEGAL BACKGROUND

### *(A) Federal Regulation of the Transportation Industry*

---

[7] 22 M.R.S.A §§ 1551 to 1560.  The associations challenge 22 M.R.S.A. §§ 1555-C(3)(A), 1555-C(3)(C) and 1555-D.

[8] N.H. Motor Transp. Ass'n v. Rowe ("N.H. Motor II"), 324 F. Supp.2d 231, 234 (D. Me. 2004); N.H. Motor I, 301 F. Supp.2d at 46.

[9] Pls.' "As Applied" Mot. for Summ. J. with Incorporated Memo. of Law (Docket Item 60). Commentators note some confusion over the distinction between as-applied and facial challenges. See, e.g., Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1335-41 (2000) (discussing the relationship between facial and as-applied challenges and stating that "[f]acial challenges are not sharply categorically distinct from as-applied challenges to the validity of statutes"); Gillian E. Metzger, Facial Challenges and Federalism, 105 Colum. L. Rev. 873, 879-83 (2005) (addressing the confusion about what constitutes a facial challenge and noting that it arises in part from the Supreme Court's statement in U.S. v. Salerno, 481 U.S. 739, 745 (1987), that a facial challenge is only successful if the statute has no valid application); see also McGuire v. Reilly, 386 F.3d 45, 57 (1st Cir. 2004) (indicating that the standard for a facial challenge may not be as demanding as Salerno suggests).  On this motion and throughout this case, I use the term "facial" to refer to the challenge based solely on the words of the Maine statute and "as-applied" to refer to the challenge based solely on the actual effect of the law.  See N.H. Motor II, 324 F. Supp.2d at 233-34 & n.1; N.H. Motor I, 301 F. Supp.2d at 40 n.2.  This distinction is based on the associations' bifurcated summary judgment approach (first asserting a challenge based on the face of the statute, then bringing this effects-based challenge) and the Supreme Court's holding in Morales, 504 U.S. at 388, that the FAAAA preempts statutes that expressly refer to (based on the face of the statute) or have a forbidden significant effect on (based on the statute's application) a carrier's prices, routes or services.

[10] Def.'s Mot. for Summ. J. with Incorporated Memo. of Law (Docket Item 64); Def.'s Opp'n to Pls.' "As Applied" Mot. for Summ. J. ("Def.'s Opp'n") at 9 (Docket Item 68).

Federal regulation of the transportation industry dates back to the Interstate Commerce Act of 1887, which created the Interstate Commerce Commission ("ICC") to regulate interstate railroad carriers.[11]  Congress sought national uniformity in the regulation of interstate rail transport.  It therefore limited state authority over railroad carriers (and other industries later regulated by the ICC.)[12]

Congress placed motor carriers under ICC control with the Motor Carrier Act of 1935.[13]  The Motor Carrier Act authorized the ICC to regulate the entry, routes, business practices, rates and safety of motor carriers engaged in interstate or foreign commerce.  A few years later, Congress created the Civil Aeronautics Authority, an agency similar to the ICC, to regulate air transportation.[14]  The Civil Aeronautics Authority governed entry, routes, rates, business practices and safety of the airline industry.  The Federal Aviation Act of 1958 recodified the Civil Aeronautics Act, continued the Civil Aeronautics Board (the reorganized form of the Civil Aeronautics Authority)[15] and established and transferred authority over safety regulation to the Federal Aviation Agency (later renamed the Federal Aviation Administration).[16]

---

[11] See Act to Regulate Commerce (Interstate Commerce Act), ch. 104, 24 Stat. 379 (1887).  For a comprehensive history of federal regulation of transportation, see Paul Stephen Dempsey, Transportation:  A Legal History, 30 Transp. L.J. 235 (2003).

[12] See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318, 325-26 (1981); see also W. Union Tel. Co. v. Boegli, 251 U.S. 315, 316-17 (1920) (placing telegraph companies under ICC control showed congressional intent "to subject such companies to a uniform national rule" and thus preclude state regulation).

[13] Ch. 498, 49 Stat. 543 (1935).

[14] See Civil Aeronautics Act of 1938, ch. 601, 52 Stat. 973 (1938).

[15] See Reorganization Plan No. IV, § 7, 54 Stat. 1234, 1235-36 (1940).

[16] See Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731 (1958); see also Department of Transportation Act, Pub. L. No. 89-670, §§ 3(e)(1), 6(c)(1), 80 Stat. 931, 932, 938 (1966) *(continued on next page)*

Since the 1970s, Congress has reversed course and deregulated the transportation industry.[17]  In the Airline Deregulation Act of 1978, Congress reduced federal regulation of the airline industry to encourage maximum reliance on free market competition.[18]  Congress also prevented the States from interfering with federal deregulation by including a broad preemption provision prohibiting states from "enact[ing] or enforc[ing] any law . . . relating to rates, routes, or services of any air carrier."[19]

In the 1994 FAAAA, Congress extended the Airline Deregulation Act's preemption provision to prohibit state regulation of air/ground carriers as well.  It also added a new provision preempting state regulation of motor carriers of property.[20] In the same language used in the Airline Deregulation Act's preemption provision, the FAAAA preemption provisions broadly prohibit states from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service" of a motor carrier, air carrier or air/ground carrier of property.

---

(renaming the Federal Aviation Agency).

[17] See, e.g., ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995); Staggers Rail Act of 1980, Pub. L. No. 96-448, 94 Stat. 1895 (1980); Motor Carrier Act of 1980, Pub. L. No. 96-296, 94 Stat. 793 (1980); see also Dempsey, supra, at 327-66 (discussing deregulation of the various transportation industries).

[18] See Airline Deregulation Act of 1978, Pub. L. No. 95-504, 92 Stat. 1705 (1978) (codified in scattered sections of 49 U.S.C.).

[19] Id. § 105(a); see Morales, 504 U.S. at 378-79; see also New England Legal Found. v. Mass. Port. Auth., 883 F.2d 157, 172-73 (1st Cir. 1989) ("In reducing federal economic regulation of the field [with the Airline Deregulation Act of 1978] . . ., Congress obviously did not intend to leave a vacuum to be filled by the Balkanizing forces of state and local regulation.").  Congress initially codified this preemption provision at 49 U.S.C. App. § 1305(a)(1), then amended and recodified it at its current location, 49 U.S.C. § 41713(b)(1), in Pub. L. No. 103-272, ch. 417, 108 Stat. 745 (1994).

[20] See Federal Aviation Administration Authorization Act of 1994, Pub. L. No. 103-305.  Section 601(b) of the FAAAA is the air/ground carrier provision, codified at 49 U.S.C. § 41713(b)(4)(A). Section 601(c) is the motor carrier provision, which was recodified as amended at its current location, 49 U.S.C. § 14501(c)(1), in Pub. L. No. 104-88, ch. 145, 109 Stat. 803 (1995).

In enacting the FAAAA preemption provisions, Congress exercised its authority under the Interstate Commerce Clause to ease the burden intrastate regulation imposed on interstate commerce.[21]  Congress believed that the need for preemption of state authority arose out of a "patchwork of [state] regulation" of transportation, which created "a huge problem for national and regional carriers attempting to conduct a standard way of doing business."  It believed that intrastate regulation also resulted in higher rates for intrastate shipments. Congress designed the preemption provisions to eliminate diverse state regulations (such as regulation of entry, tariffs, prices and types of commodities carried), and promote uniform standards for air, air/ground and motor carriers engaged in the transportation of property.[22]

**(B)  Federal Contraband Cigarette Law**

Although Congress has limited state regulation over the transportation of goods, Congress has also expressly recognized the power of the states to regulate and confiscate contraband cigarettes (cigarettes on which state taxes have not been paid).  In 1978, Congress stated in the Contraband Cigarette Trafficking Act that federal regulation of contraband cigarettes does not "affect the concurrent jurisdiction of a State to enact and enforce cigarette tax laws, to provide for the confiscation of cigarettes and other property seized for violation of such laws, and to provide for penalties for the violation of such laws."[23]  Congress included this provision because "[t]he major responsibility for enforcing state cigarette tax laws

---

[21] See FAAAA, Pub. L. No. 103-305, § 601(a) (findings).
[22] H.R. Rep. No. 103-677, at 86-88 (1994), reprinted in 1994 U.S.C.C.A.N. 1715, 1758-60.
[23] 18 U.S.C. § 2345(a).

is now and must continue to be the burden of the states."[24]

### (C) *Maine's Tobacco Delivery Law*

The Maine Legislature enacted the Tobacco Delivery Law to "clarif[y] the collection of taxes with regard to the delivery sales of cigarettes" and "to strengthen the regulation of delivery sales of cigarettes, especially with regards to preventing sales to minors."[25]  When the Maine Legislature enacted the law in 2003, its Health and Human Services Committee considered testimony that nearly 25% of Maine's high school students smoke occasionally and 14% smoke on a regular basis.[26]  The bill's sponsor informed the Health and Human Services Committee that delivery sales via the internet increased minors' access to tobacco by giving them an opportunity to purchase tobacco without having to verify their age.  He also stated that out-of-state retailers advertise and sell tobacco products tax-free, thereby increasing the tobacco delivery sales through the mail and the internet and costing the State lost tax revenue.[27]

The Tobacco Delivery Law is one of many steps that Maine has taken to restrict underage access to tobacco.  When considering the Tobacco Delivery Law, the Legislature heard testimony about Maine's "comprehensive program on youth smoking," which "includes education on tobacco, increases in the price of cigarettes through [an] excise tax, . . . programs to help youth who smoke and

---

[24] H.R. Rep. 95-1778, at 13 (1978), reprinted in 1978 U.S.C.C.A.N. 5535, 5541.

[25] L.D. 1236, Summary for the Original Legislative Document (121st Me. Legis. 2003).

[26] See Committee File of the Committee on Health and Human Services on L.D. 1236, "An Act To Regulate the Delivery Sales of Cigarettes and To Prevent the Sale of Cigarettes to Minors" (April 29, 2003), Testimony of the Maine Coalition on Smoking or Health.  This testimony is the written testimony submitted at the time of the public hearing held by the committee assigned the bill. There is no record of the oral testimony presented at these hearings.

[27] See id., Testimony of Representative Glenn Cummings.

want to quit" and "tough laws regarding access."[28]    According to repeated
testimony, this comprehensive approach contributed to a decline in smoking by
Maine high school students.[29]

Increasing internet sales have frustrated the State's laudable and extensive
efforts to restrict underage access to tobacco.  The Maine Tobacco Delivery Law
addresses this problem by requiring:  that delivery services check for packages
marked as containing tobacco and confirm that those packages are being sent by
a Maine-licensed tobacco distributor or retailer; that tobacco retailers tell their
delivery service (such as UPS or the other members of the carrier associations) the
age of any tobacco-product purchaser; and that tobacco retailers use for tobacco-
product delivery only a delivery service that agrees to request age identification
from and deliver to the specific addressee.[30]

### (D)  Other States' Tobacco Delivery Laws

Other states recently have passed statutes regulating the delivery of tobacco
products.[31]  Although these state tobacco delivery laws involve similar limitations
on tobacco shipments, the specific requirements vary by state.

For example, while state limitations on tobacco shipments often depend on

---

[28] Id., Testimony of the Maine Coalition on Smoking or Health.

[29] See, e.g., id.; id., Testimony of Dora Anne Mills, Director, Bureau of Health, Department of
Human Services ("As a result of these efforts, Maine's tobacco addiction rates have plummeted
among youth—from nearly 40% of Maine high school students being . . . smokers in 1997 to 25%
in 2001.  This 36% decline is one of the largest declines seen across the country.").

[30] See 22 M.R.S.A. §§ 1555-C(3)(A), (C), 1555-D.

[31] See, e.g., Ariz. Rev. Stat. §§ 42-3221 to 3230 (enacted in 2004); Conn. Gen. Stat. § 12-285c
(enacted in 2003); Okla. Stat. tit. 68, § 317.4 (enacted in 2003); Wash Rev. Code § 70.155.105
(enacted in 2003).  The associations cite many of these statutes in paragraphs 100 to 158 of their
Statement of Material Facts.  The Attorney General qualifies and moves to strike all of these
paragraphs.  Def.'s Responsive SMF ¶¶ 100-158.  I consider these state statutes as relevant law,
not facts.

whether a retailer shipping or receiving the package is licensed, the licensing is state-specific. Thus, for each tobacco shipment, an interstate delivery service must determine whether the addressee is located in a state that has such a limitation, then consult a list of licensed retailers provided by that state to determine if the delivery is lawful.[32]

Many states require that tobacco retailers use a delivery service that will confirm the addressee's age and deliver only to an adult.[33] But while some states require that the addressee sign personally for the package, others allow any adult to sign. States also vary in their requirements for checking the identification of the person signing for the package.[34]

Although many of these state laws require the retailer to mark the package to reveal that it contains tobacco, the required location and content of the marking may differ.[35] The type of tobacco regulated also varies from state to state. Some statutes regulate only cigarettes, while others cover a broad range of tobacco products.[36]

---

[32] See, e.g., Alaska Stat. § 43.50.105(c); Conn. Gen. Stat. § 12-285c(a); 22 M.R.S.A. § 1555-D; N.Y. Pub. Health Law §§ 1399-ll(1)-(2).

[33] See, e.g., Ariz. Rev. Stat. § 42-3225(A)(2); Conn. Gen. Stat. § 12-285c(c); Del Code Ann. tit. 30, § 5365(a)(2); 22 M.R.S.A. § 1555-C(3)(C); Or. Rev. Stat. § 323.718(1)(b)(A).

[34] Compare Ariz. Rev. Stat. § 42-3225(2) (addressee or adult residing at the same address must sign and identification is required if the signer appears to be under twenty-seven) with Conn. Gen. Stat. § 12-285c(c) (customer receiving the delivery must provide proof of age) and 22 M.R.S.A. §§ 1555-C(3)(C)(2) to (3) (addressee must sign and identification is required if the addressee is under twenty-seven).

[35] Compare Del Code Ann. tit. 30, § 5365(a)(1) (shipping documents must include a clear and conspicuous statement that Delaware law prohibits shipping tobacco to minors and requires the payment of applicable taxes) with 22 M.R.S.A. § 1555-C(3)(B); 10-144 Code Me. R. Ch. 203, §§ 10(C)(2) (marking must be on the outside of the package and, at a minimum, on the same plane as the shipping label, and must show that tobacco products are inside and list the retailer's name and Maine license number) and Nev. Rev. Stat. § 202.24935(3) (packaging or wrapping must be clearly marked "cigarettes" or "tobacco products").

[36] Compare Alaska Stat. § 43.50.105 (cigarettes) and Conn. Gen. Stat. § 12-285c (cigarettes) with
(continued on next page)

9

### III. ANALYSIS

The carrier associations attack Maine's Tobacco Delivery Law on the basis that the FAAAA expressly preempts state regulation that relates to a carrier's services.[37]   According to Article VI of the United States Constitution, federal statutes enacted under constitutional authority are "the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." The FAAAA, enacted under Congress's constitutional authority to regulate interstate commerce, prohibits states from enacting laws "related to a . . . service of" an air carrier, air/ground carrier or motor carrier "with respect to the transportation of property."[38]   Congress has specified some areas that are

---

22 M.R.S.A. §§ 1551(3), 1555-C, 1555-D (any form of tobacco and any material or device used for smoking, chewing or other tobacco consumption) and Nev. Rev. Stat. § 202.24935(1) ("cigarettes, cigarette paper, tobacco of any description or products made from tobacco").

[37] They also argue preemption based on prices and routes, but I find it necessary to address only service(s).  Since the associations have argued only express preemption, I do not consider implied preemption.

[38] See 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A).   49 U.S.C. § 14501(c)(1) is the motor carrier provision.  It provides that a state:

> may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any *motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

(Emphasis added.).  49 U.S.C. § 41713(b)(4)(A) is the air and air/ground carrier provision.  In very similar language, it provides that a state

> may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service *of an air carrier or carrier affiliated with a direct air carrier through common controlling ownership* when such carrier is transporting property by aircraft or by motor vehicle (whether or not such property has had or will have a prior or subsequent air movement).

(Emphasis added).  Congress intended that these "identical" provisions "function in the exact same manner with respect to [their] preemptive effects."  H.R. Rep. No. 103-677, at 85, reprinted in 1994 U.S.C.C.A.N. at 1757.  Both provisions apply here because the associations include ground carriers as well as air/ground carriers.  (UPS is covered by the air/ground carrier provision because one of its operating entities is an air carrier.  Pls.' SMF, Def.'s Responsive SMF ¶ 5.)

Congress enlarged the Airline Deregulation Act preemption provisions to include motor carriers and air/ground carriers because it wanted to level the playing field between deregulated air carriers, carriers that are affiliated with an air carrier but not otherwise covered by the Airline *(continued on next page)*

exempt from preemption, but the Maine Tobacco Delivery Law fits none of the exemptions.[39]   Therefore, the associations argue, the FAAAA preempts the challenged provisions of the Maine Tobacco Delivery Law.

Given the deadly health consequences, there are no persuasive arguments for allowing minors to have tobacco products.  Thus, it is hard to believe that, if Congress were confronted now with the specific question whether Maine should be able to take steps to protect the health of its children, Congress would vote to prohibit what Maine is trying to do.  But the federal legislation that I must interpret comes from a congressional push to deregulate airlines and motor carriers generally, without regard for the topic or goal of the preempted state regulation (other than the few, irrelevant, specified exceptions).  At the time, Congress believed that state regulation was interfering with ordinary market forces, driving up the price of service and hindering competition.[40]  To avoid that state interference, Congress enacted preemption legislation that speaks in general

Deregulation Act, and motor carriers not affiliated with an air carrier.  Id. at 82, 87, reprinted in 1994 U.S.C.C.A.N. at 1754, 1759.  The preemption is not limited to interstate transportation.  See FAAAA, Pub. L. No. 103-305, § 601(a) (finding that "the regulation of *intrastate transportation* of property by the States has—(A) imposed an unreasonable burden on interstate commerce; (B) impeded the free flow of trade, traffic, and transportation of interstate commerce; and (C) placed an unreasonable cost on the American consumers") (emphasis added); N.Y. State Motor Truck Ass'n, 2004 WL 2937803, at *4 ("The FAAAA, with a few minor exceptions, effectively preempts state regulations of intrastate motor carrier activities.").

[39] Savings clauses in the preemption provisions permit states to regulate safety with respect to motor vehicles, highway route controls or limitations based on vehicle size, weight or cargo hazards, financial responsibility relating to insurance, household goods transportation, and tow truck pricing for service provided without the towed-vehicle owner's or operator's consent.  49 U.S.C. §§ 14501(c)(2), 41713(b)(4)(B).

The safety exception, 49 U.S.C. §§ 14501(c)(2)(A), 41713(b)(4)(B)(i), does not exempt Maine's Tobacco Delivery Law from preemption because the exception applies only to state regulation of motor vehicle safety, and does not preserve the states' general authority over safety issues.  See United Parcel Serv., Inc. v. Flores-Galarza ("UPS II"), 385 F.3d 9, 13-14 (1st Cir. 2004).  The exception for the transportation of household goods, 49 U.S.C. §§ 14501(c)(2)(B), 41713(b)(4)(B)(ii), also does not apply because it refers to state regulation of the services of moving companies.  See *(continued on next page)*

categories.  To interpret the scope of the resulting federal preemption, I must "look

to Congress's intent, which is revealed in the language of the provision, as well as

the structure and purpose of the statute."[41]

I turn therefore to the statutory language.   The preemption provisions

broadly prohibit states from enacting a law "related to a price, route, or service" of

---

UPS II, 385 F.3d at 14.

[40] See FAAAA, Pub. L. No. 103-305, § 601(a).

[41] United Parcel Serv., Inc. v. Flores-Galarza ("UPS I"), 318 F.3d 323, 334 (1st Cir. 2003).  The Supreme Court has provided several guideposts for approaching the issue of federal preemption:

> (1) An express congressional definition of what is preempted "supports a reasonable inference . . . that Congress did not intend to pre-empt other matters."  Freightliner Corp. v. Myrick, 514 U.S. 280, 288 (1995);
>
> (2) Congressional purpose is the "ultimate touchstone."  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992) (internal quotation omitted);
>
> (3) If the federal statute would "bar state action in a field of traditional state regulation," a court must "work on the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that is the clear and manifest purpose of Congress."  Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 541-42 (2001) (citations and internal quotation omitted);
>
> (4) This "assumption" (elsewhere called a "presumption," see Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 666 (2003); UPS I, 318 F.3d at 336) disappears when a state legislates in a field with "a history of significant federal presence."  United States v. Locke, 529 U.S. 89, 108 (2000).

Ultimately the analysis here hinges on the second factor, congressional purpose.

The parties have not argued that the first factor helps resolve this case.

They have spent a good deal of energy on the third and fourth factors.  I conclude that I erred in my analysis in my earlier decision on the associations' facial motion for summary judgment, where I applied the presumption against preemption by viewing the field narrowly as "ground transport or delivery of dangerous products, especially to minors in order to protect their health."  I noted there that the First Circuit in UPS I made much of the long federal presence in air transportation (which I distinguished from the history in ground transportation).  See N.H. Motor I, 301 F. Supp.2d at 44.  But I observe now that I cannot make this distinction, because the purpose of the FAAAA's preemption provisions was to even the playing field for air and ground transportation.  See H.R. Rep. No. 103-677, at 82, reprinted in 1994 U.S.C.C.A.N. at 1754.  More importantly, in determining whether there is a presumption against federal preemption, the focus is to be on the field where Congress legislates.  ("Th[e] presumption [against preemption] only arises . . . if Congress legislates in a field traditionally occupied by the states."  UPS I, 318 F.3d at 336 (citing Locke, 529 U.S. at 108).)  I therefore adopt the approach taken in UPS I and do not apply the presumption against preemption.  But see Ward v. New York, 291 F. Supp.2d 188, 209-10 (W.D.N.Y. 2003) (distinguishing UPS I and applying a presumption against preemption because New York's tobacco delivery law was "a public health law of general application").

Since both sides argued explicitly on this motion whether I should apply the presumption against preemption, there is no unfairness in my making this correction and no longer applying the presumption.  See Pls.' "As Applied" Mot. for Summ. J. at 10-13; Def.'s Opp'n at 9-12; Def.'s Mot. for Summ. J. at 8.  Even if I continued to apply the presumption, I would find Maine's Tobacco Delivery Law preempted for the reasons stated in text.

an air carrier, air/ground carrier or motor carrier "with respect to the transportation of property."[42]  I deal with the significant terms in reverse order.

**(A)  *"With respect to the transportation of property"***

The Maine statute deals with the transportation (here, the delivery) of property, namely, tobacco products.[43]

**(B)  *"Service"***

Two Supreme Court cases have interpreted the Airline Deregulation Act's preemption provision (the statutory predecessor to the FAAAA preemption provisions).  The Airline Deregulation Act provision that these cases interpret is very similar to both of the FAAAA preemption provisions and uses the term "services."[44]  Unfortunately, these Supreme Court cases do not shed much light on the term "services" or "service."  In one case, the state statutes regulated the advertising of airfares.  Since the federal statute expressly prohibited state regulation that relates to rates (fares), the Supreme Court had no need to consider

---

[42] 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A).

[43] The language "with respect to the transportation of property" comes from the motor carrier provision, 49 U.S.C. § 14501(c)(1).  The provision for air carriers and air/ground carriers, 49 U.S.C. § 41713(b)(4)(A), has slightly different language.  This provision prohibits state regulation of "an air carrier or carrier affiliated with a direct air carrier . . . *when such carrier is transporting property by aircraft or motor vehicle* (whether or not such property has had or will have a prior or subsequent air movement)."  (Emphasis added).  Under this provision, the Maine statute regulates a motor carrier affiliated with a direct air carrier when the motor carrier is transporting (delivering) property (tobacco products) by motor vehicle.

[44]  These cases interpret the original Airline Deregulation Act provision, which provided that no state "shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier having authority under title IV of this Act . . . to provide air transportation."  49 U.S.C. App. § 1305(a)(1) (1993).  In 1994, Congress amended this preemption provision to include its current language (the same language used in the FAAAA provisions), which provides that a state may not "enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."  See Pub. L. No. 103-272, ch. 417, 108 Stat. 745 (July 5, 1994) (also recodifying the provision at its current location, 49 U.S.C. § 41713(b)(1)).  Congress did not intend the amendment to make any substantive change, see id.; Wolens, 513 U.S. at 223 n.1, and the parties have not cited any cases suggesting a different definition for the term "service" under the FAAAA *(continued on next page)*

or define the term "services."[45] The other case concerned frequent flyer miles; the Supreme Court observed summarily that frequent flyer miles relate both "to 'rates,' *i.e.*, [the airline]'s charges in the form of mileage credits for free tickets and upgrades, and to 'services,' *i.e.*, access to flights and class-of-service upgrades." It did not elaborate further on the meaning of the term "services," although it did reject an attempt to separate "matters 'essential' from matters unessential to airline operations" in analyzing what is preempted.[46]

Lower courts, on the other hand, have struggled with the scope of the "services" preemption in the Airline Deregulation Act, particularly in determining whether federal law preempts state tort law for accidents that happen on board an aircraft.[47]   These courts have limited the preempting term "service" to the

---

than that used for the term "services" under the original Airline Deregulation Act provision.
[45] Morales, 504 U.S. at 379-80.  The Court in Morales instead addressed the meaning of the phrase "relating to," as discussed below.  504 U.S. at 383-91.
[46] Wolens, 513 U.S. at 226.  Wolens considered the meaning of the language "enact or enforce any law" as it related to the common law of contracts.  See id. at 228-29.
[47] In Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1265-66 (9th Cir. 1998), the Ninth Circuit held that the Airline Deregulation Act did not preempt state negligence and breach of contract claims because "service" referred to "the provision of air transportation to and from various markets at various times," not the provision of amenities such as personal assistance, luggage handling, and food and drink.  The Eleventh Circuit has held that a state claim of age discrimination in employment is not preempted because it does not relate to an airline's services, but that claims relating to the physical capabilities of flight personnel could relate to services and thus be preempted.  Parise v. Delta Airlines, Inc., 141 F.3d 1463, 1466-68 (11th Cir. 1998).  Courts have also held that a state defamation claim had too tenuous a connection with services (ticketing) to be preempted, Taj Mahal Travel, Inc. v. Delta Airlines, Inc., 164 F.3d 186, 195 (3d Cir. 1998), but that a plaintiff's claim for conversion for a carrier's failure to deliver the contents of a package related to the carrier's services and was thus preempted, Forman v. Fed. Express Corp., 753 N.Y.S.2d 348, 351-52 (N.Y. Civ. Ct. 2003).  The Fifth Circuit held that a state tort claim for personal injury was not preempted because it related to the operation of the aircraft, not its services.  Hodges v. Delta Airlines, Inc., 44 F.3d 334, 340 (5th Cir. 1995).  The court in Trujillo v. American Airlines, Inc., 938 F. Supp. 392, 394 (N.D. Tex. 1995), applied this services/operations distinction, holding that negligence and consumer protection claims for the airline's preparation and shipping of a package were preempted because they involved services, not operations of the airline.
      Some of these cases interpret the term "services" in the original Airline Deregulation Act preemption provision, 49 U.S.C. App. § 1305(a)(1), and others interpret the term "service" in the amended provision, 49 U.S.C. § 41713(b)(1), depending on which version was in effect.

frequency and scheduling of transportation and the choice of starting and ending points;[48] or have defined "services" as bargained-for provisions (preempted) distinct from "operations or maintenance" (not preempted).[49]  The Third Circuit, on the other hand, has concluded that the services/operations distinction is "strained and unsatisfactory," and that to define the term service, "focusing on the competitive forces of the market . . . leads to a more accurate assessment of Congressional intent."[50]

The First Circuit has not entered this debate over the meaning of the word "services" in the Airline Deregulation Act.[51]   But without discussing the ambiguities of the term, the First Circuit has said that the word "service," as used in the FAAAA's air and air/ground carrier provision, includes "the delivery of packages on an express or time-guaranteed basis."[52]   In that case, the First Circuit characterized UPS's delivery services as depending on the "orderly flow of packages."  It also quoted approvingly a Ninth Circuit statement that "[t]erms of service determine cost.  To regulate them is to affect the price."[53]

I follow the First Circuit decision.  The Maine statute here deals with the

---

[48] Charas, 160 F.3d at 1265-66.
[49] Hodges, 44 F.3d at 336-37, 338-39.
[50] Taj Mahal, 164 F.3d at 194.
[51] See French v. Pan Am Express, Inc., 869 F.2d 1, 3 (1st Cir. 1989) (declining to address express preemption based on the Airline Deregulation Act's reference to "services" where the comprehensive federal legal scheme set out in the rest of the Airline Deregulation Act impliedly preempted the plaintiff's state claim).
[52] UPS I, 318 F.3d at 336 (interpreting 49 U.S.C. § 41713(b)(4)(A)).
[53] Id. (quoting Fed. Express Corp. v. Cal. Pub. Utils. Comm'n, 936 F.2d 1075, 1078 (9th Cir. 1991)). Price is another preempted area of regulation.  49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A) (prohibiting states from enacting or enforcing a law "related to a price, route, or service" of a carrier).  The Fifth Circuit has interpreted the term "price," holding that a negligence claim for failure to provide more leg room to prevent the health condition of deep vein thrombosis related to price because providing more leg room would reduce the number of seats and affect the prices the airline charged.  Witty v. Delta Air Lines, Inc., 366 F.3d 380, 383 (5th Cir. 2004).

delivery of packages and, in its application to UPS, affects delivery on an express or time-guaranteed basis.   UPS has a national and international distribution system that relies heavily on uniform procedures for picking up, documenting, processing, handling and delivering packages.   The record establishes that to comply with the Maine statute, UPS must use delivery practices for Maine packages that vary from its nationally and internationally uniform procedures.[54] This lack of uniformity affects the price of UPS's services and interferes with the orderly flow of packages by jeopardizing the speed, reliability and efficiency of delivery.[55]   Under First Circuit precedent, therefore, the Maine statute has some effect on a carrier's "services."

### (C)  *"Related to"*

---

[54] Pls.' SMF, Def.'s Responsive SMF ¶¶ 7, 9, 18, 20, 24, 26, 30-31, 60-67.  The Attorney General admitted paragraphs 7, 9, 18, 26, 30, 31 and 60 through 67 of the associations' Statement of Material Facts.

He responded "[q]ualified" to the associations' paragraph 20, which states that UPS preloaders must scan the exterior of every package to be delivered in Maine for a marking indicating the package contains tobacco products.  The Attorney General responded that "[p]reloaders are already inspecting packages for markings," but did not deny that it takes the preloaders *more* time to check the package for the marking required by the Maine statute, see 10-144 Code Me. R. Ch. 203, §§ 10(C)(2), 11; see also footnote 67 (discussing what a carrier must do to comply with these regulations).

In response to paragraph 24, which states that the preloaders do not usually read the shipper's name and only occasionally read the addressee's name, and that having to do so because of the Maine statute delays the preloaders' tasks, the Attorney General stated, "Qualified. UPS has done no operational study to ascertain whether there is such a delay or, if so, the magnitude of that delay."  The Attorney General does not deny that the preloaders usually do not check for the shipper's or the addressee's name, or that having to do so causes delay.  There is no need for an operational study because it is logical that checking these names would cause some delay, however slight.

[55] See Pls.' SMF, Def.'s Responsive SMF ¶¶ 7-8, 10-11.  The Attorney General admitted paragraphs 7, 8 and 10, but responded "[q]ualified" to the associations' paragraph 11.  Paragraph 11 states that UPS must avoid even minor delays to meet its delivery deadlines, and that "[d]elays or disruptions at any point in UPS's operations can affect thousands of packages in transit."  The Attorney General responded that UPS's time projections are based on historical data, which inherently include delays associated with non-deliverable packages, and that a number of factors can delay UPS's services.  But the Attorney General did not deny that delays affect delivery deadlines, and, logically, the fact that UPS already encounters delays does not mean additional delay is acceptable.

16

In <u>Morales</u>, the Supreme Court determined the meaning of the phrase "relating to" in the Airline Deregulation Act.[56]  The Court recognized that the phrase has a broad scope both in ordinary language and in the statute.  It ruled that the relationship can be satisfied in either of two ways: if the state law: (a) expressly references the carrier's prices, routes or services or (b) has a "forbidden significant effect upon" the carrier's prices, routes or services.[57]  I see no reason to interpret the FAAAA phrase, "related to," any differently.  Indeed, the legislative history makes clear that the drafters intended the same meaning,[58] and the First Circuit has made it the law of this circuit that the <u>Morales</u> interpretation controls the FAAAA as well.[59]  I will address each of the three challenged Maine

---

[56] 504 U.S. at 383-89.

[57] <u>Id</u>. at 388; <u>see also</u> <u>UPS I</u>, 318 F.3d at 335 (citing <u>Morales</u>, 504 U.S. at 388).

[58] According to the FAAAA's legislative history:

> In substituting the word "related" for the prior word "relating" . . . we are intending no substantive change to the previously enacted preemption provision in Section 105 of the Federal Aviation Act and do not intend to impair the applicability of prior judicial case law interpreting these provisions.  In particular, the conferees do not intend to alter the broad preemption interpretation adopted by the United States Supreme Court in <u>Morales v. TransWorld Airlines, Inc.</u> . . . .

H.R. Rep. No. 103-677, at 83, <u>reprinted</u> <u>in</u> 1994 U.S.C.C.A.N. at 1755.

[59] <u>UPS I</u>, 318 F.3d at 334-35.  In interpreting the Airline Deregulation Act preemption provision, the Court in <u>Morales</u> considered a similar ERISA preemption provision, 29 U.S.C. § 1144(a).  504 U.S. at 383-85.  The ERISA provision preempts state laws "insofar as they . . . relate to any employee benefit plan."  29 U.S.C. § 1144(a); <u>Morales</u>, 504 U.S. at 383.  At the time of <u>Morales</u>, under the ERISA provision a law "relate[d] to" an employee benefit plan "if it ha[d] a connection with, or reference to, such a plan."  <u>Morales</u>, 504 U.S. at 384 (internal quotation omitted).  The Supreme Court later limited the meaning of "relate to" in the ERISA provision, stating that courts should consider the objectives of the ERISA statute rather than look to "infinite relations" or "infinite connections" to measure preemption, and noting that ERISA preempts state laws that "mandate[] employee benefit structures or their administration."  <u>N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.</u>, 514 U.S. 645, 656-58 (1995); <u>see also</u> <u>Catholic Charities of Me., Inc. v. City of Portland</u>, 304 F. Supp.2d 77, 90-92 (D. Me. 2004) (discussing this cutback in the ERISA meaning of "relate to").  Despite the Supreme Court's narrowing of the ERISA meaning of "relate to," Congress intended the <u>Morales</u> Court's broad interpretation of "relating to" in the Airline Deregulation Act to apply to the FAAAA preemption provisions.  <u>See</u> H.R. Rep. No. 103-677, at 83, <u>reprinted</u> <u>in</u> 1994 U.S.C.C.A.N. at 1755; <u>see also</u> <u>UPS I</u>, 318 F.3d at 335 n.19 ("[I]f developments in pension law have undercut holdings in air-transportation law, it is for the

*(continued on next page)*

provisions for whether they satisfy either or both or these two requirements.

### (1)  Section 1555-D

One of the three challenged provisions of the Maine statute expressly references carriers' services.  Specifically, section 1555-D states:  "A person may not knowingly transport or cause to be delivered to a person in this State a tobacco product purchased from a person who is not licensed as a tobacco retailer in this State."[60]  Although this prohibition uses the general language "a person" (rather than "a delivery service" or "a carrier"), it expressly references the service that carriers provide (the transportation of property).  Carriers that violate this prohibition face penalties under section 1555-D(2).  Moreover, to achieve compliance, subsection 1555-D(1) requires the Attorney General to provide lists of licensed tobacco retailers and known unlicensed retailers to "a delivery service." "Delivery service" is defined as "a person, including the United States Postal Service, who is engaged in the commercial delivery of letters, packages, or other containers."[61]  A "delivery service" under the Maine statute that uses motor vehicle transportation fits within the FAAAA's definition of "motor carrier" ("a person

---

Supreme Court itself to make the adjustment.  Our marching orders are clear: follow decisions until the Supreme Court overrules them.") (quoting United Airlines, Inc. v. Mesa Airlines, Inc., 219 F.3d 605, 608 (7th Cir. 2000)) (alteration in original).

[60] In full, the preamble reads:

> A person may not knowingly transport or cause to be delivered to a person in this State a tobacco product purchased from a person who is not licensed as a tobacco retailer in this State, except that this provision does not apply to the transportation or delivery of tobacco products to a licensed tobacco distributor or tobacco retailer. A person is deemed to know that a package contains a tobacco product if the package is marked in accordance with the requirements of section 1555-C, subsection 3, paragraph B or if the person receives the package from a person listed as an unlicensed tobacco retailer by the Attorney General under this section.

22 M.R.S.A. § 1555-D.

providing motor vehicle transportation for compensation").[62]  Section 1555-D thus expressly references carriers' services.  Under the analysis of <u>Morales</u> and <u>UPS I</u>, that is enough to result in preemption.

This conclusion differs from what I said in my preliminary rulings.[63]  My conclusion has changed because I no longer apply the presumption against preemption,[64] and because, since my previous rulings, I have had the opportunity for further thought and reflection, as well as the benefit of the First Circuit's decision in <u>UPS II</u>, which sheds additional light on the issue of preemption under the FAAAA.  I follow the plain language of the statute and the First Circuit authority in <u>UPS I</u> and <u>UPS II</u> in concluding that section 1555-D expressly references carriers' services.[65]

Even if it did not make the express reference, section 1555-D would be preempted because, under the other <u>Morales</u>/<u>UPS I</u> standard for preemption, it also has a forbidden significant effect on carriers' services.  Section 1555-D prohibits carriers from delivering tobacco products in Maine if they have been purchased from an unlicensed retailer, unless the delivery is to a licensed tobacco distributor or retailer.  The carrier must thus consult the Maine Attorney

---

[61] <u>Id</u>. § 1551(1-C).
[62] 49 U.S.C. § 13102(12).  The FAAAA does not define the term "carrier," used in the air/ground provision, 49 U.S.C. § 41713(b)(4)(A) (preempting state regulation of "any air carrier or carrier affiliated with a direct air carrier").
[63] <u>N.H. Motor II</u>, 324 F. Supp.2d at 234; <u>N.H. Motor I</u>, 301 F. Supp.2d at 43-46.
[64] <u>See</u> footnote 41.
[65] There is no unfairness to the parties in altering my conclusion since both parties argued the matter on these new motions.  <u>See</u> Pls.' "As Applied" Mot. for Summ. J. at 22-23; Def.'s Opp'n at 9 (arguments on facial preemption); footnote 41 (citing the parties' arguments on these motions on the presumption against preemption).

General's lists of Maine-licensed and known unlicensed tobacco retailers before delivering packages containing tobacco products.[66]

For a carrier to comply with section 1555-D, it (in the case of UPS, its preloaders who load the package cars for deliveries) must examine every package it receives with a Maine destination address to try to determine if the package contains tobacco products.  It can do this either by looking for the required marking,[67] or by reading the names of the addressee and the shipper for some indication that the package contains tobacco products.[68]   If the package is marked or if the name of the addressee or shipper indicates tobacco products, the carrier must next research whether the addressee is a tobacco retailer or distributor licensed in Maine (and thus able to receive any package containing tobacco products, whether shipped from a licensed or unlicensed retailer).  For UPS, this results in the package being removed from the usual delivery procedures.[69]  If the addressee is not a licensed tobacco retailer or distributor, UPS arranges to have the package returned to the shipper.  If the shipper is located in Maine, UPS must contact the shipper to retrieve the package (because

---

[66] See 22 M.R.S.A. § 1555-D(1).  (The carrier is presumed to know that a package contains a tobacco product if it is from a listed unlicensed retailer or if it is marked by the retailer, as required in section 1555-C(3)(B), with the name and Maine license number of the retailer and an indication that the contents are tobacco products.  Id. § 1555-D.)

[67] The regulations for the Maine Tobacco Delivery Law attempt to ease examination by requiring that the marking "shall, at a minimum, appear on the same plane of the package as the shipping label that identifies the delivery address."  See 10-144 Code Me. R. Ch. 203, §§ 10(C)(2).  A carrier "is deemed to know that a package contains a tobacco product" if it is marked in this way.  Id. § 11.  But the carrier is protected, i.e., "deemed *not to know* that a package contains tobacco," only if the marking appears only on the plane opposite the shipping label (the bottom of the package).  Id.  This means that a carrier will be presumed to know the package's contents if the marking is on the top of the box, and may be found to know the contents if the marking appears on any side other than the top or the bottom.

[68] Pls.' SMF, Def.'s Responsive SMF ¶¶ 18, 20, 23, 33, 94-96.

[69] See Pls.' SMF, Def.'s Responsive SMF ¶ 26.

returning it to the shipper would itself violate section 1555-D).[70]

In UPS II, the First Circuit held that a Puerto Rico statute "impermissibly affected UPS's prices, routes, and services in part because it required UPS to identify the contents of the packages (a deviation from standard procedures used for deliveries elsewhere in the United States)."[71]   Section 1555-D of the Maine statute requires carriers to attempt to identify a package's contents, causing UPS to use procedures for packages in Maine that differ from its nationally uniform procedures.   This departure from UPS's uniform procedures delays the delivery process.[72]   Having to identify, separate and, if necessary, contact the shipper to retrieve a package containing tobacco products is at least as burdensome as the impermissible requirement in UPS I that UPS obtain a certificate of excise tax payment from the recipient of a parcel.[73]

The summary judgment record therefore shows that, as in UPS I, compliance with section 1555-D significantly affects UPS's services by interrupting the orderly flow of packages and interfering with the timeliness and effectiveness of UPS's service.[74]   I cannot successfully distinguish the effects of section 1555-D

---

[70] Pls.' SMF, Def.'s Responsive SMF ¶¶ 30-31.

[71] 385 F.3d at 14.

[72] Pls.' SMF, Def.'s Responsive SMF ¶¶ 20, 24, 26.  The Attorney General often qualifies or denies the associations' statements that the changed procedures cause delay, claiming that the associations have not done any operational or time study to prove the delay.  See, e.g., Def.'s Responsive SMF ¶ 24, 29.  I conclude that there is no need for empirical studies to prove that a change in the normal, uniform procedure, such as removing the package from the delivery process to research the addressee, Pls.' SMF ¶¶ 26-29, would cause a delay in the process.  The First Circuit did not require such data to prove an impact on the express or on-time delivery of packages in UPS I, 318 F.3d at 334-36.  See also footnote 92 (addressing the need for empirical data).

[73] See 318 F.3d at 326, 327 n.3.

[74] See id. at 336; accord Wine & Spirits Wholesalers of Mass., Inc. v. Net Contents, Inc., 10 F. Supp.2d 84, 87 (D. Mass. 1998) (tort claim based on Federal Express's alleged violation of statutory licensing provisions for liquor transporters dealt with the act of and method employed in providing delivery services for wine and was thus preempted by the Airline Deregulation Act).

from the effects of the Puerto Rico statute in UPS I and UPS II.[75]  It is true that the purpose of the Puerto Rico requirement was to ensure excise tax collection, whereas the purpose of this Maine provision is minors' health.[76]  But a worthy purpose does not save a state statute from federal preemption.[77]

According to the First Circuit, courts should derive Congress's intent not only from the words of the statute but also from the statute's structure and purpose.[78]  Here, the congressional purpose is apparent in the language of the FAAAA preemption provisions, Congress's view of the problem it was dealing with,

---

[75] The Attorney General argues that the economic nature of the tax regulation in UPS I distinguishes it from this case because Congress intended to preempt economic regulation, not regulation of health and safety.  Def.'s Mot. at 9-10, 16; Def.'s Opp'n at 11-12.  The FAAAA's legislative history does refer to "economic regulation," but does not define the term (and the Attorney General does not suggest a definition).  See H.R. Rep. No. 103-677, at 82, reprinted in 1994 U.S.C.C.A.N. at 1754 (noting that one purpose of the preemption provisions is to even the playing field between air carriers and motor carriers "with respect to intrastate economic trucking regulation"); id. at 84 (states may not use their permissible regulatory authority "as a guise for continued economic regulation as it relates to prices, routes or services"); id. at 87 (citing the Ninth Circuit's holding in Fed. Express, 936 F.2d at 1079, that the Airline Deregulation Act preempted "intrastate economic regulations for motor carriers" as applied to Federal Express).  In interpreting the Airline Deregulation Act preemption provision in Federal Express, the Ninth Circuit concluded that the term "economic regulations" includes regulations that bear on price and regulations that relate to a carrier's terms of service because, as the First Circuit quoted in UPS I, "[t]erms of service determine cost.  To regulate them is to affect the price.  The terms of service are as much protected from state intrusion as are the air carrier's rates."  936 F.2d at 1078 (quoted in UPS I, 318 F.3d at 336).  Under this definition, which I look to because it was cited with approval by the First Circuit and is consistent with the language and purposes of the FAAAA, the Maine regulations are economic because they affect the carriers' terms of service and, accordingly, affect the price of the carriers' services.  There is therefore no basis for an economic/non-economic distinction between the Puerto Rico law in UPS I and the Maine regulations.

[76] As I observed at the outset, the Maine statute as a whole has a dual purpose: tax collection and protection of minors' health.  The particular challenged provisions, however, achieve only the health purpose and have no apparent relationship to tax collection.  Def.'s Reply Br. at 4 (noting that although one purpose of the statute is tax collection, the challenged provisions relate only to the statutory purpose of restricting minors' access to tobacco).

[77] See, e.g., Witty, 366 F.3d at 386 (concluding that the Airline Deregulation Act preempted a tort lawsuit alleging that the airline was negligent in creating a risk of deep vein thrombosis, a health condition with potentially serious complications).

[78] UPS I, 318 F.3d at 334.  Perhaps that analysis is for implied preemption, not argued here.  See Morales, 504 U.S. at 383 ("pre-emption may be either express or implied, and is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose") (internal quotation omitted).  I consider it, however, in light of the First Circuit's pronouncement in UPS I.

and the legislative history: Congress wanted to avoid the burden on interstate commerce caused by diverse state regulations.[79] The structure of the preemption provisions reflects this congressional intent, for the provisions enlarge the Airline Deregulation Act's already broad preemption scheme.[80] Indeed, as other individual states promulgate restrictions that vary a little or a lot from what Maine has done,[81] the growing complexity those laws will present to the market of interstate delivery services demonstrates why Congress preempted individual state regulation in favor of a uniform federal approach.[82]

---

[79] See Pub. L. No. 103-305, § 601(a) (findings); H.R. Rep. No. 103-677, at 87, reprinted in 1994 U.S.C.C.A.N. at 1759.

[80] See FAAAA, Pub. L. No. 103-305, § 601(b), (c). Other than the preemption provisions, the structure and content of the FAAAA are not helpful in determining Congress's intent. Some provisions advance goals similar to those of the preemption provisions, by limiting the burdens on interstate commerce caused by the taxation of airport businesses, see id., § 112(e), and promoting the efficiency of air transportation, see id. § 104 (administration of airport improvement programs should employ technology and approaches that will promote efficiency in air transportation). But most of the statute authorizes various research programs, reports, fees and appropriations unrelated to the preemption of state regulation or the general goal of deregulation. The structure of the statute is useful to consider but not as significant as it would be if the parties were arguing implied, rather than express, preemption. See Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31 (1996) (if "explicit pre-emption language does not appear [in the statute], or does not directly answer the question . . . courts must consider whether the federal statute's 'structure and purpose,' or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent"); Morales, 504 U.S. at 383.

[81] See, e.g., Conn. Gen. Stat. § 12-285c (permitting shipment and delivery of cigarettes only to cigarette distributors or dealers, warehouse operators and government employees); Okla. Stat. tit. 68, § 317.4 (shipping documents must include a statement that Oklahoma law prohibits shipping tobacco products to minors and requires the payment of applicable taxes, and the shipper must use a delivery service that requires the recipient or an adult at the same address to sign and demands proof, if the person signing appears to be under twenty-seven, that the person signing is an adult and is the addressee or is living at the addressee's address); Wash Rev. Code § 70.155.105 (requiring anyone mailing, shipping, or delivering cigarettes to:  obtain a written statement on the first delivery to an individual certifying the recipient's age, address and understanding of relevant tobacco laws; verify this statement against a data base or obtain an approved form of photo identification; and include as a part of the shipping documents a statement that the law prohibits shipment of tobacco to anyone under eighteen and requires the payment of applicable taxes). See also the discussion above, in the Legal Background, of the differences in the state tobacco laws.

[82] At the time the FAAAA was enacted, Congress noted impermissible regulations in forty-one states. This "patchwork of regulation" included entry controls that varied from liberal to strict; price regulation that, for a carrier that wanted to change its prices, involved expensive and time-consuming procedures in each state the carrier operated; regulations on tariff filing; and regulation of the types of commodities carried.   H.R. Rep. No. 103-677, at 86-87, reprinted in 1994 *(continued on next page)*

The Attorney General argues nevertheless that Congress did not intend to preempt state regulation of the delivery of illegal products.[83]  But in broadly restricting state regulation of the transportation industry in the FAAAA, Congress necessarily limited the states' regulatory powers.[84]  States may still regulate contraband, and even the delivery of contraband, but only if the regulation does not expressly refer to or significantly affect a carrier's prices, routes or services.[85]

**(2)  *Subsection 1555-C(3)(A) and 1555-C(3)(C)***

---

U.S.C.C.A.N. at 1758-59.

[83] Def.'s Mot. for Summ. J. at 14-15.  The Contraband Cigarette Trafficking Act arguably preserves the states' rights to regulate the transportation of contraband cigarettes because, as noted above, it provides that federal regulation of contraband cigarettes does not affect the states' authority "to enact and enforce cigarette tax laws, to provide for the confiscation of cigarettes and other property seized for violation of such laws, and to provide for penalties for the violation of such laws."  18 U.S.C. § 2345(a).  But this provision preserves only state authority to enact and enforce cigarette tax laws.  The challenged provisions here relate to restricting minors' access to tobacco, not tax collection.  See Def.'s Reply Br. in Further Support of his Mot. for Summ. J. ("Def.'s Reply Br.") at 4 (Docket Item 78) ("The Maine Legislature enacted the Tobacco Delivery Act for two purposes—but the Challenged Provisions only relate to one of those purposes, keeping tobacco out of the hands of minors.").  In any event, even if the challenged provisions did relate to tax collection, the 1978 provision in the Contraband Cigarette Trafficking Act predates the Morales Court's broad interpretation of the Airline Deregulation Act preemption provision in 1992 and Congress's enlargement of that provision in the FAAAA in 1994.

[84] The Attorney General relies on Robertson v. State of Washington Liquor Control Board, in which the Court of Appeals of Washington held that the FAAAA does not preempt state laws prohibiting the transportation of cigarettes on which the taxes had not been paid and providing for the seizure of vehicles used for such transportation.  The court in Robertson determined that the Contraband Cigarette Trafficking Act "expressly preserved" Washington's authority to enforce its cigarette tax laws by seizing property used to violate those laws, and that the state laws "had no more than an 'indirect, remote, and tenuous' relationship with the deregulatory purposes of the FAAA Act."  10 P.3d 1079, 1084, 1085 (Wash. Ct. App. 2000).

Unlike Robertson, the Contraband Cigarette Trafficking Act does not apply to the issues raised in this case.  Moreover, Robertson used a different definition of "related to" than the one I use here.  Rather than adopting the express reference/forbidden significant effects definition from Morales, Robertson used a limited definition proposed by Justice Scalia for ERISA cases.  See id. at 1082-83 (citing Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 335-36 (1997) (Scalia, J. concurring)).

[85] In my earlier ruling, I considered the statement in the FAAAA's legislative history that, at the time the FAAAA was enacted, certain states, including Maine, did not impermissibly regulate carriers' prices, routes or services.  I interpreted the statement as implicit approval of these existing state statutes, some of which regulated the transportation of contraband.  See N.H. Motor I, 301 F. Supp.2d at 45-46 (citing H.R. Rep. No. 103-677, at 86, reprinted in 1994 U.S.C.C.A.N. at 1758).  In light of the plain language of the FAAAA and the holdings of UPS I and UPS II, this brief statement in the legislative history, which does not approve any specific statutes or indicate the extent of congressional research into statutes existing at the time the FAAAA was *(continued on next page)*

The other two challenged Maine provisions, 22 M.R.S.A. §§ 1555-C(3)(A) and (C), do not impose any direct obligations on carriers, and carriers face no penalties under them.  Instead, these provisions apply to tobacco retailers who ship tobacco products.[86]  Therefore, they do not meet the Morales/UPS I standard of express reference to a carrier's services.[87]

I turn then to the other component of the Morales/UPS I analysis:  do these subsections have a "forbidden significant effect" upon carriers' services?  I conclude that subsection 1555-C(3)(C) has that effect.  That subsection requires tobacco retailers to use only carriers that guarantee to provide certain services, specifically:  that the carrier will deliver the product only to the actual purchaser of the product; will require the actual purchaser to sign for the package and to be old enough to purchase tobacco legally; and will require, as a condition of delivery if that person is under twenty-seven, a valid government-issued photo identification showing legal age to purchase tobacco.[88]  The summary judgment record demonstrates that for a carrier to make those guarantees, the carrier will

---

enacted, no longer persuades me that the FAAAA does not preempt the Maine statute.

[86] The portion of the statute that contains these two provisions begins: "The following provisions apply to a tobacco retailer shipping tobacco products pursuant to a delivery sale."  22 M.R.S.A. § 1555-C(3) (preamble to both (A) and (C)).

Subsection 1555-C(3)(A) provides that "[p]rior to shipping, the tobacco retailer shall provide to the delivery service the age of the purchaser."  22 M.R.S.A. 1555-C(3)(A).  Subsection 1555-C(3)(C) requires that a

> tobacco retailer utilize a delivery service that imposes the following requirements:  (1) [t]he purchaser must be the addressee; (2) [t]he addressee must be of legal age to purchase tobacco products and must sign for the package; and [3] [i]f the addressee is under 27 years of age, the addressee must show valid government-issued identification that contains a photograph of the addressee and indicates that the addressee is of legal age to purchase tobacco products.

22 M.R.S.A. § 1555-C(3)(C).

[87] See N.H. Motor I, 301 F. Supp.2d at 43.

have to:  examine every package the carrier receives with a Maine destination address to determine if it contains tobacco products; ensure that its driver delivers only to the particular addressee (not leaving the package on the porch or with whoever answers the door or with a neighbor or in the office mailroom); and in addition determine whether the addressee is under twenty-seven, and, if so, demand valid government-issued photo identification showing legal age to purchase tobacco.[89]

The analysis is similar to that for section 1555-D.  Like that section, subsection 1555-C(3)(C) impermissibly affects carriers' services because it results in a carrier (who wishes to participate in this commerce) having to identify the contents of the package to determine whether it must impose the delivery conditions listed in the statute.[90]  Imposing these conditions on delivery causes carriers' drivers to alter their delivery practices for packages in Maine containing tobacco products, and can delay delivery of the package with tobacco products and subsequently delivered packages if the driver is unable to find the addressee to receive the package.[91]   Under UPS I, these effects are sufficient to preempt subsection 1555-C(3)(C).[92]

---

[88] 22 M.R.S.A. § 1555-C(3)(C); 10-144 Code Me. R. Ch. 203, § 10(C)(3).

[89] See Pls.' SMF, Def.'s Responsive SMF ¶¶ 23, 50, 60-67.

[90] See UPS II, 385 F.3d at 14; accord Wine & Spirits Wholesalers, 10 F. Supp.2d at 87.

[91] See Pls.' SMF, Def.'s Responsive SMF ¶¶ 42-44, 51, 58, 60-67.  Although the Attorney General admits that having to deliver to the addressee can cause various problems for the carrier, see Def.'s Responsive SMF ¶¶ 60-67, the Attorney General denies that these problems could cause delay, stating that "UPS has not studied the cost or feasibility of providing a service that restricts delivery to a particular person," id. ¶ 68.  As I noted above, see footnotes 54 and 55, the associations do not need to present an empirical study to prove the delay that could logically result from these complications.

[92] See 318 F.3d at 336.  The Attorney General responds that UPS could "charge the shipper an appropriate amount" for the extra activities.  Def.'s Opp'n at 7.  That response demonstrates the
*(continued on next page)*

Without the delivery conditions of subsection 1555-(C)(3)(C), subsection 1555-C(3)(A) has no apparent remaining purpose. It requires that a tobacco retailer tell the carrier the age of the purchaser before shipping a tobacco product.[93] This subsection results only in the carrier receiving information about the purchaser's age: the carrier does not have to do anything with this information without the requirements of subsection 1555-C(3)(C). This effect on carriers' services is not significant. I do not find subsection 1555-C(3)(A) to be preempted because it does not have a significant effect on carriers' services.[94]

---

forbidden significant effects that prompt preemption, for it represents a direct effect on price (or profitability and hence competitiveness).

Despite the Attorney General's argument that, because of dollar amounts, I should consider the effects here not sufficient to reach the "significant" level of the "forbidden significant effect" standard, I conclude that no more is required. See id. at 4, 8. Morales should not be read to require courts to assess the actual competitiveness of a particular market to determine when effects reach the level of significance. For the same reason, I reject the Attorney General's argument that UPS was required to do more empirical research or industrial engineering studies. See, e.g., id. at 4, 7, 14-16; Def.'s Mot. for Summ. J. at 5-7. There is no suggestion of such a requirement in UPS I and UPS II. Accord Witty 366 F.3d at 383 (using logic rather than data to find significant effects); see also Wolens, 513 U.S. at 226 (rejecting a distinction between matters essential and unessential to airline operations in deciding preemption); Morales, 504 U.S. at 388 (determining, "as an economic matter," that state regulation of false advertising will have a forbidden significant effect on fares, without mentioning any empirical data).

Therefore, I do not resolve the parties' disagreement over whether an additional two seconds are really necessary to examine every package coming to Maine, leading to an annual $144,000 expense, Def.'s Opp'n at 3-4; whether it is the Maine statute that has prompted a UPS business decision not to accept certain packages or whether there are no tobacco shippers currently interested in shipping directly to Maine consumers in any event, see Def.'s Mot. at 12-13; Def.'s SMF ¶¶ 87-94; the cost of dealing with packages identified as containing tobacco (UPS says two dollars per package; the State attacks the basis for the estimate), Def.'s SMF ¶ 128; and the costs of training UPS's Maine personnel to comply with the delivery requirements, Def.'s Responsive SMF ¶ 88; see Def.'s Mot. for Summ J. at 16-17.

[93] 22 M.R.S.A. § 1555-C(3)(A); see also 10-144 Code Me. R. Ch. 203, § 10(C)(1).

[94] Both the associations and the Attorney General contend that the recent Supreme Court decision in Granholm v. Heald supports their arguments. Pls.' Notice of Post-Submission Supreme Court Authority Relevant to the Parties' Cross Motions for Summary Judgment (Docket Item 90); Def.'s Notice of Recent Relevant Precedent (Docket Item 91). But Granholm does not affect the outcome in this case because the questions there are different. The Court in Granholm invalidated state regulations that restricted out-of-state wineries' direct shipments to consumers when in-state shipments were permitted. __U.S.__, Nos. 03-1116, 03-1120, 03-1274, 2005 WL 1130571, at *5 (May 16, 2005). The attack on the state regulation there was under the Commerce Clause, not the FAAAA. Moreover, the Court in Granholm focused extensively on the Twenty-First Amendment to the United States Constitution, which deals with alcohol, but not tobacco, and federal statutes *(continued on next page)*

## IV.  RELIEF

The associations request a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, declaring that subsections 1555-C(3)(A) and (C) are completely preempted and that section 1555-D is preempted as applied to motor and air/ground carriers.[95]  Aside from his merits-related arguments, the Attorney General does not respond to the associations' request for a declaratory judgment. Whether the FAAAA preempts the challenged Maine provisions presents "a case of actual controversy" under 28 U.S.C. § 2201(a) because the parties have adverse legal interests and there is a real threat of prosecution under the challenged Maine provisions.[96]  The associations are therefore entitled to the declaratory relief they request for the preempted provisions, subsection 1555-C(3)(C) and section 1555-D, but not for subsection 1555-C(3)(A), which is not preempted.

The associations also request a permanent injunction against any enforcement of subsections 1555-C(3)(A) and 1555-C(3)(C) and against enforcement of section 1555-D against motor carriers and air/ground carriers.[97] The Attorney General does not argue that injunctive relief is inappropriate.  To issue a permanent injunction, I must determine that:  (1) the plaintiffs prevail on the merits; (2) the plaintiffs would suffer irreparable injury in the absence of

---

regulating the sale of alcohol.  See id. at *11-*20 (determining, based on a detailed analysis of the Twenty-First Amendment and relevant statutes and caselaw, that the Amendment does not permit discrimination against imported liquor); id. at *22-*23 (Stevens, J., dissenting) (stating that the Twenty-First Amendment allows the state regulations because "our Constitution has placed commerce in alcoholic beverages in a special category"); id. at *24-*41 (Thomas, J., dissenting) (questioning the majority's interpretation of statutes and caselaw on the sale of alcohol).

[95] Pls.' Compl. ¶¶ 1, 2(a), (b), 46-49(b).

[96] See Pls.' SMF, Def.'s Responsive SMF ¶ 92 (Maine is enforcing the challenged provisions); 10B Charles Alan Wright, et al., Federal Practice and Procedure, § 2757, at 473, 486-87 (3d ed. 1998).

[97] Pls.' Compl. ¶¶ 1, 2(c), 49(c); Pls.' "As Applied" Mot. for Summ. J. at 23-25.

injunctive relief; (3) the harm to the plaintiffs would outweigh the harm that the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction.[98]

The associations are not entitled to injunctive relief for subsection 1555-C(3)(A) because they have not prevailed on the merits of that claim.  The associations have prevailed on the merits of their preemption claims for subsection 1555-C(3)(C) and section 1555-D of the Maine statute.  The associations' members would suffer irreparable injury without injunctive relief because the enforcement of the preempted provisions causes at least one carrier to alter its uniform delivery procedures for Maine packages and affects its business by interfering with its timely and efficient delivery of packages.[99]  There is no suggestion that any such loss could be recovered from the State.

The harm to the associations' members from enforcement of the preempted provisions would outweigh the harm to the State from imposing the requested injunction.  The injunction the associations request would enjoin enforcement of subsection 1555-C(3)(C) and enforcement of section 1555-D against motor and air/ground carriers:  the State could enforce the rest of the statute, and could still enforce section 1555-D against anyone other than motor and air/ground carriers.  Much of the statute would thus remain unaffected by enjoining enforcement of the preempted provisions.

---

[98] <u>A.W. Chesterton Co. v. Chesterton</u>, 128 F.3d 1, 5 (1st Cir. 1997).

[99] <u>See</u> <u>United Parcel Serv., Inc. v. Flores Galarza</u> ("<u>UPS</u>"), 210 F. Supp.2d 33, 44 (D.P.R. 2002); <u>see also</u> <u>UPS I</u>, 318 F.3d at 337 (affirming the district court's determination that injunctive relief was appropriate).

Finally, an injunction would not adversely affect the public interest.  As the trial court noted in <u>UPS</u>, Congress determined that the FAAAA preemption provisions serve the public interest by reducing the inefficiency, costs, inhibition of innovation and technology, and limitations on the expansion of markets caused by state regulation.[100]

The Attorney General does argue that any ruling and resulting declaratory and injunctive relief should apply only to UPS.[101]  But that limitation would be inconsistent with the congressional purpose, for it would permit one carrier to have privileges that others do not, an intrusion into the competitive marketplace.[102]  Moreover, the words of the statute are contrary: A state law is preempted if it "relate[s] to a price, route or service of *any* motor carrier," or "of *an* air carrier or carrier affiliated with a direct air carrier."[103]  I therefore will not limit the ruling or the relief to UPS.[104]

The plaintiffs shall submit a proposed injunction by June 17, 2005, after first consulting with the Attorney General's office to resolve all issues as to form and scope not resolved in this opinion.  The relief proposed shall "be no more

---

[100] <u>See</u> 210 F. Supp.2d at 44-45; H.R. Rep. No. 103-677, at 87, <u>reprinted</u> <u>in</u> 1994 U.S.C.C.A.N. at 1759; <u>see also</u> Pub. L. No. 103-305, § 601(a) (findings).

[101] Def.'s Mot. for Summ. J. at 11 n.8.

[102] <u>See</u> H.R. Rep. No. 103-677, at 82, 87, <u>reprinted</u> <u>in</u> 1994 U.S.C.C.A.N. at 1754, 1759 (the purpose behind the FAAAA preemption provisions is to uniformly regulate carriers, regardless of their corporate form, by eliminating the patchwork of state regulation and the competitive advantage air carriers enjoyed over other carriers under the Airline Deregulation Act).

[103] 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A) (emphasis added).

[104] The Attorney General has also requested briefing on "the severability issue":  whether any of the challenged Maine provisions that remain are enforceable without the preempted provisions.  Def.'s Mot. for Summ. J. at 19.  There is no need for briefing on severability in light of my separate preemption analysis for each challenged provision and the absence of any argument from the associations that the preemption of one or some of the challenged provisions affects the enforceability of the rest.

burdensome to the defendant than necessary to provide complete relief to the plaintiffs."[105]  The defendant shall file any response by June 24, 2005.

## V.  CONCLUSION

Although the Maine Tobacco Delivery Law has very worthy motives, I conclude that two provisions "relate[] to" a "service of any motor carrier" or air/ground carrier "with respect to the transportation of property," and are therefore preempted.[106]  Section 1555-D expressly references carriers, and significantly affects carriers by causing them to alter their procedures for preparing packages for delivery and for returning packages containing tobacco products.  Subsection 1555-C(3)(C) imposes conditions on tobacco shippers that inevitably impose significant effects on a carrier's delivery services: unless a carrier is willing to make the required guarantees, it is foreclosed from this part of the transportation market.  Whatever one might think of the social benefits or costs of delivering tobacco products, the effects of sections 1555-D and 1555-C(3)(C) are the types of effects that the FAAAA forbids.  The effects are not "too tenuous, remote or peripheral" to escape preemption.[107]

---

[105] UPS I, 318 F.3d at 337 (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979)).

[106] 49 U.S.C. §§ 14501(c)(1), 41713(b)(4)(A).  Each side suggests that a parade of horribles will follow from whatever ruling I make.  The Attorney General says that a ruling in favor of the associations will call into question state laws about delivery of guns, stolen property, drugs, explosives, liquor, etc.  See Def.'s Mot. for Summ. J. at 5.  The associations have said that a ruling in the Attorney General's favor will leave them subject to whatever new product becomes the next subject of state concern, for example, herbal and dietary supplements or whatever else is next on an ever-changing list of popular concern.  See Pls.' Reply Mem. in Support of Facial Mot. for Summ. J. at 3 (Docket Item 18).  The answer to both these arguments is that each case will have to be argued and resolved on its own merits.  I do note that Morales suggests that some things are too distantly related to be preempted (in that case, state laws against prostitution and gambling as they might be applied to passengers in an aircraft).  See 504 U.S. at 390.

[107] Morales, 504 U.S. at 390.  The State, through subsection 1555-C(3)(C), has essentially required carriers to provide a service that guarantees delivery only to adults, and through section 1555-D has made the carriers' service less efficient by requiring them to alter their delivery procedures to
*(continued on next page)*

31

I therefore **GRANT** the plaintiffs' motion for summary judgment and **DENY** the defendant's motion for summary judgment for section 1555-D and subsection 1555-C(3)(C) of the Maine statute because the FAAAA preempts these provisions. I **DENY** the plaintiffs' motion for summary judgment and **GRANT** the defendant's motion for summary judgment on subsection 1555-C(3)(A), which is not preempted by the FAAAA.  I **DENY** the plaintiffs' request for declaratory relief for subsection 1555-C(3)(A), but I **GRANT** the plaintiffs' request for declaratory relief for section 1555-D and subsection 1555-C(3)(C), and declare that the FAAAA preempts 22 M.R.S.A. § 1555-C(3)(C) in its entirety and preempts 22 M.R.S.A. § 1555-D as applied to motor carriers and air/ground carriers.  I will issue an injunction after the parties submit their proposed language.

      **SO ORDERED.**

      **DATED THIS 27TH DAY OF MAY, 2005**


            /s/D. Brock Hornby
            **D. BROCK HORNBY**
            **UNITED STATES DISTRICT JUDGE**

---

identify, determine if they can deliver, and potentially contact the shipper to retrieve packages containing tobacco products.  Those "service" requirements are hardly tenuous, remote or peripheral regulations.

**U.S. DISTRICT COURT**
**DISTRICT OF MAINE (BANGOR)**
**CIVIL DOCKET FOR CASE #:  1:03cv178**


| | | |
|---|---|---|
| **NEW HAMPSHIRE MOTOR TRANSPORT ASSOCIATION**<br><br>**MASSACHUSETTS MOTOR TRANSPORTATION ASSOCIATION, INC.**<br><br>**VERMONT TRUCK AND BUS ASSOCIATION, INC.**<br><br>     **Plaintiffs** | represented by | **MICHAEL A. NELSON**<br>Jensen, Baird, Gardner & Henry<br>P.O. Box 4510<br>Portland, ME 04112<br>(207) 775-7271<br>email: mnelson@jbgh.com<br><br><br>**LAWRENCE R. KATZIN**<br>**PAUL T. FRIEDMAN**<br>**RUTH N. BORENSTEIN**<br>Morrison & Foerester LLP<br>425 Market Street<br>San Francisco, CA 94105<br>(415) 268-7000<br>email: LKatzin@mofo.com<br>pfriedman@mofo.com<br>rborenstein@mofo.com |

v.

| | | |
|---|---|---|
| **G. STEVEN ROWE**, in his official capacity as Attorney General for the State of Maine<br><br>     **Defendant** | represented by | **MELISSA REYNOLDS O'DEA**<br>**PAUL D. STERN**<br>Office of the Maine Attorney General<br>State House Station 6<br>Augusta, ME 04333-0006<br>(207) 626-8800<br>email: melissa.odea@maine.gov<br>paul.d.stern@maine.gov |